Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North
Suite 225
Billings, MT 59101
Telephone:  406-403-7066
michelle.sullivan@sullivanmiller.com
adrian.miller@sullivanmiller.com

Aaron Bieber
The Law Offices of Aaron Bieber PLLC
P.O. Box 1017
Saratoga, WY 82331
Telephone: (713) 899-3893
aaron@aaronbieberlaw.com
*Admitted pro hac vice*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC, | ) ) ) ) | Cause No. CV-25-65-BLG-TJC |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S PRELIMINARY PRETRIAL STATEMENT** |
| KRAKEN OIL AND GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiff Phoenix Energy One, LLC f/k/a Phoenix Capital Group Holdings, LLC ("Phoenix"), by and through its attorneys of record, submits its preliminary pretrial statement as required by Local Rule 16.2(b)(1).

## I.    BRIEF FACTUAL OUTLINE

This case involves an undivided one-half interest in oil, gas, and hydrocarbons owned by the United States in Richland County, as more particularly described as follows:

Township 26 North, Range 59 East, MPM
Section 21: W1/2NW1/4 and NW1/4SW1/4

(the "Federal Minerals").

Kraken Oil and Gas, LLC and/or Kraken Operating, LLC (collectively, "Kraken") leased the Federal Minerals in 2018. There are three oil and gas wells producing from the Federal Minerals: The Dagney 21-28 #1H well, the Dagney 33-21 #3H well, and the Dagney 33-21 #4H well (collectively, the "Wells"). In June 2020, in litigation challenging the prior federal lease sale, Kraken's lease for the Federal Minerals was vacated. *Wildearth Guardians v. United States Bureau of Land Management*, 458 F.Supp.3d 880, 897 (D. Mont. 2020) (the "Wildearth Order")

The Dagney 21-28 #1H well was spud in December 2017 and began producing in June of 2018, prior to the Wildearth Order. On December 13, 2018, Sections 21 and 28 of Township 26 North, Range 59 East were pooled

by the Montana Board of Oil and Gas ("MBOG") on the basis of surface acreage (the "21-28 Pooling Order"). According MBOG online data, the Dagney 33-21 #3H well and the Dagney 33-21 #4H well were both spud on October 20, 2020, and both began producing on January 31, 2021. Both wells were spud after Kraken's lease was vacated for the Federal Minerals.

Approximately nine months after its previous federal lease was vacated, BLM approved a Communitization Agreement (a "CA") submitted by Kraken for BLM's approval, adding the unleased Federal Minerals to a 1280-acre spacing unit (the "2021 CA"). Section 5 of the 2021 CA required Kraken to place all the proceeds attributable to the unleased Federal Minerals into an escrow or trust account until the Federal Minerals were leased or ownership was established.

On April 8, 2021, MBOG pooled Section 21, 28, and 33 of Township 26 North, Range 59 East for the Wells on the basis of surface acreage (the "21-28-33 Pooling Order"). In its application to MBOG, Kraken represented to MBOG that it was the working interest owner covering the Federal Minerals.

Kraken requested that United States Bureau of Land Management ("BLM") enter into a Compensatory Royalty Agreement (a "CRA") for the unleased Federal Minerals in September 2021, but BLM refused. Kraken

appealed BLM's decision to the Interior Board of Land Appeals ("IBLA"). The IBLA issued a decision on September 14, 2022, finding that BLM had authority to enter into a CRA with Kraken. However, BLM and Kraken did not subsequently enter into a CRA.

Instead, Kraken entered into an Amended Communitization Agreement with BLM in June 2023 for the Dagney 21-28 #1H well (the "21-28 CA"). Kraken also entered into a new CA in June 2023 for the Dagney 33-21 #4H and Dagney 33-21 #3H wells (the "33-21 CA"). Section 5 of both the 21-28 CA and the 33-21 CA (collectively, the "2023 CAs") includes the following language, contemplating that there might be a future lessee of the Federal Minerals "Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), including drilling, completing, and equipping the well, the acquiring party(s) [lessee] shall own the working interest described in the tract, as described on Exhibit B, and shall have the rights and obligations of said working interest as to the effective date of the Federal Lease."

Section 5 of the 2023 CAs also purports to "allocate" to Kraken "the percentage of production attributable to the unleased Federal land within the communitized area" until "the effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s)," or until production ceases.

The language in Section 5 of both 2023 CAs purporting to "allocate" production to Kraken appears to be language from a CRA, even though there is no separate document establishing a CRA. Both 2023 CAs also purport to be effectively retroactively. It is unclear what happened to the revenue from the unleased Federal Minerals between June 2020 when Kraken's federal lease was vacated and June 2023 when Kraken and BLM entered into the 2023 CAs. There was a 2021 Communitization Agreement in place applicable to the Dagney 21-28 #1H well (the "2021 CA") during that time, which required Kraken to place all proceeds attributable to the Federal Minerals into an escrow or trust account until the Federal Minerals were leased or ownership was established. Upon information and belief, no such account was ever established for the Federal Minerals.

Phoenix was awarded a lease for the Federal Minerals effective as of October 1, 2024, after bidding successfully at a competitive bidding auction (the "Lease"). After Phoenix was awarded the Lease, it reached out to Kraken for an accounting to pay its proportionate share of the Wells, including drilling, completing, and equipping the Wells so that it may exercise its right to net revenue for the Federal Minerals since inception of the Wells. Kraken refused to provide an accounting for the unleased Federal Minerals prior to October 1, 2024. Phoenix is not a party to the 2023 CAs.

## II.    BASIS FOR JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves claims arising out of federal law, and it is brought pursuant to 28 U.S.C. § 2201 requesting declaratory judgment. The proper venue for this action is in the United States District Court for the District of Montana because the Wells are located within the district. 28 U.S.C. § 1391(b)(2). Further, the Wells are located in Richland County, which is part of the Billings Division under L.R. 1.2(c).

## III.    FACTUAL BASIS AND LEGAL THEORY FOR EACH CLAIM AND DEFENSE

All claims are brought under 28 U.S.C. § 2201.

### 1. COUNT I

Phoenix is not a party to the 21-28 CA or the 33-21 CA. Phoenix is not a party to any agreement with Kraken regarding the Federal Minerals. The Federal Minerals could always be developed through a lease and operated in conformity with a well-spacing program, as is evident from the fact that Kraken held a lease covering the Federal Minerals until June 2020 and Phoenix now holds the Lease covering the Federal Minerals.

According to 43 CFR § 3105.22, a CA is only authorized to be approved "when a lease or a portion thereof cannot be independently developed and operated in conformity with an established well-spacing" program. The

definition of a CA under 30 U.S.C. § 226(m) holds similarly, allowing for a CA only "[w]hen separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program." Finally, the BLM Handbook 3160-9 – Communitization in Section .1.11(B) states that communitization cannot be construed as "justification or allowing two or more lessees, working interest owners, or operators to share drilling costs and revenues." Such an agreement "can only be done by contractual agreement between interested parties without sacrificing portion of the federal royalites or splitting royalites among various leases." Section 5 of the 2023 CAs exceeds and is outside the purpose and effect of a CA. The 2023 CAs cannot allocated revenue from the unleased Federal Minerals to Kraken.

### 2. COUNT II

Section 5 of the 2023 CAs has language that mirrors language from a Compensatory Royalty Agreement, including the language purporting to allocate to Kraken the revenue attributable to the unleased Federal Minerals. The IBLA has already determined that if federal minerals are subject to a CRA, they cannot be subsequently leased in *Enron Oil and Gas Co.*, 152 IBLA 153 (2000). Similarly, federal minerals that are leased also cannot be subject to a CRA.

The BLM Handbook on Communitization holds the same: "a compensatory royalty agreement for small tracts of unleased lands may also be negotiated pursuant to 43 CFR § 3100.22 in lieu of leasing such tracts." BLM Handbook 3160-9- Communitization .1.11(H)(3). Under 43 CFR § 3162.2-2, if a well is draining federal minerals, then the BLM can either enter into a CRA or offer the minerals for lease. But it cannot do both. Both 2023 CAs violate already established law because the Federal Minerals cannot be subject to what is effectively a CRA, allocating production to Kraken, and also be leased.

### 3. COUNT III

Kraken and BLM have not entered into an actual Compensatory Royalty Agreement.  Instead, de facto CRA language was added to the 2023 CAs. The 2023 CAs did not follow the formal requirements of a CRA, even though they have language in them mirroring CRA language. Under federal law, a CRA is the only way that BLM can allocate revenue from unleased federal minerals to an operator. The BLM Handbook, for example, holds that a CRA can be negotiated pursuant to 43 CFR 3100.22 in lieu of leasing tracts.  BLM Handbook – Communitization .1.11(H)(3). A CA, on the other hand, cannot be used to address cost sharing or revenue sharing among working interest owners and lessees. *Id.* at .1.11(B). There is no federal law which allows BLM

8

to enter into some sort of de facto CRA through a CA without following the formal requirements for a CRA. Section 5 of the 2023 CAs is invalid and unlawful.

### 4. COUNT IV

The 21-28 Pooling Order and the 21-28-33 Pooling Order for the Wells orders that the lands covered are pooled and production of such Wells are allocated "on the basis of surface acreage." The 2023 CAs simply adopt the production allocation method of state pooling orders.  Section 5 of the 2023 CAs specifically states that the communitized area "shall be allocated among leaseholds comprising said area in the production that the acreage interest of each leasehold bears to the entire acreage committed to this agreement." Kraken does not have a lease covering the Federal Minerals or any interest in the Federal Minerals.

When the language in an agreement is clear and unambiguous, a court must apply the language as written. *See, e.g., Bradley v. Crow Tribe of Indians*, 2005 MT 309, ¶ 28, 329 Mont. 448, 124 P.3d 1143. The same is true for statutes and administrative orders – the plain language controls if it is clear and unambiguous.  *State v. Bloomer*, 2025 MT 93, ¶ 9, 421 Mont. 481, 568 P.3d 513.  Kraken cannot be allocated revenue for the Federal Minerals

under state pooling laws, federal communitization agreement regulations, and/or the actual language of the 2023 CAs.

## 5. COUNT V

Under section 5 of the 2023 CAs, the federal government is paid a 12.5% (1/8) royalty from production associated with the Federal Minerals. Under Kraken's interpretation of Section 5 of the 2023 CAs, the federal government gets paid a 12.5% royalty from inception of the Wells until October 1, 2024 (the effective date of the Lease).

Under the Lease, the federal government gets paid a 1/6 (16.67%) royalty. According to Phoenix's interpretation of Section 5, which follows federal law, the federal government gets paid a 1/6 royalty from inception of the Wells forward.

30 U.S.C. § 226(m) requires that a communitization agreement be "in the public interest." Kraken's interpretation of the 2023 CAs, where the federal government gets less royalty, is not in the public interest. Additionally, although BLM and Kraken did not enter into a CRA, the language in Section 5 of the 2023 CAs contains CRA language. According to 30 U.S.C. 226(j), a CRA requires: (1) that the Secretary of Interior determine that federal lands are being drained by wells on adjacent lands, (2) BLM negotiate agreements with the lessees of adjacent lands to compensate the

federal government for drainage of the federal minerals, and (3) if the federally owned lands that are being drained are subject to a lease, such agreements must be made with he consent of the lessees." None of these requirements were followed by BLM.

## 6. COUNT VI

Count VI is asserted in the alternative if the Court finds that Section 5 of the 2023 CAs is valid and lawful. The 21-28 CA and the 33-21 CA were not entered into until June 2023. However, the 21-28 CA has language purporting to make it effective as of June 1, 2018, and the 33-21 CA has language purporting to make it effective as of January 11, 2021. The 2023 CAs affect the rights of Phoenix, who has an interest in the production and royalties from the Wells and Federal Minerals.

A necessary party to a CA includes any party who has an interest in the production or royalites from the communitized formation. 43 C.F.R. § 3105.23. A CA must be signed by all necessary parties and must be filed prior to the expiration of the federal lease involved to confer the benefits of the agreement upon such lease. *Id.* Parties whose rights are affected by an agreement are indispensable parties to the agreement. *See, e.g., Whelan v. Placid Oil Co.*, 198 F.2d 39 (5th Cir. 1952) (all mineral owners who joined in the unitization agreement had an interest in all the unitized lands and were

necessary and indispensable parties). If there is a new lease, then a CA may not be effective prior to the date of the lease issuance. *Lee Oil Properties, Inc.*, 85 IBLA 291, at FN. 4 (March 13, 1985). A CA may be made retroactive and effective to first production only if all parties agree, including the new lessee. *Id.*

Phoenix is the new lessee of the Federal Minerals. It is not a party to the 2023 CAs and it has not agreed to the retroactive language in those CAs. Accordingly, the retroactive language in the CAs in invalid under federal law. Further, the 2023 CAs are not effective as to Phoenix's interest unless or until it executes those CAs.

## 7. COUNT VII

Count VII is asserted in the alternative if the Court finds that the 2023 CAs is lawful and valid, and, specifically, if it finds that Section 5 of the 2023 CAs is lawful and valid. Section 5 of the 2023 CAs states that in order for Phoenix to exercise its "rights and obligations" under the Lease, Phoenix must pay its proportionate cost of "drilling," "completing" and "equipping" the Wells, including all costs from the Wells' inceptions, being the spud dates until present. Since Phoenix is required to pay its proportionate share of costs of the Wells from inception until present as a condition precedent to receiving

revenue under the Lease, it is also entitled to its proportionate share of revenue for the Federal Minerals under the lease from inception.

In the alternate, the language in Section 5 of the 2023 CAs is ambiguous. Either Kraken and/or the BLM drafted Section 5 of the 2023 CAs, and the ambiguity must be interpreted against them. Whether an ambiguity exists in a contract is a question of law. *Corporate Air v. Edwards Jet Center*, 2008 MT 283, ¶ 31, 345 Mont. 336, 190 P.3d 1111. An ambiguity exists if language is "susceptible to at least two reasonable but conflicting meanings." *Id.* "An ambiguity in a contract is generally construed against the drafter." *Id.* at ¶ 32. Phoenix had no part in drafting the 2023 CAs. If the Court finds that Phoenix is subject to the CAs, then the ambiguities in Section 5 must be interpreted against Kraken and/or BLM.

## IV.    COMPUTATION OF DAMAGES

Phoenix is asking the Court to determine who is entitled to royalties from the Federal Minerals from inception of the Wells forward. Phoenix does not know where those royalties have been deposited. For example, Phoenix does not know whether Kraken appropriately deposited those royalties into a trust or escrow account as required by the 2021 CA or whether Kraken simply kept the royalties. Pheonix also does not have any accounting for the Federal

Minerals from inception of the Wells until the date of the Lease because Kraken has refused to provide that accounting.

Phoenix requests that the Court find that once Phoenix pays its proportionate share of costs, including drilling, completing, and equipping the Wells, that Phoenix is entitled to its proportionate share of revenue from the Wells from inception forward. Once Phoenix obtains the appropriate accounting in discovery, it can calculate those numbers – what it owes for its proportionate share of costs and what it is owed for royalties.

## V.    PENDING RELATED LITIGATION.

None.

## VI.    ADDITIONAL PROPOSED STIPULATIONS OF FACT AND APPLICABLE LAW.

The applicable law is set forth in Section III above.

## VII.    PROPOSED DEADLINES FOR JOINING PARTIES OR AMENDING PLEADINGS.

Phoenix agrees to the dates set forth in the Joint Discovery Plan.

## VIII. CONTROLLING ISSUES OF LAW SUITABLE FOR PRETRIAL DISPOSITION.

None.

## IX.    INDIVIDUALS WITH KNOWLEDGE OF THE FACTS

| Name | Knowledge | City | State |
|---|---|---|---|
| Justin Arn | Chief Land and Title Officer, Phoenix. Justin oversees acquisitions of federal leases, including the Lease in question. He is knowledgeable about bidding on federal leases and Phoenix's interactions with Kraken after the lease acquisition. | Dallas | TX |
| Cristi Veitenheimer | Revenue Accounting Specialist, Phoenix. Cristi assists with acquisition of federal leases, including the one in question. She is knowledgeable about bidding on federal leases and Phoenix's interactions with Kraken after the lease acquisition. | Dallas | TX |
| Adam Mohamad | Finance Manager, Phoenix. Adam interacted with Kraken personnel regarding revenues held in suspense in the Wells and the CAs applicable to the Wells | Irvine | CA |
| Justine Payne | Landman, Kraken. Mr. Payne interacted with Phoenix personal via email regarding Kraken's position on the CAs and how Kraken was treating the federal mineral revenue. | | MT? |
| Stephanie Haydel | Division Order Analyst, Kraken. Ms. Haydel had brief interactions with Phoenix via email regarding Phoenix's inquiries about revenue from the Wells. | Houston | TX |
| Samantha Iron Shirt | BLM Fluid Minerals Adjudication Section Chief. Ms. Iron Shirt corresponded via email with Phoenix about the federal minerals and Wells. Ms. Iron Shirt had an approximately one-hour conversation with Phoenix's counsel, Mr. Bieber, regarding inquiries about the CAs for the Wells. Ms. Iron Shirt may have further information about creation of the CA's and BLM's acceptance of the language inserted in Section 5 of the CAs, as well as BLM's policies regarding participation in Wells and statutory risk penalties. | Billings | MT |

| Leanne Waterman | BLM employee who processes CAs for BLM's Montana office. Ms. Waterman had a phone call and email correspondence with Phoenix's counsel, Mr. Bieber, about the CAs for the Wells. | Miles City | MT |

All employees, owners, contractors, and agents of Kraken who were involved in the subject matter of this litigation and who are named by Kraken and/or BLM. All employees of BLM who were involved in the subject matter of this litigation and who are named by Kraken and/or BLM.

## X.    THIRD-PARTY INSURANCE AGREEMENTS.

Not applicable.

## XI.    THE STATUS OF SETTLEMENT DISCUSSIONS AND PROSPECTS FOR COMPROMISE.

The parties have not yet engaged in settlement discussions. Phoenix believes that such discussions are unlikely to occur before discovery has been conducted. There may be a chance at settlement discussions once the underlying facts are fully known.

## XII.   SUITABILITY OF SPECIAL PROCEDURES

As shown in the Joint Discovery Plan submitted by the parties, the parties believe that this case will be determined on summary judgment. Accordingly, the parties have requested that the Court set a case schedule with deadlines for summary judgment briefing and without a trial date or pretrial deadlines.

If the case is not decided on summary judgment, then the parties will request a trial date and additional pretrial deadlines.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone (406) 403-7066
adrian.milller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Aaron Bieber
The Law Offices of Aaron Bieber PLLC
P.O. Box 1017
Saratoga, WY 82331
Phone: (713) 899-3893
Email: aaron@aaronbieberlaw.com

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2025, the foregoing was served by the

Clerk of the U.S. District Court of Montana, Billings Division, through the Court's

CM/ECF system, which sent a notice of electronic filing to all counsel of record.

s/ Adrian A. Miller
Adrian A. Miller
