# EXHIBIT A

Brianne C. McClafferty
Holland & Hart LLP
401 North 31st Street, Suite 1200
P.O. Box 639
Billings, Montana 59103-0639
Telephone: 406.252.2166
Fax: 406.252.1669
*bcmcclafferty@hollandhart.com*

Matthew J. Salzman, *pro hac vice*
Holland & Hart LLP
2811 W. 66th Terrace
Mission Hills, KS 66208
Telephone: 913.558.1221
*mjsalzman@hollandhart.com*

Utsarga Bhattarai, *pro hac vice*
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80202-3921
Telephone: 303.295.8168
*ubhattarai@hollandhart.com*

Attorneys for Defendants
Kraken Oil & Gas, LLC, and
Kraken Operating, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC <br><br> Plaintiff, <br><br> KRAKEN OIL & GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | Cause No. CV-25-65-BLG-TJC <br><br> **AFFIDAVIT OF ANDREW MCGHEE IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS** |

State of Texas      )
                ) ss.
Harris County     )

I, Andrew McGhee, being duly sworn, hereby state under penalty of perjury that:

1.     I am currently Vice President of Business Development for Kraken Oil & Gas LLC. I have a Bachelor of Science in Agricultural Economics from Texas A&M University. I have been working in the oil and gas industry for over 14 years, since 2011. During that time, I have been involved with regulatory, lands, and commercial operations, including for oil and gas operations in Montana. I have extensive experience with Kraken's efforts to develop federal, state, and private minerals, including experience with Communitization Agreements ("CA") both in Montana and in other states.

2.     I was hired by Kraken as Landman in 2014 and remained in that position until 2016, where I was responsible for negotiating oil and gas leases, surface agreements, and assignments. I also supervised brokers in conducting due diligence on title and reviewed well ownership and their division of interest. Finally, I provided testimony to regulatory bodies on a variety of oil and gas topics. Between 2016-2020, I was promoted to the Land Manager where I managed and oversaw the Land and Division Order departments. In this role, I coordinated and assisted the operations team to meet drilling timelines, worked with other working interest

2

owners, landowners, and local, state, and federal regulatory agencies, supervised brokers in leasing, title, and due diligence activities, and managed and coordinate regulatory, title and curative issues with title attorneys. In 2020, I became the Vice President of Business Development and still currently hold that title. As VP of Business Development, I manage all of Kraken's acquisitions and divestitures of company assets as well as all non-operated positions.

3.      In my roles as a Landman, Land Manager, and VP of Business Development, I have gained an understanding of the life cycle of oil and gas development, including the work necessary to find and then drill for oil and gas, the federal and state permitting process, and the capital investment required to accomplish every task necessary to successfully drill a modern horizontal well.

4.      I have personal experience with Kraken's efforts to develop the federal minerals at issue in this dispute, Kraken's communications with BLM after Kraken's lease was vacated, and the investment Kraken made in planning and drilling the Dagney #1H 21-28 and Dagney 33-21 #3H and Dagney 33-21 #4H wells.

5.      As a general matter, the process of producing oil and gas from federal lands is complex, involving geologic work to determine the prospectivity of an area, acquiring state and federal permits, and significant work to successfully drill down to target formation(s). This process takes years and many millions of dollars of up-front investment all in reliance on an uncertain future payout. In order to make this

3

investment, developers rely on certainty as to the specifics of their ownership position in the lands being developed. Oil and gas developers, like Kraken, generally do not invest in projects where their ownership position, and their share of eventual revenues, is uncertain or undefined.

6.     Throughout the western United States (including in Montana), it is common to have federal mineral interests adjacent to private and state mineral interests. Because the state regulators have no jurisdiction over federal mineral interests, the federal government will often agree to "pool" the federal minerals with other minerals in a State-approved spacing unit by entering a communitization agreement or "CA." This pooling allows for the most efficient development of large areas as a unit, instead of unnecessary duplicating costs. I have never been involved in a situation where BLM refused to execute a CA following a state's pooling order.

7.     Specific to the Dagney #1H, #3H, and #4H wells, Kraken relied on the validity of Federal CA MTM111087, as amended (the "Amended CA") and Federal CA, MTM112222 (the "New CA") it entered into with BLM. Kraken covered the costs of development for the federal minerals expecting that the CAs would be honored, and it would be compensated according to their terms. Additionally, Kraken believed that the BLM's decision to issue the CAs was a final decision that could not be challenged by a new lessee of the federally owned 50% undivided interest in the minerals.

4

8.      The Amended CA for Dagney #1H and the New CA for Dagney #3H and #4H are both retroactively effective back to the date of first production. This is common for CAs because state regulators typically require a producing well before they will pool the subsurface mineral interests, and BLM typically will not agree to pool federal minerals until after a state has pooled the other interests in a spacing unit. Thus, by the time the CA is approved, generally a well will have already been drilled, and already be producing hydrocarbons associated with the federal minerals. This was the case here, as the Dagney #1H well was completed in June 2018, but the CAs were not approved until later, requiring them to be retroactively effective so that Kraken could properly account for all of the production.

9.      Kraken's reliance on the validity of the CAs is demonstrated by its investment of millions into drilling the Dagney #1H, #3H, and #4H wells. Kraken had other potential projects waiting to be developed, and Kraken could have deployed the monies invested in the Dagney #1H, #3H, and #4H wells elsewhere if it had known its rights under the CAs would be challenged well after its investment had already been made.

10.      In my experience, rather than electing to participate in wells, BLM always elects to be a non-participating, non-cost-bearing royalty interest owner. Generally speaking, participation in an oil and gas well allows all the participating interest owners to contribute to the cost (and share the risks) of drilling the well. If

5

the proceeds from the well fail to exceed the costs of drilling, all the participating owners lose money. Only if the participating owners' proportionate share of the proceeds exceed the costs, will the participating owners receive a return on their investment.

11.　I understand that Phoenix's position in this dispute is that it has the right to retroactively participate in the Dagney #1H, #3H, and #4H wells, back to their inception. Kraken assumed the portion of the risk for these wells associated with the federal minerals at issue and paid all of the costs. Phoenix's demand to retroactively participate in and profit from the Dagney wells would allow it profit after-the-fact, without taking on any of the risks associated with participating and paying for the costs before the wells were already producing oil and gas and generating a return.

DATED:　December 12, 2025.

_____<br>Andrew McGhee

This record was signed and sworn to before me on _December 12th_, 2025, by _Andrew David McGhee_.



HANS MONROY
Notary ID #134924484
My Commission Expires
May 30, 2028

(Signature of notarial officer)
[Affix seal/stamp as close to signature as possible]

36460629_v2