# EXHIBIT L

Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North
Suite 225
Billings, MT 59101
Telephone:  406-403-7066
michelle.sullivan@sullivanmiller.com
adrian.miller@sullivanmiller.com

Aaron Bieber
The Law Offices of Aaron Bieber PLLC
P.O. Box 1017
Saratoga, WY 82331
Telephone: (713) 899-3893
aaron@aaronbieberlaw.com
*Admitted pro hac vice*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC, | ) ) ) ) | Cause No. CV-25-65-BLG-TJC |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S RESPONSES TO KRAKEN'S FIRST SET OF INTERROGATORIES** |
| KRAKEN OIL AND GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | | |

Plaintiff Phoenix Energy One, LLC f/k/a Phoenix Capital Group Holdings, LLC ("Phoenix"), by and through its attorneys of record, answers and responds to Defendant Kraken Oil and Gas, LLC's ("Kraken") First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

1.      Because discovery is ongoing, Phoenix reserves the right to revise, correct, supplement, and clarify any of its answers and responses.

2.      Phoenix reserves the right to file a motion for a protective order at a later date if it deems it to be necessary.

3.      Counsel for Phoenix invites discussion with counsel for Kraken with respect to these responses and Phoenix's objections thereto with the expectation that discussion between counsel may eliminate or modify objections, reduce burdens on the parties, or otherwise result in a mutually satisfactory resolution of the objections contained herein.

## NON-WAIVER

Phoenix does not waive and intends to preserve the following:

1.      All questions as to competency, relevancy, materiality, privilege and admissibility thereof as evidence for any purpose in any subsequent proceeding including, but not limited to, the trial of this or any other action;

2

2.      The right to object on any ground and at any time to a demand for a further response to Kraken's First Set of Interrogatories to Phoenix, or other discovery, involving or relating to the subject matter of said requests;

3.      The right at any time and for any reason to revise, correct, supplement or clarify any of the following objections or responses.

4.      The right to object to the number of interrogatories based upon the limit set by Fed. R. Civ. P. 33.

## INTERROGATORIES

**Interrogatory No. 1:**   Identify each person Phoenix believes may have knowledge or documents related to any of the facts involved in this case and specify the knowledge or documents each person may have. (Among other things, this Answer should include identifying each person involved in any due diligence Phoenix did relating to bidding in the Lease Sale, each person involved in deciding whether and how much to bid on leases in the Lease Sale, and Phoenix's policies, practices, and procedures concerning acquisition of interests).

**Answer:**

| Name | Subject |
|---|---|
| Justin Arn | Chief Land and Title Officer, Phoenix. Justin oversees acquisitions of federal leases, including the Lease in question. He is knowledgeable about bidding on federal leases in general and Phoenix's interactions with Kraken after the lease acquisition.  Justin Arn was primarily responsible for determining whether to |

3

| | participate in the Lease Sale, how much to bid in the Lease Sale, and for due diligence on the Wells at issue in this litigation. |
|---|---|
| Cristi Veitenheimer | Revenue Accounting Specialist, Phoenix. Cristi assists with acquisition of federal leases, including the one in question. She is knowledgeable about bidding on federal leases and Phoenix's interactions with Kraken after the lease acquisition. |
| Adam Mohamad | Finance Manager, Phoenix. Adam interacted with Kraken personnel regarding revenues held in suspense in the Wells and the CAs applicable to the Wells. |
| Curtis Allen | CFO, Phoenix. Curtis may have had communications with Justin Arn when Justin was deciding whether to bid on the Lease Sale and how much to bid. Curtis may have also had conversations with Justin Arn about the Lease once Phoenix was awarded the winning bid. |
| Nathan Burget | VP of Land, Phoenix. Nathan may have had conversations with Justin Arn or may have reached out to BLM or Kraken after the lease was awarded. His role would have been minimal. |

**Interrogatory No. 2:** Identify each material oral communication Phoenix has had with another party or nonparty (excluding privileged communications with counsel) related to one or more of the Complaint allegations, including the allegations related to the Original CA, the Amended CA, the New CA, the Lease Sale, the Phoenix Lease, or when Phoenix may be entitled to receive revenue or obligated to pay cost of production, and the production, expenses, or revenues attributable to the Dagney Wells. ("Material" in this interrogatory means a communication upon which a party could rely to prove, disprove, or clarify – such

4

as determining the timing of who may have been involved in – an allegation in the Complaint).

**Answer:**   Phoenix objects to this interrogatory because it is compound and overly broad. The interrogatory includes multiple different questions and subsets of questions in one request. Without waiving this objection, Phoenix does not keep a log or remember every single oral conversation that a representative of Phoenix may have had, either internally or externally, regarding all the identified subjects. However, Phoenix does recall the following oral communications:

1. Phone conference between Aaron Bieber, counsel for Phoenix, and Leanne Waterman in Miles City Field office for the Bureau of Land Management on or about January 14, 2025. Mr. Bieber and Ms. Waterman discussed the CAs, whether the BLM kept a file containing additional information pertaining to the CAs, and whether the BLM had a compensatory royalty agreement covering the undivided fifty percent [50.0%] oil and gas interests of the United States of America in the W/2NW/4 and NW/4SW/4 of Section 21, Township 26 North, Range 59 East, MPM, being ULA MTM 112185.

2. Phone conference between Aaron Bieber, counsel for Phoenix, and Samantha Iron Shirt, Acting Supervisor Petroleum Engineer – North Central Montana District – Division of Oil & Gas and Fluid Minerals Adjudication Section Chief, Montana/Dakotas State Office on or about January 30, 2025.  Mr.

Bieber and Ms. Iron Shirt discussed Section 5 of the CAs and Amended CAs, the funds related to the undivided fifty percent [50.0%] oil and gas interests of the United States of America in the W/2NW/4 and NW/4SW/4 of Section 21, Township 26 North, Range 59 East, MPM, whether there was a compensatory royalty agreement covering said lands, and the status of funds related to the same. Ms. Iron Shirt indicated she was to conduct an investigation into such matters along with counsel for BLM and follow up with Mr. Bieber. Ms. Iron Shirt did follow up to a limited extent in email correspondence.

3. The individuals identified in Answer to Interrogatory No. 1 above had discussions with each other about the auction itself, including what to bid based upon the online production data for the wells at issue and their understanding that Phoenix would be entitled to revenue once it paid its share of costs.  They also had numerous conversations with each other once they came to understand that Kraken was not going to give Phoenix the requisite accounting information for Phoenix to pay its share of costs and that Kraken was going to keep the corresponding revenue. These individuals do not remember specific dates or conversations; they only remember general topics.

**Interrogatory No. 3:**  Explain why Phoenix filed its Complaint on May 15, 2025, rather than before or after that date.

**Answer:**  Phoenix spent several months engaging in conversations with BLM starting in January 2025. In those conversations, Phoenix was attempting to understand BLM's position regarding interpretation of the CAs at issue in this litigation, whether there were separate CRAs covering the federal minerals, and about BLM's general practices regarding unleased federal minerals. The last response to those emailed questions was from Samantha Iron Shirt in March 2025. Phoenix realized that BLM was not going to take any specific position on interpretation of the CAs by the end of March 2025. Without waiving attorney-client privileged information, including but not limited to communications, Phoenix filed its Complaint as soon as feasible thereafter given the necessity of legal research and fact gathering.

**Interrogatory No. 4:**  Does Phoenix contend that BLM or any lessor can lease minerals free and clear of any existing encumbrances on those minerals to which BLM or said lessor previously agreed? If so, state and explain Phoenix's basis and all facts, and identify all persons with knowledge and all documents, related to Phoenix's contention.

**Answer:**  Phoenix objects to the interrogatory as outside the scope of discovery and not reasonably calculated to lead to the discovery of admissible

7

evidence. Phoenix further objects to the interrogatory because it calls for a legal conclusion. Without waiving these objections, Phoenix does not know what Kraken means by an "encumbrance." To the extent that Kraken is implying that a CA constitutes an encumbrance upon federal minerals, Phoenix disagrees with that interpretation.

**Interrogatory No. 5:**  State and explain the basis for Phoenix's contention in paragraph 104 of the Complaint that Phoenix is or "was a necessary party to Section 5 of the 2023 CAs and that Section 5 is, accordingly, unlawful and invalid," including all facts, and identify all persons with knowledge and all documents, related to Phoenix's contention.

**Answer:**  Phoenix objects to the interrogatory as calling for a legal conclusion. Determining whether Phoenix is or was a "necessary party" is a legal question. Without waiving this objection, Phoenix notes that paragraphs 97 through 99 of the Complaint include the basis for the legal claim in paragraph 104 of the Complaint, including the fact that Phoenix has not consented to the 2023 CAs and is not a party to them. The documents at issue are the 2023 CAs themselves, which show that Phoenix is not a party, and the lack of any documentation showing that Phoenix consented to the CAs. Phoenix also identifies BLM's MS-3160-9 Communitization Manual.

8

**Interrogatory No. 6:** State all facts and identify all persons with knowledge and all documents related to Phoenix's contention in paragraph 31 of the Complaint that "the language in Section 5 of both 2023 CAs purporting to 'allocate' production to Kraken appears to be language from a CRA even though there is no separate document establishing a CRA."

**Answer:** Phoenix objects to the interrogatory as calling for a legal conclusion. Without waiving this objection, all parties agree that there is no separate CRA; Kraken has admitted as much in its Answer to the Complaint. The BLM's Model Form for Compensatory Royalty Agreement can be found at Illustration 10 (Rel. No. 3-352) of BLM's MS-3160-Drainage Protection Manual. The Model Form of Federal Communitization Agreement can be found at Appendix 1, Page 5 of BLM's MS-3160-9 Communitization Manual.

Notably, Section 5 of the Model Form of Federal Communization Agreement includes standard CA language in it, which requires all communitized substances to be allocated "among the leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears" to the entire acreage. Section 5 of the Model Form further requires that all proceeds attributable to unleased federal minerals be placed in an interest earning escrow account. In short, a CA does not allow for an operator to be allocated revenues from unleased federal minerals; it requires the exact opposite – that all revenues from unleased federal

9

minerals be placed in an escrow account. The Model Form for Compensatory Royalty Agreement, on the other hand, does allow for an operator to be allocated revenue from unleased federal minerals. Accordingly, the language in section 5 of the 2023 CAs purporting to allocate revenue from the federal minerals to Kraken is not language from a CA; it is language from a CRA.

**Interrogatory No. 7:**  State all facts, and identify all persons with knowledge and all documents, related to Phoenix's contention in paragraph 32 of the Complaint that "Kraken inserted Section 5 language in both 2023 CAs in an attempt to mirror a CRA and create the same effect as a CRA."

**Answer:**  Phoenix objects to the request to the extent it calls for a legal conclusion. Without waiving this objection, please see Answer to Interrogatory No. 8. The standard language in BLM communitization agreements does not include language allocating revenue from unleased federal mineral interests to operators. That is not the purpose of a CA, and it is unlawful under the applicable regulations and statutes. The standard language in BLM compensatory royalty agreements, however, does allocate revenue of unleased federal mineral interests to operators. Accordingly, the language in Section 5 of both 2023 CAs mirrors a CRA and creates the same effect as a CRA. Since Kraken is the operator who applied for the CAs and is the only entity that benefits from the amended language in Section 5 of both 2023 CAs, Phoenix assumed that the specific language allocating revenue to

Kraken was drafted and/or proposed by Kraken. However, discovery is ongoing, and Phoenix will amend this answer as necessary.

**Interrogatory No. 8:**  State and explain the basis for Phoenix's contention in paragraph 40 of the Complaint that Phoenix has "rights to net revenue for the Federal Minerals since inception," including all facts, and identify all persons with knowledge and all documents, related to Phoenix's contention.

**Answer:**  Phoenix objects to the request as calling for a legal conclusion. The question as to whether Phoenix is entitled to net revenue for the Federal Minerals since inception is the main legal question in this case. Without waiving that objection, Phoenix identifies the language in Section 5 of the 2023 CAs (as defined by the Complaint) which states, "Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), <u>including drilling, completing and equipping the well,</u> the acquiring party(s) shall own the working interest" and "shall have the rights and obligations of said working interest as to the effective date of the Federal lease." (emphasis added). Phoenix also identifies the language in the Notice of Competitive Lease Sale dated May 21, 2024 (attached as Exhibit 2 to Kraken's First Requests for Admission), which identifies the parcel at issue in this litigation and states, "The <u>successful bidder</u> should contact the CA operator to determine their rights under the CA. The CA operator may require the successful bidder to pay a proportionate cost of the well, <u>including drilling, completing,</u>

11

<u>equipping, and operating the well</u> as a condition of participating in the CA." *See* Kraken_000093 (emphasis added). Notably, that requirement did not notify any <u>potential</u> bidder to contact the operator or notify a potential bidder that the CA was anything other than a standard BLM CA, which does not and cannot allocate revenue from unleased minerals to an operator.

The First, Second, Third, and Fourth Parcel List from BLM (attached as Exhibits 3-6 to Kraken's First Set of Requests for Admission) contains the exact same language, notifying a <u>successful bidder</u> to contact the operator about a CA, notifying a successful bidder that it may have to pay its shares of costs since inception of the wells to participate, and failing to include any notification that the CA at issue was not a standard CA. Paying costs from drilling forward entitles Phoenix to its share of revenue from drilling forward.

Phoenix also identifies BLM's MS-3160-9 Communitization Manual and BLM's MS-3160-Drainage Protection Manual. Both manuals explain the difference between CAs and CRAs, including what is permissive to include in a CA and what must, instead, be included in a CRA. Again, a CA cannot allocate revenue of unleased federal minerals to an operator. And as expressly noted in the Model Compensatory Royalty Agreement and throughout MS-3160, if a CRA is in place, then the minerals cannot be subsequently leased.  If Phoenix is not entitled to its proportionate share of revenue from inception of the wells forward, then

Section 5 of the 2023 CAs is effectively a CRA. If that is the correct interpretation,

than it was unlawful for the federal minerals to be leased.

Dated this 30th day of October, 2025.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone (406) 403-7066
adrian.milller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Aaron Bieber
The Law Offices of Aaron Bieber PLLC
P.O. Box 1017
Saratoga, WY 82331
Phone: (713) 899-3893
Email: aaron@aaronbieberlaw.com

*Counsel for Plaintiff*

13

## VERIFICATION

I, Justin Arn, state that I have read the foregoing Responses to Kraken's First Set of Interrogatories and know the contents thereof. I certify that I am duly authorized to make this verification on behalf of Phoenix Energy One, LLC, and that the facts set forth in the foregoing, so far as they are made of my own knowledge, and so far as they have been made upon information derived from others, I am informed and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing in true and correct.  Executed on this _____ day of October, 2025.

_____
Justin Arn, Chief Land and Title Officer

14

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2025, the foregoing was served on all counsel of record via email.

s/ Adrian A. Miller
Adrian A. Miller
