Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North
Suite 225
Billings, MT 59101
Telephone:  406-403-7066
michelle.sullivan@sullivanmiller.com
adrian.miller@sullivanmiller.com


*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> KRAKEN OIL AND GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Cause No. CV-25-65-BLG-TJC <br><br><br> **PLAINTIFF'S RESPONSE TO DEFENDANT BLM'S MOTION TO DISMISS** |

Plaintiff Phoenix Energy One, LLC f/k/a Phoenix Capital Group Holdings, LLC ("Phoenix"), by and through its attorneys of record, responds to Defendant United States Bureau of Land Management's ("BLM") Motion to Dismiss as follows:

## FACTS

This case involves an undivided one-half of the associated oil, gas, and hydrocarbons in certain lands in Richland County, Montana, more particularly described as follows (the "Lands"):

> Township 26 North, Range 59 East, MPM
> Section 21: W1/2NW1/4 and NW1/4SW1/4

Compl., ¶ 7. The surface estate is privately owned, and the United States owns an undivided one-half of the oil, gas, and associated hydrocarbons in the Lands (the "Federal Minerals"). *Id.* at ¶ 8. Defendant Kraken Oil and Gas, LLC ("Kraken Oil") and/or Kraken Operating, LLC ("Kraken Operating")[1] leased the other undivided one half of the oil, gas, and associated hydrocarbons from their private owner(s). *Id.* at ¶ 9.

Kraken Oil leased the Federal Minerals in 2018. *Id.* at ¶ 10. There are three oil and gas wells producing from the Lands: the Dagney 21-28 #1H well, the Dagney 33-21 #3H well, and the Dagney 33-21 #4H well (collectively, the "Wells"). *Id.* ¶ 11. In June 2020, Kraken's federal lease was vacated in *Wildearth Guardians v. United States Bureau of Land Management*, 457 F.Supp.3d 880 (D. Mont. 2020). *Id.* at ¶ 14.

---

[1] Collectively, both Kraken entities are referred to as "Kraken" herein.

Approximately nine months after its previous federal lease was vacated, BLM approved a Communitization Agreement (a "CA"), adding the unleased Federal Minerals to a 1280-acre spacing unite (the "2021 CA"). Compl., ¶ 17. Section 5 of the 2021 CA required Kraken Oil to place all the proceeds attributable to the unleased Federal Minerals into an escrow account or trust account until the Federal Minerals were leased or ownership was established. *Id.* at ¶ 18.

On September 21, 2021, Kraken requested that BLM enter into a Compensatory Royalty Agreement (a "CRA") for the unleased Federal Minerals. *Id.* at ¶ 23. BLM refused. *Id.* Kraken Oil appealed BLM's refusal to the Interior Board of Land Appeals (the "IBLA") of the United States Department of the Interior. *Id.* at ¶ 24. The IBLA issued a decision on September 14, 2022, finding that BLM had authority to enter into a CRA in that instance and remanding to BLM for further consideration of Kraken's request for a CRA (the "2022 IBLA Decision"). *Id.* at ¶ 25. The IBLA offered "no opinion on whether BLM must, or should, grant the CRA." *Id.*

BLM and Kraken did not subsequently enter into a CRA. *Id.* at ¶ 26. Instead, Kraken Operating entered into an Amended Communization Agreement with BLM in June 2023 for the Dagney 21-28 #1H well (the "21-28 CA"). *Id.* at ¶ 27. Kraken Oil and BLM also executed a new CA in June 2023 for the Dagney 33-21 #4H and Dagney 33-21 #4H wells (the "33-21 CA"). *Id.* at ¶ 29. Section 5 of both the 21-28

CA and the 33-21 CA requires a future lessee of the Federal Minerals to pay its proportionate share of costs of the Wells, including drilling, completing and equipping the Wells, as a condition precedent to exercise its rights and obligations under a federal lease covering the Federal Minerals. *Id.* at ¶ 29.

Section 5 of both the 21-28 CA and the 33-21 CA (collectively, the "2023 CAs") also purports to "allocate" to the operator (Kraken Oil or Kraken Operating) "the percentage of production attributable to the unleased Federal land within the communitized area" until "the effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s)," or until production ceases, or the CA is terminated. *Id.* at ¶ 30. The language in Section 5 of both 2023 CAs purporting to "allocate" production to Kraken appears to be language from a CRA even though there is no separate document establishing a CRA.

The 2023 CAs purport to be effective retroactively. *Id.* at ¶ 33. Even though they were both executed in June 2023, the 21-28 states that it is effective as of June 1, 2018, and the 33-21 CA purports to be effective as of January 11, 2021. *Id.* It is unclear what happened to the revenue from the unleased Federal Minerals between June 2020 when Kraken's federal lease was vacated and June 2023 when Kraken and BLM entered into the 2023 CAs. *Id.* at ¶ 34. The only agreement between BLM and Kraken covering those three years was the 2021 CA, applicable only to the Dagney 21-28 #1H well. *Id.* at ¶ 35. The 2021 CA required Kraken to place all

proceeds attributable to the unleased Federal Minerals into an escrow or trust account until the Federal Minerals were leased or ownership was established. *Id.*

Phoenix was awarded a lease for the Federal Minerals effective as of October 1, 2024, after bidding successfully at a competitive bidding auction (the "Lease"). Compl., ¶ 39. After Phoenix was awarded the Lease, it reached out to Kraken in an effort to pay its proportionate share of the Wells, including drilling, completing, and equipping the Wells so that it may exercise its rights to net revenue for the Federal Minerals since inception. *Id.* at ¶ 40. Kraken refused to provide an accounting for the unleased Federal Minerals prior to October 1, 2024. *Id.* at ¶ 41.

Despite clear language in the 2023 CAs that Phoenix is responsible to pay its proportionate share of the Wells, including drilling, completing, and equipping the Wells, Kraken has taken the stance that it is entitled to all revenues for the unleased Federal Minerals until the effective date of the Lease. *Id.* at ¶ 42. According to the language in Section 5 of the 2023 CAs, it is a condition precedent for Phoenix to pay its proportionate share of the costs of the Wells, including from drilling the Wells until present, in order for Phoenix to exercise its rights under the Lease, including the right to receive its proportionate share of revenues. *Id.* at ¶ 43. Once Phoenix pays its proportionate share of costs, it is, correspondingly, entitled to its proportionate share of revenues. *Id.* at ¶ 44.

All of Phoenix's claims are for declaratory judgment brought under various federal statutes and regulations. *See* Compl., at Counts I- VII. Those claims generally allege that the 2023 CAs are unlawful, that the CAs are actually CRAs (which prohibited the minerals from subsequently being leased), that Phoenix is a necessary party to the 2023 CAs, and, in the alternate, that Section 5 of the 2023 CAs is ambiguous and must be interpreted against defendants. *Id.* at Counts I -VII. Phoenix has not asserted a claim for monetary damages against BLM. *Id.* In fact, as expressly stated in Paragraph 45 of the Complaint, it appears that <u>Kraken</u> has unlawfully kept all the revenue attributable to the unleased Federal Minerals instead of the revenue being deposited into a federal trust account.

In conclusion, if Phoenix prevails and the unleased revenue must be released to Phoenix, then it would be coming from Kraken and not BLM. The other option that Phoenix has requested is that its Lease be cancelled and a refund of all expenditures for bid and award of the Lease. Compl., at p. 24, ¶ F. BLM has brought a motion dismiss under Fed. R. Civ. P. 12(b)(1) asserting that the Court lacks jurisdiction based upon sovereign immunity.

**ARGUMENT**

Jurisdiction may be challenged in two ways: a facial attack or a factual attack. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Here, BLM has made a facial challenge to jurisdiction, arguing that the Complaint is insufficient on its face to confer jurisdiction on this Court. "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id.* Phoenix brought this case under the Court's federal question jurisdiction, alleging BLM's violation of numerous federal regulations and statutes. Compl., at ¶ 6 and Counts I-VII.

While BLM argues that it may challenge jurisdiction at any point, sovereign immunity is an affirmative defense. And it is a defense that BLM failed to plead in its Answer. *See* Dkt. 15. In fact, BLM's Motion seems to conflate allegations regarding injury with the separate defense of sovereign immunity. Accepting all allegations in the Complaint as true, Phoenix has alleged a legally sufficient basis for jurisdiction. Even addressing BLM's recently asserted defense of sovereign immunity, the Court has jurisdiction here.

## 1. Sovereign immunity is waived because Phoenix is not seeking damages.

As expressly alleged in the Complaint, Phoenix is not seeking damages against BLM. Instead, Phoenix is seeking a declaration as to whether certain actions

of BLM comply with its statutory and regulatory obligations. Specifically, Phoenix is seeking a determination that BLM's execution of the 2023 CAs was unlawful because the language in the 2023 CAs is impermissible under the regulations and statutes that BLM is required to follow. Phoenix is also seeking a declaration that it is a necessary party to the 2023 CAs to be subject to them, and that it is entitled to the revenue from the unleased Federal Minerals once it pays its required proportionate share of costs. The other relief sought by Phoenix is similarly based upon the Court's interpretation of the CAs, applying the applicable regulations and statutes.

Congress has expressly waived sovereign immunity for suits seeking relief other than money damages against the United States and its agencies in 5 U.S.C. § 702, a provision of the Administrative Procedure Act ("APA"). "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  Further, "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702 (emphasis added).

The Supreme Court has consistently found that Section 702 constitutes a broad waiver of sovereign immunity for equitable relief, including declaratory and injunctive actions. *Bowen v. Massachusetts*, 487 U.S. 879, 891-93 (1988). As stated by the Supreme Court, "Our cases have long recognized the distinction between an action at law for damages – which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation – and an equitable action for specific relief – which may include an order providing . . . for 'the recovery of specific property *or monies*, ejectment from land, or injunction either directing or restraining the defendant officer's actions." *Id.* at 893 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*, 567 U.S. 209, 215-217 (2012).

Courts of appeals have applied this waiver to suits challenging federal agency action when asserted for the first time in a motion to dismiss. *See, e.g., Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 671-73 (6th Cir. 2013). Courts have further confirmed that "§ 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action' as set forth in § 704." *Id.* at 672. The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to

review by the courts." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

The Complaint here falls squarely within the framework provided by Section 702. Phoenix seeks only non-monetary relief from BLM, challenging BLM's interpretation and application of federal statutes and regulations governing oil and gas leasing, communitization, and royalty agreements. The relief sought is prospective and declaratory in nature – a judicial determination of the parties' rights and obligations under federal law.

## 2. The cases and statutes cited by BLM are inapplicable.

The authorities that BLM relies upon address suits seeking monetary damages. Those cases do not control here, where Phoenix only seeks nonmonetary declaratory relief. For example, BLM's reliance on *Hollomon v. Watt*, 708 F.2d 1399 (9th Cir. 1983), is misguided. *Hollomon* was a suit against the Department of Interior, the BIA, and various agency officials for loss of tribal rights in which the plaintiffs specifically requested an award of damages. 708 F.2d 1399, 1400-1401 (9th Cir. 1983). The Court denied plaintiffs' argument in *Hollomon* that they could seek damages under the Federal Tort Claims Act without first filing an administrative claim with the appropriate federal agency. *Id.* at 1402. Phoenix has not asserted a claim for damages against the BLM, and it has not alleged a tort. *Hollomon* is not applicable.

Although *Flathead Irrigation District v. Jewell*, 121 F.Supp.3d 1008 (D. Mont. 2008) was analyzed under the APA, it is also inapplicable. In *Flathead Irrigation District*, the plaintiffs requested that the Court "declare, and create out of whole cloth, an entity to operate and manage" an irrigation project that was managed by the BIA. 121 F.Supp.3d at 1017. Plaintiffs' claims were based upon a 1908 Act (Act of April 30, 1908, 35 Stat. 444), which was drafted "so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* 1018. The Court could not, accordingly, review the BIA's actions under a declaratory judgment claim or any other legal claim because review was prohibited by the 1908 Act. *Id.*

The basis of Plaintiffs' claims is not an unreviewable act of BLM. Notably, BLM has not claimed that the 2023 CAs, its decision to subsequently lease the Federal Minerals, or its decisions to not follow certain statutes and regulations are actions that are exempt from review by this Court. And, of course, there is nothing in the statutes or regulations cited by Phoenix in the Complaint that makes those CAs unreviewable.

*Morongo Band of Mission Indians v. California State Board of Equalization*, 858 F.2d 1376 (9th Cir. 1988) is inapposite. *Morongo* was an interpleader case where the Court found that an action arises under federal law "if a substantial question of federal law is a necessary element of plaintiff's cause of action." 858 F.2d at 1383.

In *Morongo*, the plaintiff asserted in its complaint that that defendant would raise a federal law <u>defense</u>. *Id.* This was insufficient because "the Court has long and consistently held that the federal-law element must appear on the face of plaintiff's *well-pleaded* Complaint." *Id.* This case is, of course, not an interpleader action. And there can be no real argument that Phoenix has insufficiently pled a federal-law basis in its Complaint, which includes citation to numerous federal statutes and regulations that BLM has violated. This case does not present the jurisdictional defect addressed in *Morongo*, which concerned the absence of any federal cause of action. In fact, none of the cases referenced by BLM support its Motion.

However, BLM's Motion does serve to highlight the problem with Kraken and BLM's actions. Defendants are attempting to apply a provision from the 2023 CAs, agreements executed <u>only</u> by those parties two years ago, to Phoenix and the Lease. Those CAs violate the Mineral Leasing Act, which requires royalties from unleased Federal Minerals to be released from a trust account to the ultimate lessee of the minerals. Yet, this is not a breach of contract case because Phoenix is not a party to the 2023 CAs. Further, Phoenix could not bring a direct administrative appeal of the 2023 CAs because Phoenix was not aware of them until after winning the bid on the Lease. If this Court does not have jurisdiction to review such actions, then Phoenix is stuck with a Lease worth substantially less than Phoenix paid for it. In short, BLM is hoping that there are no consequences for its unlawful actions and

that this Court will simply find its actions unreviewable. The APA does not allow such an outcome. This Court has jurisdiction to review all agency action under 5 U.S.C. § 702, and it should exercise such jurisdiction here.

### 3. If necessary, leave to amend in the appropriate remedy.

If this Court concludes that additional clarity is required regarding the jurisdictional basis or the declaratory nature of the relief sought, the appropriate course would be to permit amendment rather than dismissal of the Complaint. Rule 15(2) of the Federal Rules of Civil Procedure states that a "court should freely give leave [to amend] when justice so requires." The Court set a deadline of December 15, 2025, for Defendants to challenge jurisdiction. Phoenix has timely responded to BLM's Motion. The Ninth Circuit has emphasized that leave to amend should be granted where jurisdictional deficiencies could be cured by additional allegations. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Here, if necessary, Phoenix could easily amend its Complaint to meet any deficiency.

### CONCLUSION

For the foregoing reasons, the Court should deny BLM's Motion to Dismiss. In the alternative, should the Court determine that further clarification is required in the Complaint, Phoenix respectfully requests leave to amend rather than dismissal of this action.

Dated this 23rd day of December, 2025.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone (406) 403-7066
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com


*Counsel for Plaintiff*

14

## CERTIFICATE OF COMPLIANCE

The undersigned, Adrian A. Miller, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 2,929 excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ Adrian A. Miller
Adrian A. Miller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2025, the foregoing was served by the

Clerk of the U.S. District Court of Montana, Billings Division, through the Court's

CM/ECF system, which sent a notice of electronic filing to all counsel of record.

/s/ Adrian A. Miller
Adrian A. Miller