Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone: 406-403-7066
Email: adrian.miller@sullivanmiller.com
        michelle.sullivan@sullivanmiller.com

Brian D. Lee
LEE LAW OFFICE PC
P.O. Box 790, 158 Main Street
Shelby, MT 59474
Telephone: (406) 434-5244
Email: brian@leelawofficepc.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC, | ) ) ) ) | Cause No. CV-25-65-BLG-TJC |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S RESPONSE TO KRAKEN DEFENDANTS' SUMMARY JUDGMENT MOTION OR IN THE ALTERNATIVE FOR MOTION TO DISMISS** |
| KRAKEN OIL AND GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

I.    **FACTS** ...................................................................................... 1

    A.    The 2021 Communitization Agreement..................................... 1

    B.    The 2023 CAs. ........................................................................ 3

    C.    The Lease Sale ........................................................................ 6

    D.    BLM Communications.............................................................. 9

II.    **ARGUMENT** ............................................................................. 13

  **1.** There is no appealable "final decision" of BLM ............................ 14

  **2.** There was no issued decision for Phoenix to appeal to the IBLA.... 17

  **3.** Laches is not applicable ................................................................ 20

III.    **CONCLUSION** ......................................................................... 25

**CERTIFICATE OF COMPLIANCE** ...................................................... 27

**CERTIFICATE OF SERVICE**............................................................. 28

## TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................13

*Bennett v. Spear*, 520 U.S. 154 (1997).......................................... 14, 15, 16

*Clare v. Clare*, 982 F.3d. 1199 (9th Cir. 2020)................................................13

*Danjaq LLC v. Sony Corp.,* 263 F.3d 942 (9th Cir. 2001) ........................20

*Nat'l Parks & Conservation Ass'n v. Bureau of Lan Mgmt.,*
606 F.3d 1058, (9th Cir. 2010) ...................................................................14

*Tolan v. Cotton,* 572 U.S. 650 (2014) .........................................................13

*Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020) ...........................................13

**United States Code:**

28 U.S.C. § 2201........................................................................... 13, 14

30 U.S.C. § 226-2 ........................................................................... 14, 15

**Code of Federal Regulations:**

43 C.F.R. § 4.21.............................................................................14

43 C.F.R. § 3000 ...........................................................................19

43 C.F.R. § 3000.40 ......................................................................19

43 C.F.R. § 3100 ...........................................................................19

43 C.F.R. § 3165.3(b)............................................................ 17, 18, 19

43 C.F.R. § 3165.4(a).....................................................................19

**Other Sources:**

Fed. R. Civ. P. 56(a) ..............................................................................13

## I.    FACTS

**A. The 2021 Communitization Agreement.**

This case involves oil, gas, and associated hydrocarbons located in Richland County, Montana (the "Lands"). Statement of Disputed Facts ("SDF"), ¶ 2. The United States owns 50% of the minerals in the Lands (the "Federal Minerals") and the remaining 50% of the minerals in the Lands are privately owned. *Id.* During all relevant time periods, Kraken Operating, LLC ("Kraken Operating") and/or Kraken Oil and Gas, LLC ("Kraken Oil")[1] leased most of the privately owned minerals in the Lands. *Id.* at ¶ 3. Kraken had a lease covering the Federal Minerals when it completed the Dagney 21-28 #1H well in June 2018 (the "#1H Well"). *Id.* at ¶¶ 4 and 6.

On May 1, 2020, Kraken's lease for the Federal Minerals was vacated. *Id.* at ¶ 10. On April 8, 2021, the Bureau of Land Management ("BLM") approved Kraken's application for a communitization agreement ("CA") MTM111087, which states that it is effective as of June 1, 2018 (the "2021 CA"). *Id.* at ¶¶ 12 & 43. The 2021 CA only covers the #1H Well. *Id.* at ¶ 44. According to Section 5 of the 2021 CA, "All proceeds, 8/8ths, attributed to unleased Federal, State or fee land included within the CA area are to be placed in an interest earning escrow or trust account by

---

[1]. Kraken and Oil and Kraken Operating are collectively referred to as "Kraken" throughout this Brief when a distinction is irrelevant.

1

the designated operator until the land is leased or ownership is established." *Id.* at ¶ 45. Thus, the 2021 CA required Kraken to place proceeds associated with the unleased Federal Minerals in an interest-bearing escrow account (hold them in suspense) until the Federal Minerals were leased. *Id.*

The cover letter to the 2021 CA noted the same: "Section 5 of the agreement requires all proceeds, 8/8ths of the unleased Federal minerals to be placed in an interest earning escrow account by the designated operator until the land is leased." SDF, ¶ 47. The cover letter also clarified that, since leasing the Federal Minerals may take longer than anticipated, Kraken was to pay the government its 1/8th royalty and pay the remaining 7/8th unleased royalties into an unleased lands account developed by BLM. *Id.* at ¶ 48. BLM noted that it had created an unleased lands account to facilitate collection of revenue associated with the unleased minerals. *Id.*[2]

BLM gave Kraken permission to "utilize the 7/8ths proceeds to recoup the proportional share of the drilling, completion, and production costs attributable to the unleased lands that are being placed in the escrow account" so long as it maintained an accurate accounting. *Id.* at ¶ 49. After recouping its costs, Kraken was required to place the remaining Federal Mineral proceeds into the escrow account. *Id.*

---

[2] Phoenix has no idea if this account was ever established. SDF, ¶ 86.

The language in Section 5 of the 2021 CA is identical to the language in BLM's Model Form of Communitization Agreement attached to its Communitization Manual. SDF, ¶ 50. In Section 5, the standard Federal CA requires all proceeds attributable to unleased federal minerals "to be placed in an interest earning escrow or trust account by the designated operator until the land is leased or ownership is established." *Id.* at ¶ 50. Once the unleased federal minerals are leased, the escrow account funds are released to the new lessee. *Id.* at ¶ 51. The lease sale notice for the federal minerals "will be subject to a stipulation that the successful bidder must negotiate a subsequent joinder to the communitization agreement so that proceeds may be distributed." *Id.* (emphasis added).

### B. The 2023 CAs.

The Dagney 33-21 #3H well was spudded on October 10, 2020 (the "#3H Well"), and the Dagney 33-21 #4H well was spudded on October 30, 2020 (the "#4H Well"). SDF, ¶ 52. Both wells were drilled after Kraken's federal lease was vacated. *Id.* at ¶ 10. Neither the #3H nor the #4H Well are part of the 2021 CA. *Id.* at ¶ 53. On September 21, 2021, nearly a year after drilling the #3H and #4H Wells, Kraken requested that BLM enter into a Compensatory Royalty Agreement ("CRA") for the unleased Federal Minerals. *Id.* at ¶ 13. BLM refused to do so. *Id.* at ¶ 14. Kraken appealed BLM's refusal to the Interior Board of Land Appeals ("IBLA"), which

found that BLM did not lack discretion to enter a CRA with Kraken. *Id.* at ¶ 16. IBLA took no position as to whether BLM was required to do so. *Id.*

For reasons that are unknown without discovery, BLM and Kraken apparently chose not to execute a CRA. SDF, ¶ 17. Instead, on June 13, 2023, BLM executed a CA with Kraken Oil amending the 2021 CA and covering the #1H Well entitled "Amended Federal Communitization Agreement," ostensibly effectively as of June 1, 2018 (the "Amended CA"). *Id.* at ¶ 54. That same day, BLM also executed a new CA with Kraken Oil covering the #3H #4H Wells, ostensibly effective as of January 11, 2021 (the "New CA"). *Id.* The Amended CA and the New CA (collectively, the "2023 CAs") were executed by Kraken Oil and BLM. *Id.* Phoenix is not a party to the 2023 CAs, nor was it involved with the Lands prior to obtaining its lease in 2024. *Id.* at ¶ 55.

Unlike the standard language in the 2021 CA, Section 5 of the 2023 CAs contain unique, non-standard language. *Id.* at ¶ 56. Specifically, Section 5 acknowledges that the communitized area contains unleased federal minerals but purports to "allocate" to the operator "the percentage of production attributable" to the unleased Federal Minerals "until effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s). . . ." *Id.* at ¶ 57. The very next paragraph of Section 5 requires the ultimate lessee of the Federal Minerals to pay its proportionate cost of the wells, "including drilling, completing and equipping

4

the well" to exercise its rights under a lease. *Id.* at ¶ 58. These two paragraphs are contradictory. The second paragraph contains language from a standard CA, which requires the lessee of federal minerals to pay its proportionate share of costs before escrow funds from the unleased mineral account are released. *Id.* But the first paragraph contains non-standard language that purports to allocate the funds that should have been placed in escrow to the operator. *Id.* at ¶ 57.

Phoenix is unaware of any other federal CA which allocates production and/or revenue from unleased federal minerals to an operator. *Id.* at ¶ 59. According to BLM's own policy, a CA is not authorized for purposes of allocating revenue among operators or working interest owners as this can be accomplished without sacrificing a portion of Federal royalties. *Id.* at ¶ 60. In fact, allocating revenue to an operator is never a justification for a CA. *Id.* at ¶ 61.

Revenue from federal minerals can be allocated to an operator only through a federal lease or, if minerals are unleased, through a CRA. *Id.* at ¶ 62. If there are unleased federal minerals, then BLM may enter a CRA or offer the unleased minerals for lease. *Id.* A CRA allows an operator to keep revenue from the unleased minerals so long as it pays the United States a royalty based upon the gross proceeds attributable to the oil and gas produced. *Id.* at ¶ 63.

The language in Section 5 of the 2023 CAs is not language from BLM's standard CA or from any CA that Phoenix has reviewed. *Id.* Rather, it is language

5

commonly found in a CRA. *Id.* Notably, once a CRA is entered, BLM's policies prohibit it from subsequently leasing the minerals. *Id.* at ¶ 64. Because any potential lessee would expect proceeds from unleased minerals to be held in an escrow account as required by BLM's policy, they would not bid on a lease where such an account did not exist. *Id.* at ¶ 65. Nobody would bid on a lease for minerals covered by a CRA (or similar agreement) because it makes no economic sense, and it is against BLM's own policies. *Id.*

**C. The Lease Sale.**

On May 21, 2024, BLM issued a Notice of Competitive Oil and Gas Internet Lease Sale (the "First Notice"). SDF, ¶ 66. The parcel description for the unleased Federal Minerals includes the following:

> Agreements:
> **MTMT105667610:** The land within this parcel is committed to a Communitization Agreement (CA) MTM 111087, Bakken/Three Forks Formation, effective 6/01/2018, which includes the entire area of this parcel. The operator of this CA is Kraken Oil & Gas, LLC. The successful bidder should contact the CA operator to determine their rights under this CA. The CA operator may require the successful bidder to pay a proportionate cost of the well, including drilling, completing, equipment, and operating the well.

*Id.* at ¶ 67.

The First Notice <u>only</u> lists "a Communitization Agreement" and <u>only</u> lists the 2021 CA. *Id.* at ¶ 68. Neither of the non-standard 2023 CAs are listed on the First Notice, and it does not state that the 2021 CA was ever amended. *Id.* As noted above,

6

the 2021 CA follows BLM's Model Form CA, which requires the operator to place all proceeds attributable to the Federal Minerals in an interest-bearing escrow account. *Id.* at ¶ 50. That escrow account should have been released to the lessee once a lease was in place. *Id.* at ¶ 51. The First Notice also states that the "successful bidder" should contact the operator, but not that any potential bidder should do so. *Id.* at ¶ 68.

Notably, the 2021 CA only covers the #1H Well. *Id.* at ¶ 44. Kraken Oil, which is the "operator" listed on each First Notice, is not the operator of the #3H or #4H Wells; rather, Kraken Operating is the operator and has been since those wells were drilled. *Id.* at ¶ 69. In conclusion, there is nothing listed on the First Notice to alert a potential bidder that the non-standard 2023 CAs exist, that the Federal Minerals being leased are subject to any CA other than the 2021 CA, or that the #3H and #4H Wells are subject to a CA. *Id.* at ¶¶ 66-69.

The First Notice also did not alert a potential bidder that the operator had kept the unleased Federal Mineral revenue instead of depositing it into a standard escrow account. *Id.* ¶ 70. This fact is critical because bidders know that under a standard CA (like the 2021 CA), an operator is required to place unleased mineral revenue into an escrow account to be released to the ultimate lessee. *Id.* Phoenix based its bid upon the expectation that a standard unleased mineral account existed. *Id.* at ¶ 71. The First Notice did not alert Phoenix or any other bidder to the contrary. *Id.*

7

BLM issued four more notices after the First Notice, all titled as "Appendix A" (the "Parcel Lists"). SUF, ¶ 23; SDF, ¶ 72. For each of the additional Parcel Lists, the language under "Agreements" for the Parcel is identical to that of the First Notice. SDF, ¶ 72. The Parcel Lists <u>only</u> include the standard 2021 CA, do not reference the non-standard 2023 CAs, do not state that Kraken Operating is the operator of any CAs, and do not include language alerting a potential bidder that revenue from the unleased Federal Minerals has been kept by the operator instead of being placed in a standard escrow account. *Id.* The language in the Parcel Lists also suggests only that a "successful bidder" should contact the operator about the 2021 CA. *Id.*

Phoenix reviewed the First Notice and subsequent Parcel Lists prior to the lease sale. *Id.* at ¶ 73. Since there was nothing to alert Phoenix otherwise, Phoenix assumed that the revenue from the unleased Federal Minerals had been placed in a standard interest-bearing escrow account. *Id.* Phoenix was awarded a lease covering the Federal Minerals, effective as of October 1, 2024 (the "Lease"). *Id.* at ¶ 27. BLM did not give Phoenix notice of the 2023 CAs prior to execution of the Lease, and it did not give Phoenix notice after Phoenix signed the Lease. *Id.* at ¶ 74. CAs are not recorded against the legal description for minerals, so Phoenix had no record notice. *Id.* The Lease does not contain any language identifying or incorporating the 2023 CAs. *Id.* at ¶ 75.

8

**D. BLM Communications.**

Phoenix first became aware of the existence of the 2023 CAs when Kraken emailed a copy of them to Phoenix on December 12, 2024, after Phoenix requested information about the escrow account for the unleased Federal Minerals. SDF, ¶ 76. On December 11, 2024, Kraken informed Phoenix that there was no escrow/suspense account and "revenue will be paid" from the date of the lease forward "[p]er the amended Dagney #1H and the Dagney #3H & #4H Communitization Agreements." *Id.* at ¶ 77. Kraken followed up with an email attaching the 2023 CAs on December 12, after Phoenix reiterated its position. *Id.* The December 11th and 12th emails constituted the first time that Phoenix was given notice of the 2023 CAs. *Id.* at ¶ 78.

Without any information from BLM, Phoenix was understandably confused to receive copies of unlisted, non-standard 2023 CAs from Kraken containing contradictory, ambiguous language *Id.* at ¶¶ 56-58 & 79. Although Phoenix obviously knew Kraken's position, it had no idea what BLM's position was. *Id.* at ¶ 79. Phoenix spent the next several months attempting to get answers from the BLM about the 2023 CAs, including BLM's position on interpretation or applicability of the CAs. *Id.* at ¶ 80. For example, Aaron Bieber ("Bieber"), counsel for Phoenix, had a phone call with Leanne Waterman with BLM on January 14, 2025, in which he requested additional information on the 2023 CAs. *Id.* at ¶ 81. He requested

BLM's file for the non-standard 2023 CAs and asked whether there was a CRA for the unleased Federal Minerals. *Id.*

Bieber had another conversation with Samantha Iron Shirt ("Iron Shirt"), an Acting Supervisor Petroleum Engineer with BLM on January 30, 2025, requesting similar information. *Id.* At the end of the call, Iron Shirt indicated that she would investigate the issues along with BLM's counsel, and she would get back to Bieber. *Id.* Bieber diligently followed up with Iron Shirt about his inquiries, including sending her an email with additional questions on February 4, 2025. *Id.* at ¶ 82. Bieber reminded Iron Shirt that he was waiting for the results of her investigation on March 3rd and 12th. *Id.*

Finally, on March 13, 2025, Iron Shirt responded to some of Bieber's questions in an email. *Id.* at ¶ 83. She wrote, "Section 5 of the unleased mineral account contains this language, 'The designated operator may utilize the 7/8ths proceeds to recoup the proportional share of the drilling, completion, and production costs attributable to the unleased lands that are being placed in the escrow account.'" *Id.* Iron Shirt did not understand that Kraken had kept all proceeds and had not just recouped its costs as allowed. *Id.* at ¶ 84.

Iron Shirt also did not appear to know whether an unleased mineral account ever existed. *Id.* She quoted the language from the BLM notices for the lease sale, which <u>only</u> referenced the standard 2021 CAs, as if she assumed there was an

existing escrow account and no additional CAs. *Id.* According to Iron Shirt, "The BLM typically sees this as a civil matter between the lessee and the operator not involving the BLM." *Id.* It does not appear that Iron Shirt was aware that the non-standard 2023 CAs existed. *Id.*

On March 14, 2025, Bieber tried to clarify remaining issues with Iron Shirt. *Id.* at ¶ 85. Specifically, he asked whether Kraken had ever placed any proceeds from production into an unleased lands account from the wells and what was paid. *Id.* He also inquired as to what exactly BLM expected Kraken and Phoenix to come to an agreement about, and what authority BLM had for the language in the 2023 CAs. *Id.* Despite Bieber's attempts to get answers and a position from BLM, Iron Shirt did not respond further. *Id.* Phoenix still does not know whether Kraken ever placed proceeds in an escrow account or whether BLM understood what Kraken was doing with the proceeds. *Id.* at ¶ 86.

Phoenix waited for final answers from Iron Shirt, but it eventually realized that BLM was not going to respond to its inquiries, provide any further information, or provide any official position on the 2023 CAs. SDF, ¶ 87. Phoenix filed its Complaint in this matter on May 15, 2025. Doc. #1. Phoenix is not appealing the 2023 CAs in its Complaint because it is not a party to those CAs. *Id.* at ¶ 88. In fact, Phoenix has specifically asked that this Court find that the CAs are invalid because Phoenix is not a party to them. *Id.* at ¶ 89. Phoenix is also not appealing the lease

sale or the issuance of the Lease. *Id.* at ¶ 90. The lease sale notices do not include any reference to the 2023 CAs. *Id.* at ¶¶ 66-72. The Lease also does not reference or incorporate the 2023 CAs. *Id.* at ¶ 75. Phoenix was not informed by BLM prior to executing the Lease that the Lease was subject to the 2023 CAs, and it was not informed after execution. *Id.* at ¶ 74. Accordingly, Phoenix is not appealing specific documents issued by BLM because those documents do not give notice of the non-standard 2023 CAs. *Id.* at ¶ 66-72 & 75.

The lack of any notice by BLM is, instead, the exact problem. Phoenix bid on the Federal Minerals without receiving any notice of the non-standard 2023 CAs or notice that the operator had kept the unleased mineral revenue. *Id.* After signing the Lease, Phoenix was given the 2023 CAs by Kraken, who informed Phoenix that: (1) the 2023 CAs are binding, (2) Kraken's interpretation of Section 5 is binding, and (3) Kraken will be keeping all the revenue from the unleased Federal Minerals that should have been deposited into an escrow account. *Id.* ¶¶ 38 & 77. BLM, however, did not take any position and did not seem to understand that Kraken had kept all revenue from the unleased minerals. *Id.* at ¶¶ 81-85.

Phoenix brought this declaratory judgment case to determine the validity of the 2023 CAs and allocation of the unleased mineral revenue because BLM has refused to take any position. *Id.* Instead, BLM informed Phoenix that it was a civil matter between the lessee and operator. *Id.* at ¶ 84.

12

## II.    ARGUMENT

Summary judgment is only appropriate "when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to judgment as a matter of law." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th. Cir. 2020) (internal citations omitted); Fed. R. Civ. P. 56(a). The "summary judgment standard requires [a court] to resolve all disputes in favor of the non-moving party . . . ." *Clare v. Clare*, 982 F.3d 1199, 1203 (9th Cir. 2020).

A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party, and facts are "material" if they might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh evidence, resolve credibility disputes, or draw factual inferences against the nonmovant. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). Kraken's Motion relies upon disputed facts and an incorrect legal analysis. It should be denied.

As an initial matter, Kraken contends that all of Phoenix's claims are brought under the Mineral Leasing Act. That is false. Phoenix brought its claims pursuant to 28 U.S.C. § 2201, entitled "Creation of remedy" (Section 2201). According to Section 2201, in any case or controversy within a Court's jurisdiction, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration, <u>whether or not further relief could be sought.</u>" 28 U.S.C. § 2201 (emphasis added). Only two of Phoenix's claims for declaratory relief cite provisions of the MLA, and as shown below, no claims could have been brought under the MLA. SDF, ¶ 94. Phoenix's claims also include, for example, a request that the Court interpret the ambiguous language in the 2023 CAs. *Id.* at ¶ 93.

### 1. There is no appealable "final decision" of BLM.

Kraken argues that Phoenix's claims are barred under the statute of limitations found in 30 U.S.C. § 226-2, which provides that an "action contesting a decision of the Secretary involving any oil and gas lease" cannot be maintained "unless such action is commenced or taken within ninety days after the <u>final decision</u> of the Secretary relating to such matter." (emphasis added). Where IBLA review is available, it is the IBLA's decision, not preliminary BLM action, that constitutes final agency action. 43 CFR § 4.21; *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1064-65 (9th Cir. 2010).[3] For an agency's action to be "final," it must (1) mark the "consummation" of the agency's decision-making process and (2) be a decision by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).

---

[3] As discussed below, IBLA review was not available here.

Kraken's entire Motion is premised upon the incorrect contention that Phoenix is appealing a final decision of BLM. It is not. BLM has not made a final decision that Phoenix can appeal. There is no document constituting a consummation of BLM's decision-making or in which legal obligations have been determined. *Bennett*, 520 U.S. at 178. In fact, the only position BLM has taken is that this is a civil matter between Kraken and Phoenix. SDF, ¶ 84.

For example, Kraken argues that Phoenix is appealing BLM's decision to execute the 2023 CAs and that Phoenix's statute of limitations for that appeal began running in 2023. Doc. #51, p.10. Phoenix obviously could not have appealed documents to which it was not a party. SDF, ¶ 55. Phoenix was not involved with the Land before obtaining the Lease in 2024. *Id.* In fact, one of Phoenix's claims in this case is that the 2023 CAs are invalid <u>because</u> Phoenix is not a party to them. *Id.* at ¶ 89. Even assuming arguendo that 30 U.S.C. § 226-2 could apply to a dispute like this, the statute cannot begin to run against a party that had no interest in the Lands and no notice of the challenged instruments. Kraken's attempts to redefine Phoenix's claims should be ignored, as should its inane claim that Phoenix was required to appeal documents that predate Phoenix's involvement.

Kraken's remaining arguments rely on the contention that Phoenix is appealing BLM's alleged decision to "issue Phoenix a lease subject to the CAs" or BLM's supposed decision to offer the Federal Minerals for lease "subject to the CAs

at the lease sale." Doc. #51, p. 10.[4] That is, again, a mischaracterization of Phoenix's claims and the facts. There is no document that constitutes a "final decision" of BLM to offer the Federal Minerals for lease subject to the 2023 CAs. There is not a single document issued prior to the lease sale by BLM notifying bidders that the Parcel was subject to the non-standard 2023 CAs. SDF, ¶¶ 66-73. Phoenix was not informed by BLM prior to executing the Lease or after executing the Lease that the Lease was subject to the 2023 CAs. *Id.* at ¶ 74. CAs are not recorded against the mineral legal descriptions, and the Lease itself does not list or incorporate any CAs. *Id.* at ¶¶ 74-75. Even when Phoenix brought the issue to BLM's attention after receipt of the 2023 CAs from Kraken, BLM did not understand that Kraken had kept revenue for the unleased Federal Minerals instead of depositing it into an escrow account. *Id.* at ¶¶ 83-84.

Because BLM never issued a document showing a "consummation" of BLM's decision-making process pursuant to which "rights or obligations have been determined" regarding the 2023 CAs and their ambiguous language, there was nothing for Phoenix to appeal. *Bennett*, 520 U.S. at 178.  BLM did not make a "final decision" to lease the Federal Minerals subject to the 2023 CAs or issue the Lease subject to the same. Kraken conveniently fails to reference a single document issued

---

[4] The "essence" of Phoenix's Complaint is that its Lease is not subject to the 2023 CAs but is, instead, subject to BLM's regulations and policies governing unleased federal minerals. Dkt. 51, p. 10; Compl.

by BLM for the lease sale which <u>lists</u> the 2023 CAs, or any document showing that BLM notified Phoenix that the Lease was subject to the 2023 CAs. There is none.

In fact, all of Phoenix's correspondence with BLM from January to March of 2025 was an attempt to obtain a position from BLM on validity and/or interpretation of the 2023 CAs. *Id.* at ¶¶ 80-85. Phoenix brought this case as soon as it realized that BLM was not going to make a decision or engage in any further discussions with Phoenix on the issues. *Id.* at ¶ 85. Phoenix still does not know what BLM's position is on the validity or interpretation of the 2023 CAs; that is a subject for additional discovery. *Id.* at ¶ 86. Despite Kraken's attempt to shoehorn this case into an MLA appeal, there is no final decision of record that Phoenix could have appealed. Kraken's Motion must be denied because it is based upon incorrect, disputed facts and inapplicable law.

## 2. There was no issued decision for Phoenix to appeal to the IBLA.

Kraken claims that Phoenix was required to invoke IBLA jurisdiction, but it cites to no statute or regulation that would have allowed Phoenix to do so. Doc. #51, pp. 19-20. In its next argument, Kraken contends that the issues in this case should be part of the Department of Interior's comprehensive regulatory scheme and, again, subject to IBLA review. Specifically, Kraken cites 43 C.F.R. § 3165.3(b), claiming that when BLM's decisions under the MLA are challenged, the decision is first subject to review by the State Director. According to that provision, any adversely

17

affected party who contests "a notice of violation or assessment or instruction, order, or decision of the authorized officer issued under the regulations of this part" may request administrative review before the State Director. 43 C.F.R. § 3165.3(b). A request for review must be filed within 20 business days "of the date such notice of violation or assessment or instruction, order, or decision was received or considered to have been received." *Id.*

First, the language is permissive and not mandatory. A party may request administrative review. Second, as discussed extensively above, there was not a "notice of violation, assessment, instruction, order, or decision" of BLM for which Phoenix could have requested review. Kraken's attempts to create a "notice" or "final decision" of BLM fails when the facts are applied. There was not a single notice issued by BLM stating the Parcel in the lease sale was subject to the 2023 CAs. SDF, ¶¶ 66-72. The Lease itself does not mention or incorporate the 2023 CAs. *Id.* at ¶ 75. Importantly, Phoenix never "received" a copy of the 2023 CAs when they were issued because it was not a party to them. *Id.* at ¶ 55; 43 C.F.R. § 3165.3(b).

In fact, BLM never gave Phoenix notice of the non-standard 2023 CAs, even after Phoenix signed the Lease. *Id.* at ¶ 74. When Phoenix communicated with BLM about the issue, BLM did not understand that Kraken had kept revenue from the unleased Federal Minerals. *Id.* at ¶ 84. There was no decision or notice here for Phoenix to appeal. Notably, if BLM had given notice to potential bidders that the

18

operator had kept all revenue associated with the unleased Federal Minerals instead of depositing it into a standard escrow account, Phoenix would not have bid on the Parcel. *Id.* at ¶ 65. No other party would have bid on it either, other than Kraken. *Id.*

Kraken also references 43 C.F.R. § 3165.4(a), which allows for appeal of a decision of the State Director under § 3165.3(b). But Phoenix could not have initiated a request for review with the State Director because there was no order, decision, or notice for the Director to review. Thus, Phoenix also could not have appealed to the IBLA because the initial review by the State Director was impossible.

Finally, Kraken argues that Phoenix was required to initiate an IBLA appeal under 43 C.F.R. § 3000.40 because the regulation allows for appeals from decisions issued under "43 CFR parts 3000 or 3100 [which includes decisions involving CAs] . . . ." Doc. #51, p. 21. According to that provision, any party affected by a "decision of the authorized officer" has a right to appeal. 43 C.F.R § 3000.40. The only "decision" Kraken references for this argument are the 2023 CAs. Once again, Kraken claims that Phoenix had to appeal the 2023 CAs, even though it was not a party to them and had no interest in the Lands when they were issued. SDF, ¶ 55. Phoenix obviously could not have appealed documents that were executed before its involvement. Again, one of Phoenix's claims in this lawsuit is that the 2023 CAs are invalid specifically <u>because</u> Phoenix is not a party to them. SDF, ¶ 89.

Kraken's entire Motion is based on its contention that "[t]he Crux of Phoenix's claims" was "BLM's decisions to enter into these CAs and issue a lease subject to them." Doc. #51, p. 22. The opposite is true. The "crux" of Phoenix's claims is that Lease is <u>not</u> subject to the 2023 CAs. SDF, ¶¶ 89-90. Instead, the Lease and the Federal Minerals should only be subject to the standard 2021 CA, BLM's policies, and applicable law governing CAs. Phoenix was not required to initiate an IBLA appeal because there is no decision issued by BLM for it to appeal. Kraken's Motion should be denied.

### 3. Laches is not applicable.

Kraken's final argument is that Phoenix's lawsuit – brought five months after it first learned about the 2023 CAs from Kraken and while it was still waiting for answers from BLM – constitutes an "unreasonable delay" and should be dismissed under the doctrine of laches because Kraken would be prejudiced if it is not. Doc. #51, at p. 14 (citing *Danjaq LLC v. Sony Corp*, 263 F.3d 942, 951 (9th Cir. 2001)). Part of this argument relies on Kraken's claim that Phoenix is barred under the MLA's statute of limitations, which is erroneous as shown above. The remainder of Kraken's argument is based upon incorrect, disputed facts.

As it does throughout its brief, Kraken relies upon the false premise that Phoenix was given notice of the 2023 CAs in BLM's lease sale documents and that it was, therefore, required to contact Kraken about the terms of the non-standard

20

2023 CAs. Doc. #51, at p. 15. As explained exhaustively, none of the notices issued by BLM for the lease sale listed the 2023 CAs. SDF, ¶¶ 66- 72. The only CA listed with the Parcel was the 2021 CA, which contained standard language. *Id.* at ¶¶ 66-72 & 50. The 2021 CA only covered the #1H Well and required Kraken to deposit all revenue from the unleased Federal Minerals into an escrow account after Kraken accounted for the proportionate share of costs. *Id.* at ¶¶ 44-46. The BLM notices only suggested that a "successful bidder" should contact the operator and not that a potential bidder should do so, and the Notice and Parcel Lists did not alert any bidder that Kraken had kept all revenue from the unleased Federal Minerals. *Id.* at ¶¶ 66-72.

Nothing issued by BLM informed a potential bidder that a CA covered the #3H or #4H Wells; in fact, the wrong operator was listed if those wells were subject to CAs. *Id.* CAs are not recorded against mineral legal descriptions, so Phoenix did not have record notice. *Id.* at ¶ 74. Despite the lack of any notice, Kraken claims that Phoenix should have contacted Kraken Operating (a different operator than listed) just to ensure that there were no additional, unlisted CAs covering any wells before bidding. Kraken's "you should have contacted us" theory thus presupposes a duty to discover undisclosed instruments and undisclosed deviations from standard federal practice – precisely what BLM's notice regime is designed to prevent. Kraken has

21

not and cannot cite to any applicable law that would impose such a duty upon a bidder.

Kraken's contention that Phoenix knew about the 2023 CAs when it signed the Lease is similarly wrong. BLM did not inform Phoenix either prior to or after executing the Lease that the 2023 CAs existed. SDF, ¶ 74. The Lease itself does not list the 2023 CAs or incorporate them. *Id.* at ¶ 75. As noted by Kraken, Section 3(d) of the Lease notes that a signature "constitutes acceptance of this lease, including all terms, conditions, and stipulations of which the <u>lessee has been given notice</u>." *Id.* ¶ 28 (emphasis added). Since Phoenix was never given notice of the 2023 CAs, it did not accept them when it signed the Lease.

Phoenix did not unreasonably delay bringing this case by spending several months attempting to get BLM's position on the 2023 CAs. *Id.* at ¶¶ 81-84. That is particularly true given that BLM did not understand that Kraken had kept unleased mineral revenue. *Id.* at ¶¶ 83-84. As of March 2025, BLM believed that an unleased mineral account existed, that Kraken and Phoenix just needed to determine Phoenix's payment of well costs before those funds were released, and that it was a "civil matter" between Phoenix and Kraken. *Id.*

Kraken's claim that it is somehow prejudiced by the timing of this Complaint is also based upon false facts. Kraken asserts that it relied upon the 2023 CAs when it "paid all the costs for developing the federal minerals." Doc. #51, at 17. Kraken

22

could not have relied upon documents that did not exist. The #3H Well was drilled on October 10, 2020, and the #4H Well was drilled on October 30, 2020. SDF, ¶ 41 & 52. Both wells were spud after Kraken's federal lease was vacated. *Id.* The only CA in place in 2020 was the standard 2021 CA, assuming it was retroactive. *Id*. The 2021 CA only covered the #1H Well. *Id.* at ¶¶ 41 & 44. In short, Kraken spud the #3H and #4H Wells – paying all costs of drilling, completing, and equipping those wells – without any lease, CRA, or CA in place for the wells. It had no reason to believe it would receive revenue from the unleased minerals. *Id.*

The 2023 CAs were not entered into until June 13, 2023, three years after both the #3H and #4H Wells were drilled. *Id.* at ¶ 54. The only CA in place during those years, the 2021 CA, required Kraken to deposit unleased mineral revenue into an escrow account, consistent with BLM policy. *Id.* at ¶¶ 46-48. Phoenix has no idea what happened to the revenue from the unleased Federal Minerals for the Dagney wells between 2020 and 2023, and BLM does not appear to know either. SDF, ¶ 84. Kraken could not have relied upon the 2023 CAs when it drilled, completed, and equipped the wells because the 2023 CAs did not exist for another three years.

Kraken's claim that it would be out its costs if this case moves forward is also wrong. The 2021 CA allowed Kraken to "utilize the 7/8ths proceeds to recoup the proportional share of the drilling, completion, and production costs attributable to the unleased lands that are being placed in the escrow account." SDF, ¶ 49. After

23

paying BLM its 1/8th royalty, Kraken was allowed to use the remaining 7/8th revenue from the unleased Federal Minerals to recoup its costs before depositing the remainder in an escrow account. *Id.* The standard language in a Federal CA <u>and</u> in BLM's notices for the lease sale are similar. *Id.* ¶¶ 50-51 & 67. Both require a successful bidder to pay its proportionate share of costs for the wells – including drill, completing, and equipping the wells – <u>before</u> the escrow funds are released. *Id.*[5] That is exactly what BLM expected to happen when Phoenix contacted BLM about the unleased funds. SDF, ¶¶ 83-84.

Notably, the disputed language in Section 5 of the 2023 CAs <u>also</u> includes this standard language, which requires the lessee to pay its proportionate share of costs from drilling, completing, and equipping the wells before participating in revenue. *Id.* ¶ 58. That is exactly why the provision is ambiguous. But, no matter how this case is decided, there is no scenario where Kraken will be left carrying the costs of developing the Federal Minerals. Any claim by Kraken that it will be out those costs if this case moves forward is untrue and a red herring. [6]

Kraken's real argument is that it wants to keep a windfall – the revenue (after costs) from unleased Federal Minerals during a time where there was no lease or

---

[5] According to BLM's lease sale notices for the Parcel, the "CA operator may require the successful bidder to pay a proportionate cost of the well, including drilling, completing, equipping, and operating the well." SDF, ¶ 67.

[6] Phoenix bid $765,580 for the Lease without any notice of the 2023 CAs, and it is the only party who will be out actual costs if this case does <u>not</u> move forward.

CRA allowing Kraken to do so. The timing of the 2023 CAs is important. They were executed in June 2023, and by December 2023, BLM had decided to lease the very minerals that were ostensibly the subject of the 2023 CAs. SDF, ¶¶ 23 & 54. To be clear, if the 2023 CAs are valid, Kraken had no claim to the unleased revenue from the Federal Minerals until <u>six months</u> before BLM decided to lease those very minerals. Kraken's argument that it spent years relying on the 2023 CAs is not credible; the facts show the exact opposite. Instead, Kraken and BLM executed the 2023 CAs mere months before BLM was going to lease the Federal Minerals. The CAs purport to be retroactive, apparently so Kraken could claim the unleased mineral revenue which it had already kept. Kraken's laches argument is unsustainable, and the Court should deny Kraken's Motion.

### III.    CONCLUSION

Kraken's Motion relies upon incorrect, disputed facts and inapplicable law. For the reasons set forth herein, it should be denied.

Dated this 19th day of January, 2026.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone (406) 403-7066
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

25

Brian D. Lee
LEE LAW OFFICE PC
P.O. Box 790, 158 Main Street
Shelby, MT 59474
Telephone: (406) 434-5244
Email: brian@leelawofficepc.com

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned, Adrian A. Miller, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6,496 excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ Adrian A. Miller
Adrian A. Miller

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2026, the foregoing was served by the Clerk of the U.S. District Court of Montana, Billings Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

/s/ Adrian A. Miller
Adrian A. Miller