Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone: 406-403-7066
Email: adrian.miller@sullivanmiller.com
        michelle.sullivan@sullivanmiller.com

Brian D. Lee
LEE LAW OFFICE PC
P.O. Box 790, 158 Main Street
Shelby, MT 59474
Telephone: (406) 434-5244
Email: brian@leelawofficepc.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| PHOENIX ENERGY ONE, LLC )<br>f/k/a PHOENIX CAPITAL )<br>GROUP HOLDINGS, LLC, )<br> )<br>Plaintiff, )<br> )<br>vs. )<br> )<br>KRAKEN OIL AND GAS, LLC, )<br>KRAKEN OPERATING, LLC, and )<br>UNITED STATES BUREAU OF )<br>LAND MANAGEMENT, )<br> )<br>Defendants. | Cause No. CV-25-65-BLG-TJC<br><br>**PLAINTIFF'S STATEMENT OF DISPUTED FACTS** |

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit 1 | BLM Manual 3160-9 – Communitization |
| Exhibit 2 | Communitization Agreement MTM111087 (April 8, 2021) |
| Exhibit 3 | BLM Manual MS 3160- Drainage Protection |
| Exhibit 4 | Notice of Competitive Oil and Gas Internet Lease Sale (May 21, 2024) |
| Exhibit 5 | Appendix A July 2024 Oil & Gas Parcel List (4 Separate Appendices) |
| Exhibit 6 | Declaration of Justin Arn |
| Exhibit 7 | Lease for Oil and Gas, MTMT106370202 (Sept. 19, 2024) |
| Exhibit 8 | Email string between Phoenix Personnel and Kraken Personnel (Oct. 2, 2024  - Dec. 12, 2024) |
| Exhibit 9 | Amended Federal Communitization Agreement (June 13, 2023) |
| Exhibit 10 | Communitization Agreement MTM112222 (June 13, 2023) |
| Exhibit 11 | Emails between Aaron Bieber and Samantha Iron Shirt (February 4, 2025 – March 14, 2025) |

**KRAKEN'S STATEMENT OF UNDISPUTED FACTS**

1.      Producing oil and gas on federal lands is an expensive, complex, multi-year process. Oil-and-gas companies obtain geological data to determine where oil and gas may be found, enter into oil and gas leases or otherwise acquire rights to develop those hydrocarbons from the subsurface minerals, obtain the necessary state and federal permitting and approvals, determine and prepare drilling sites, drill and complete wells that often reach thousands of feet into the earth, and either construct or arrange for the necessary infrastructure to transport

and market the production. The costs and capital investment required is significant, and uncertainty is the death knell of development. *See* Exhibit A, Affidavit of Andrew McGhee ("McGhee Aff.") at ¶¶ 5, 9. **Undisputed.**

2. The subsurface mineral interest in question is located in Richland County, Montana, and its ownership is split—the United States owns a 50% undivided interest, and the remaining 50% of those same minerals are privately owned. Compl. (Doc. 1) ¶¶ 7-8; Kraken's Amended Answer (Doc. 41) ¶¶ 7-8; BLM's Answer (Doc. 15) ¶¶ 7-8. **Undisputed.**

3. Kraken has leased the majority of the privately owned 50% undivided interest. *See* Compl. ¶ 9; Kraken's Amended Answer ¶ 9; BLM's Answer ¶ 9. **Undisputed.**

4. Kraken also acquired a lease from the BLM for the federally owned 50%, and sought to develop oil and gas from the minerals jointly owned by the United States and private owners along with the surrounding minerals. Compl. ¶ 10; Kraken's Amended Answer ¶ 10; BLM's Answer ¶ 10. **Undisputed.**

5. Without objection from BLM (or anyone else), Kraken received an order from the state regulators, the Montana Board of Oil and Gas Conservation ("MBOGC"), forming a temporary spacing unit encompassing the jointly owned minerals and a drilling permit authorizing Kraken to drill a well to try to produce

oil and gas from the minerals in the spacing unit. Exhibit B, 06/25/2017 MBOGC TSU Order; Exhibit C, 09/12/2017 MBOGC Drilling Permit. **Undisputed.**

6. Kraken completed the Dagney 21-28 #1H in June 2018, after which it began producing oil and gas. Compl. ¶ 12; Amended Answer ¶ 12; BLM's Answer ¶ 12. **Undisputed.**

7. In December 2018, the MBOGC entered a permanent spacing unit order and a pooling order, which effectively merged or "pooled" all of the non-federal interests in the spacing unit, thereby allowing them to share proportionately in the benefits of the oil and gas production. Exhibit D, 12/13/2018 MBOGC PSU Order; Exhibit E, 12/13/2018 MBOGC Pooling Order. **Undisputed.**

8. The MBOGC has no jurisdiction over federally owned minerals or, in this case, the federally owned portion of the minerals. Consequently, as is common practice, Kraken applied to BLM for a communitization agreement ("CA") specifying the terms by which BLM would agree to pool the federal minerals Kraken leased with the other minerals in the State-approved spacing unit. *See* Compl. ¶ 17; Amended Answer ¶ 17; BLM's Answer ¶ 17; Exhibit A, McGhee Aff. at ¶¶ 6, 7. **First sentence – undisputed.**

**Second sentence – disputed** as to the fact that it is "common practice" to apply for a communitization agreement when there is already an established well-spacing or well-development program by the State. *See* BLM Manual 3160-9 –

Communitization, at § .1(.11)(A)(1) (USA_000070), attached hereto as Exhibit 1. According to the BLM policy, "communitization will not be authorized when a single Federal lease or unleased Federal acreage can be fully developed and still conform to an optional (North-South or East-West spacing) pattern established by State order." *Id.*

9.      Kraken made plans to continue to invest, drill more wells, and further develop oil and gas from the spacing unit. Exhibit A, McGhee Aff. at ¶¶ 7-9. **Undisputed.**

10.     Around the same time, non-profit groups brought a lawsuit alleging that BLM had violated federal environmental statutes when issuing several leases in Montana, including Kraken's lease, and, on May 1, 2020, Judge Morris ordered those leases to be vacated. *Wildearth Guardians v. United States BLM*, 457 F. Supp. 3d 880 (D. Mont. 2020). **Undisputed.**

11.     BLM and Kraken were not sure how to proceed, given that development of the now-unleased minerals already was underway and Kraken already was producing oil and gas from them. Exhibit F, April 2021 Kraken-BLM Email Exchange at USA_000714-715.

**Undisputed** that the #1H Well had already been drilled. **Disputed** that any other well had been drilled or developed when the Lease was vacated. SUF, ¶ 6; SDF; Ex. 6, ¶ 26.

12. On April 8, 2021, BLM approved Kraken's application for a CA submitted before its lease was vacated, and BLM issued Federal CA MTM111087, effective as of June 1, 2018. Exhibit G, 4/8/2021 BLM Approval of CA. **Undisputed.**

13. In light of the vacatur of its lease, Kraken asked BLM to issue a Compensatory Royalty Agreement ("CRA") for the then-unleased lands. Compl. ¶ 23; Amended Answer ¶ 23; BLM's Answer ¶ 23. **Undisputed.**

14. In an October 14, 2021 letter, BLM indicated that issuing a CRA was "not the proper legal course of action" and outside of its discretion. Exhibit H, 10/14/2021 BLM Letter at USA_000735. **Undisputed.**

15. Kraken timely appealed BLM's decision to IBLA within thirty days. *See* Compl. ¶ 24; Amended Answer ¶ 24; BLM's Answer ¶ 24. **Undisputed.**

16. On September 14, 2022, IBLA issued its decision, noting the breadth of BLM's discretion under the MLA and reversing the BLM's decision that it lacked discretion to enter into a CRA as an "inappropriately narrow interpretation of BLM's legal authority," but taking no position concerning whether a CRA was appropriate in this case. Exhibit I, IBLA Decision 2022-28 at USA_000771. **Undisputed.**

17. In exercising its discretion, BLM chose not to enter a CRA with Kraken. Compl. ¶ 26; Amended Answer ¶ 26; BLM's Answer ¶ 26. **Phoenix**

**cannot determine whether to dispute or not dispute these facts without further discovery. It is unclear why BLM and Kraken did not enter into a CRA.**

18.    Instead, on June 13, 2023, BLM entered into an amended 21-28 CA, MTM111087, effective June 1, 2018 ("Amended CA") and a new 33-21 CA, MTM112222, effective January 11, 2021 ("New CA") with Kraken. Compl. Ex. A, Amended CA; Compl. Ex. B, New CA.

19.    **Undisputed** as to the dates that the New CA and Amended CA was executed or that they claim to be retroactive**. Disputed** on legal and factual grounds as to whether the CAs can be retroactive. Specifically, for the Amended CA, there was already a CA in effect from April 8, 2021 forward, covering the Dagney #1H Well. *See* MTM111087 (April 8, 2021), attached hereto as Exhibit 2. The 2021 CA required Kraken to place all proceeds from the unleased federal minerals into an interest-bearing escrow account until the minerals were leased. *Id.* at § 5. There was no CA covering the Dagney #3H or the Dagney #4H wells prior to 2023, and the BLM's Drainage Protection Manual required Phoenix to place all proceeds from the unleased federal minerals into an interest-bearing escrow account during that time period. *See* BLM Manual MS 3160- Drainage Protection, § 2.4 (USA_000142), attached hereto as Exhibit 3. According to the BLM's Drainage Protection Manual, if a lease for federal minerals expires, "the former lessee is liable for payment of compensatory royalty" during the time that the

federal minerals are subject to drainage. *Id.* Phoenix disputes under the regulations that BLM has authority to retroactively allow an operator to keep unleased federal mineral revenue using a CA when that revenue should have been placed in an escrow account according to its own policy and applicable law. *Id.*

20.    The Amended CA amended the original CA for the Dagney #1H well, while the New CA accounted for two new, longer wells Kraken had drilled, the Dagney #3H and #4H wells. *Id.*

**Undisputed** that the Amended CA states that it amends the 2021 CA and that the New CA states that it covers the #3H and #4H wells, which were drilled in 2020. Ex. 6, ¶ 26.  **Disputed** as to whether those CAs can be retroactive to allow Kraken to keep unleased mineral revenue, which it should have placed in an escrow account beginning when Kraken's federal lease was vacated. Ex. 3, § 2.4.

21.    Both CAs state: "Any party acquiring a Federal lease of the unleased Federal land included in the communitized area established hereunder, will be subject to this agreement as of the effective date of the Federal lease to said party(s)." Compl. Ex. A, Amended CA, Section 5 at 2; Compl. Ex. B, New CA, Section 5 at 2. **Undisputed.**

22.    BLM eventually made the decision to re-lease the 50% federally owned portion of the minerals subject to the CAs. This process began at least by December 28, 2023, when BLM released a public scoping letter notifying the

public of a list of parcels potentially available for bidding at an upcoming lease sale. Exhibit J, 12/28/2023 BLM Scoping Letter.

**Disputed.** Phoenix does not dispute that BLM eventually decided to re-lease the federal minerals, but it disputes that it made a decision that the new lease would be subject to the Amended CA and the New CA (collectively, the "2023 CAs"). BLM released five notices associated with the proposed lease sale. The First Notice was issued on May 21, 2024. *See* Notice of Competitive Oil and Gas Internet Lease Sale, attached hereto as Exhibit 4. BLM issued four subsequent parcel list thereafter titled "Appendix A July 2024 Oil & Gas Parcel List." *See* Parcel Lists attached hereto as Exhibit 5. For each Notice and/or Parcel List, next to the parcel at issue in this case (MT 2024-07-0360, which later become MT-2024-08-0360), the <u>only</u> CA which is listed is the 2021 CA. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. Neither the Amended CA nor the New CA are listed on the original Notice or any subsequent Parcel List. *Id.* There is no CA listed on the December 28, 2023 BLM Scoping Letter or parcel list of the proposed parcels to be included in a lease sale. Kraken's SUF, Ex. J. Accordingly, BLM's decision and all public documents associated with the lease sale was not "subject to the CAs," but, instead, only listed the 2021 CA.

23.    As to the parcel for the 50% federally owned portion of the minerals involved in this case, Parcel Number MT-2024-07-0360, BLM informed prospective buyers on December 28, 2023, that this Parcel:

> is committed to Communitization Agreement (CA) MTM 111087, Bakken/Three Forks Formation, effective 6/01/2018, which includes the entire area of this parcel. ***The operator of this CA is Kraken Oil & Gas, LLC. The successful bidder should contact the CA operator to determine their rights under this CA.*** The CA operator may require the successful bidder to pay a proportionate cost of the well, including drilling, completing, equipping, and operating the well as a condition of participating in the CA.

Exhibit K, Kraken's First Set of Requests for Admission to Phoenix, Ex. 4 at Kraken_000141 (emphasis added). **Undisputed.**

24.    BLM provided notice that a lease of this Parcel was subject to a preexisting CA operated by Kraken and that "the successful bidder should contact" Kraken, "the CA operator to determine their rights under this CA" at least ***four more times***: with the Draft Environmental Assessment ("EA") that the agency released for public comments on February 26, 2024, twice alongside the Final EA that the agency issued for public protest three months later on May 21, 2024, and again when BLM released the final parcels list and lease stipulations on August 5, 2024. *Id.*, Ex. 2 at Kraken_000093; *id.*, Ex. 4 at Kraken_000151; *id.*, Ex. 5 at Kraken_000160; *id.*, Ex. 6 at Kraken_000180; *see also* Exhibit L, Phoenix's Resp. to Kraken's First Set of Interrogatories at Answer No. 8 (noting the presence of

this language within the BLM's Notice of Competitive Lease Sale dated May 21, 2024 and four separate parcel lists issued by the BLM). **Undisputed** that each notice listed the 2021 CA.

**Disputed** that the notices listed the correct operator. Each Notice and/or Parcel List stated that Kraken Oil and Gas LLC ("Kraken Oil") was the operator. The Dagney #3H and #4H wells are both operated by Kraken Operating, LLC ("Kraken Operating"). *See* Declaration of Justin Arn, attached hereto as Exhibit 6, at ¶ 11. BLM's initial notice and subsequent notices listed the wrong operator for the wells ostensibly covered by the 2023 CAs. *Id.*

25.    The BLM issued its Decision Record on August 5, 2024, deciding to offer the 50% interest in the 120-acre Parcel at the lease sale, subject to the CAs. Exhibit M, 08/05/2024 BLM Decision Record at USA_001397.

**Disputed.**  As stated in Paragraph 22 above, every Notice and/or Parcel List issued by BLM stated that the parcel at issue in this case was only subject to the 2021 CA. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The BLM Decision on Record dated August 5, 2024 does not list the 2023 CAs or the 2021 CA. Kraken SUF, Ex. M. In fact, the Decision on Record does not list any CAs or state that the 120-acre Parcel at issue in this case was "subject to the CAs." *Id.*

11

26.    After receiving and reviewing each of these five BLM notices stating that the lease was subject to a CA and that the winning bidder should contact the operator, Kraken, to determine its rights under the CA, Phoenix then bid on a lease of this Parcel. Exhibit N, Phoenix's Resp. to Kraken's Requests for Admissions at Response Nos. 14-48; Exhibit O, 8/5/2024 Phoenix's Slack Messages at PHX_001501.  **Undisputed**, other than to note that the "operator" listed was Kraken Oil and not Kraken Operating.

27.    On August 6, 2024, BLM notified Phoenix that it had submitted the winning bid and the agency awarded Phoenix the lease dated September 19, 2024, effective October 1, 2024. Exhibit P, 8/6/2024 Phoenix's Winning Bid; Compl. Ex. C, Phoenix Lease at 1. **Undisputed.**

28.    The lease states that Phoenix's signature "constitutes acceptance of this lease, including all terms, conditions, and stipulations of which the lessee [*i.e.*, Phoenix] has been given notice." Compl. Ex. C, Phoenix Lease, Section 3(d) at 2. **Undisputed.**

29.    Phoenix admits that it received and "reviewed" each of the five above-referenced BLM notices. Exhibit N, Phoenix's Resp. to Kraken's Requests for Admissions at Response Nos. 14-48. **Undisputed.**

30.    Yet, Phoenix did not contact Kraken to determine or inquire about its rights under the CAs. *Id.* at Response Nos. 49-51.

**Partially disputed.** Phoenix does not dispute that it did not contact Kraken to determine or inquire about its rights "under the CAs," but denies that it was given any notice of the 2023 CAs in any BLM issued documents prior to bidding on the Lease or that it was informed that it needed to contact anyone about them. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. Phoenix also was not given any notice that the 2023 CAs existed by BLM after it was awarded the Lease. *See* Ex. 6, at ¶ 18. The Lease itself does not mention any CA, and it does not incorporate any CA into it. *See* Lease for Oil and Gas, MTMT106370202 (Sept. 19, 2024), attached hereto as Exhibit 7. Phoenix was not given any notice by BLM that the 2023 CAs existed after it executed the Lease. Ex. 6, at ¶ 18. The first time Phoenix learned that the 2023 CAs existed was when Kraken emailed Phoenix a copy of the 2023 CAs on December 12, 2024, after Phoenix inquired about the unleased mineral escrow account that should have existed according to Section 5 of the 2021 CA and Section 5 of the BLM's Model Form Communitization Agreement. *See* Ex. 6, at ¶ 20; Email string between Phoenix Personnel and Kraken Personnel (Oct. 2, 2024 through Dec. 12, 2024), attached hereto as Exhibit 8; Ex. 1, at USA_000092-93; Ex. 2, § 5. Those emails started on October 2, 2024, but Kraken did not reference the 2023 CAs until December 11, 2024. Ex. 8.

31.     Almost immediately after Phoenix's lease subject to the CAs became effective, Phoenix sent the lease to Kraken, but it did not make any inquiry about its rights. Exhibit Q, 10/02/2024 to 12/11/2024 Kraken-PHX Emails at PHX_001519.

**Disputed.** Phoenix disputes that the Lease was subject to the CAs. BLM did not give notice of the 2023 CAs in any lease sale Notice or Parcel List. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The Lease does not state that it is subject to any CA, nor does it incorporate any CA. Ex. 7. BLM did not give Phoenix notice of the 2023 CAs after it signed the Lease. Ex. 6, at ¶ 18.  There is no document issued by BLM before or after Phoenix was awarded the Lease stating that the Lease is subject to the 2023 CAs. *Id.* at ¶¶ 12-13 & ¶ 18. Phoenix also disputes that it failed to contact Kraken about its rights. Phoenix specifically inquired about its right to the unleased revenue from the federal minerals, which should have been held in suspense in an escrow account according to the 2021 CA, the only CA it had notice of at that time, and according to BLM's own policy and Model Form Federal Communitization Agreement. *See* Kraken SUF, Ex. Q; Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042; Ex. 6 at ¶¶ 20-21; Ex. 1, at USA_000092-93; Ex. 2, § 5.

32.     When Phoenix did contact Kraken and began asking questions in December 2024, Phoenix did not inquire about its rights as the BLM notices had directed; instead, Phoenix requested information about the funds in suspense and demanded Kraken pay Phoenix all of the production revenue dating back to first production (meaning six years before the effective date of Phoenix's lease), which Phoenix assumed were being held in suspense. *Id*. at PHX_001516-1517.

**Disputed.** Phoenix inquired about its rights according to the BLM notices that were issued, which only listed the 2021 CA. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. According to Section 5 of the 2021 CA, Kraken was required to place revenue for the unleased Federal Minerals in an interest-bearing escrow account until the minerals were leased. Ex. 2, § 5. Once leased, the suspended funds in the escrow account should have been released to the lessee as required by the 2021 CA and BLM policy. *Id*.; Ex. 1, at § .1(.11)(H)(2) (USA_000074). Phoenix specifically requested information about the funds in suspense because it is entitled to the suspended funds in the escrow account according to the only CA listed in the BLM's notice regarding the lease sale, according to its Lease (which does not list the 2023 CAs), and according to BLM's communitization policies. *Id*.; Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042; Ex. 7.

33.    Yet, when Phoenix made this inquiry about the funds in suspense and discussed internally about being entitled to revenues back to first production even though it did not acquire any interest in that production until six years later, Phoenix had not reviewed and did not even have a copy of the CAs that it knew its lease was subject to. Exhibit N, Phoenix's Resp. to Kraken's Requests for Admissions at Response Nos. 64-70; Exhibit Q, 10/02/2024 to 12/11/2024 Kraken-PHX Emails at PHX_001516.

**Partially disputed**. Phoenix does not dispute that it did not have copies of the 2023 CAs but disputes that it knew the 2023 CAs existed. As noted extensively above, there was not a single document issued by BLM giving notice of the 2023 CAs prior to the lease sale. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The Lease does not mention the 2023 CAs and it does not incorporate them. Ex. 7. BLM did not give Phoenix notice of the 2023 CAs prior to or after Phoenix executed the Lease. Ex. 6, at ¶ 18. Phoenix did not have a copy of the 2023 CAs because it did not know that they existed until Kraken sent copies of them to Phoenix on December 12, 2024. *Id.* at ¶ 20. Phoenix also disputes that it did not acquire any interest in revenue for the unleased Federal Minerals until its Lease was issued. The 2021 CA specifically required Kraken to deposit revenue associated with the unleased Federal Minerals into an interest-bearing escrow

account. Ex. 2, § 5. BLM policy and the Model Form Federal Communitization Agreement require the same, and they require that those suspended funds be released to the ultimate lessee of the unleased minerals once the lessee has paid its share of costs. Ex. 1, at § .1(.11)(H)(2) (USA_000074) and USA_000092-93.

34.    Kraken responded to Phoenix twice within nine days, and pointed out that Phoenix's lease was not effective until October 1, 2024 and that its terms only granted lease rights prospectively; Kraken sent Phoenix copies of the CAs, which also granted Phoenix no rights until the effective date of its lease; and Kraken agreed to provide Phoenix accounting information from October 1, 2024, onwards. Exhibit Q, 10/02/2024 to 12/11/2024 Kraken-PHX Emails at PHX_001516-1517.

**Partially Disputed.** Phoenix does not dispute the substance of the emails or what Kraken stated in them. Phoenix disputes that the Lease only grants Phoenix the right to the revenue associated with the Federal Minerals from the date of the Lease forward. According to Section 5 of the 2021 CA, the only CA listed on any BLM Notice or Parcel List associated with the lease sale, Kraken should have placed the revenue from the unleased federal minerals into an interest-bearing account, which would have been released to the ultimate lessee once the lessee paid its proportionate share of costs under BLM policy. Ex. 2, § 5; Ex. 1, at § .1(.11)(H)(2) (USA_000074) and USA_000092-93. Accordingly, the ultimate

lessee of the minerals is supposed to receive the suspended funds in the escrow account after paying its share of costs. *Id.*

35.     On January 14, 2025, apparently for the first time, Phoenix contacted BLM to determine its rights under the CAs. *See* Exhibit L, Phoenix's Resp. to Kraken's First Set of Interrogatories at Answer Nos. 2, 3.

**Partially Disputed.** Phoenix does not dispute that it contacted BLM about the 2023 CAs on January 14, 2025 for the first time, but it disputes that it had any knowledge <u>from</u> BLM about the 2023 CAs at any time prior to that. Ex. 6, at ¶¶ 11-20. Phoenix only learned about the 2023 CAs from Kraken in December 2024. *Id.* at ¶ 20. Phoenix also disputes that it contacted BLM "to determine its rights." Phoenix's emails with BLM were an attempt to gather further information on the 2023 CAs and to determine BLM's position on the validity and interpretation of the 2023 CAs. *See* Kraken's SUF, Ex. L, at Resp. to Int. Nos. 2 and 3; *See* Emails between Aaron Bieber and Samantha Iron Shirt (February 4, 2025 – March 14, 2025), attached hereto as Exhibit 11.

36.     When asked to explain under oath "why Phoenix filed its Complaint on May 15, 2025," Phoenix began its answer with "Phoenix spent several months engaging in conversations with BLM *starting* in January 2025," and it wasn't until after those communications that Phoenix decided to pursue its claims. *Id*. at Answer No. 3 (emphasis added).

**Partially disputed.** Phoenix does not dispute that it began conversations with BLM in January 2025 about the 2023 CAs. Phoenix waited to file its claim because it was attempting in the communications to obtain BLM's position on the issues brought in this litigation. Kraken SUF, Ex. L at Resp. to Int. No. 3. When Phoenix realized that BLM was not going to take any position, it worked diligently to bring this lawsuit. *Id.*

37. On the same day it began those conversations with BLM, Phoenix sent a demand letter to Kraken reciting the same material facts it alleges in its Complaint and demanding, among other things, the same relief it seeks in its Complaint. Exhibit R, 01/14/25 Demand Letter at PHX 000102-104.

**Partially disputed.** Phoenix disputes that the demand letter to Kraken seeks the same relief demanded in its Complaint. The Complaint requests a declaration that the 2023 CAs are invalid, partially invalid, violate BLM's own policies and applicable law, and/or contain ambiguous language that should be interpreted against the drafters. Kraken SUF, at Ex. R; Compl., at Counts I – VII.

38. On February 3, 2025, Kraken provided a response to each of the points raised in Phoenix's demand letter, set forth its understanding of Phoenix's rights under its lease and the CAs, including that Phoenix was not entitled to production proceeds prior to October 1, 2024, and providing copies of the relevant documents. Exhibit S, 02/03/2025 Kraken's Response to Phoenix's Demand at

PHX 000012-13. **Phoenix does not dispute the substance of the letters, but it disputes Kraken's legal position as set forth in the letters.**

39.    30 U.S.C. 226-2 states: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." **Phoenix disputes that this is a factual contention. It is a legal conclusion.**

40.    Phoenix did not file this lawsuit until May 15, 2025—which was 702 days after BLM decided to issue the CAs to which Phoenix's lease are subject (June 13, 2023); 504 days after BLM first provided notice during the lease sale process that the lease would be subject to a CA (December 28, 2023); 283 days after BLM final decision to offer the lease for sale subject to the CAs (August 5, 2024); 282 days after Phoenix learned it had submitted the winning bid for the lease subject to the CAs at the lease sale (August 6, 2024); 238 days after the date BLM issued the lease to Phoenix (September 19, 2024); and 226 days after the effective date of the lease subject to the CAs (October 1, 2024). Compl.; Compl. Ex. A, Amended CA; Compl. Ex. B, New CA; Exhibit J, 12/28/2023 BLM Scoping Letter; Exhibit P, 8/6/2024 Phoenix's Winning Bid; Compl. Ex. C, Phoenix Lease.

**Partially disputed.** Phoenix disputes that BLM "made a final decision to offer the lease for sale subject to the CAs." There is nothing of record showing that BLM offered the lease for sale subject to the 2023 CAs. BLM did not give notice of the 2023 CAs in any lease sale Notice or Parcel List. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The Lease does not state that it is subject to any CA, nor does it incorporate any CA. Ex. 7. BLM did not even give Phoenix notice of the 2023 CAs after it signed the Lease. Ex. 6, at ¶ 18. There is no document issued by BLM before or after Phoenix was awarded the Lease stating that the Lease is subject to the 2023 CAs. For the same reason, Phoenix disputes that "it submitted the winning bid for the lease subject to the CAs at the lease sale." Again, there is nothing of record stating that the Lease would be or is subject to the 2023 CAs. Finally, for the same reasons, Phoenix disputes that the Lease is "subject to the CAs." There was nothing of record prior to bidding on the Federal Minerals stating that a lease would be subject to the 2023 CAs, the Lease does not list or incorporate the 2023 CAs, and Kraken was never informed by BLM either prior to signing the Lease or after signing the Lease that the Lease was subject to the CAs. *See* Ex. 4, at p. 32 (Kraken-000093); Ex.5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042; Ex. 7; Ex. 6, at ¶ 18.

41.     As the operator and counterparty to the CAs, Kraken reasonably carried all the costs for developing the federal minerals and paying the federal royalties with the expectation that the CAs were valid and would be compensated according to their terms. *See* Exhibit A, McGhee Aff. at ¶¶ 5-9.

**Partially Disputed.** Without further discovery, Phoenix cannot determine what Kraken did or did not believe. However, the only CA in place from 2021 until the 2023 CAs were executed was the 2021 CA. *See* Exs. 2, 9, & 10. The 2021 CA was submitted before Kraken's lease was vacated, and it was approved after the lease was vacated. Kraken SUF, ¶ 12. The 2021 CA required in Section 5 that Kraken deposit all revenue from the unleased Federal Minerals into an interest-bearing escrow account after accounting for its proportionate share of costs. Ex. 2, § 5. The #3H Well was spud on October 10, 2020, after Kraken's federal lease was vacated. Kraken SUF, at ¶ 10; Ex. 6, ¶ 26. The #4H Well was spud on October 30, 2020, after Kraken's federal lease was vacated. *Id.* Given that the 2021 CA was the only CA in place and only covered the #1H Well when Kraken drilled the #3H Well and the #4H Well, it is unlikely that Kraken had any expectation that it would be compensated for anything other than its costs. Ex. 2. Further, Kraken could not have expected to be compensated according to the terms of the 2023 CAs before they existed, including when it drilled all three wells. Kraken SUF, ¶ 10-12; Ex. 6, ¶ 26.

22

42.     Kraken has invested millions in the Dagney wells to develop the lands subject to the Amended CA and New CA. Kraken could have easily deployed those funds elsewhere if it had known it could not rely on the CAs. *See* Exhibit A, McGhee Aff. at ¶ 9.  **Phoenix cannot determine whether to dispute this fact without additional discovery.**

## PHOENIX'S STATEMENT OF ADDITIONAL FACTS

43.     On April 8 2021, BLM approved Kraken's application for a communitization agreement ("CA") MTM1111087, which states that it is effective as of June 1, 2018 (the "2021 CA"). *See* Exhibit 2.

44.     The 2021 CA only covers the #1H Well. Ex. 2 at USA_000663.

45.     According to Section 5 of the 2021 CA, "All proceeds, 8/8ths, attributed to unleased Federal, State or fee land included within the CA area are to be placed in an interest earning escrow or trust account by the designated operator until the land is leased or ownership is established." *Id.* at § 5 (USA_000667).

46.     Accordingly, the 2021 CA required Kraken, as the operator of the #1H Well, to place proceeds associated with the unleased federal minerals into an interest-bearing escrow account (hold them in suspense) until the federal minerals were leased. *Id.*

47.     The cover letter to the 2021 CA, which was written to Andrew McGhee with Kraken Oil & Gas, stated, "Section 5 of the agreement requires all

proceeds, 8/8ths of the unleased Federal minerals to be placed in an interest earning escrow account by the designated operator until the land is leased." *Id.* at USA_000663.

48.    The cover letter also clarified that as leasing the federal minerals may take longer than anticipated, Kraken was to pay the government its 1/8th royalty and pay the remaining 7/8th unleased royalties into an unleased lands account developed by the Bureau of Land Management ("BLM"). *Id.* BLM stated that it had created an unleased lands account to facilitate collection of revenue associated with the unleased minerals. *Id.*

49.    BLM gave Kraken permission to "utilize the 7/8ths proceeds to recoup the proportional share of the drilling, completion, and production costs attributable to the unleased lands that are being placed in the escrow account" and maintain an accurate accounting of the amount placed in the escrow account after it recouped its costs. *Id.* at USA_000663-664.

50.    The language in Section 5 of the 2021 CA is identical to the language in BLM's Model Form of Communitization Agreement. Ex. 1, at USA_000092-93. The BLM's Model Form requires in Section 5 that all proceeds attributable unleased federal minerals "are to be placed in an interest earning escrow or trust account by the designated operator until the land is leased or ownership is established." *Id.* at USA_000093.

24

51.    Once the unleased federal minerals are leased, the escrow account funds are supposed to be released to the new lessee after the lessee pays its proportionate share of costs for the well. Ex. 1, at § .1(.11)(H)(2) (USA_000074); Ex. 6, ¶ 25. The BLM Communitization Manual specifically provides that the lease sale notice for the federal minerals "will be subject to a stipulation that the successful bidder must negotiate a subsequent joinder to the communitization agreement so that proceeds may be distributed." *Id* (emphasis added).

52.    The Dagney #3H Well (the "#3H Well") was spud on October 10, 2020. Ex. 6 at ¶ 26. The Dagney #4H Well (the "#4H Well") was spud on October 30, 2020. *Id.*

53.    Neither the #3H Well nor the #4H Well are part of the 2021 CA. Ex. 2, at USA_000663.

54.    On June 13, 2023, BLM entered into a CA with Kraken Oil amending the 2021 CA entitled "Amended Federal Communitization Agreement," covering the #1H Well, ostensibly effectively as of June 1, 2018 (the "Amended CA"). *See* Exhibit 9 attached hereto. That same day, BLM entered into a new CA with Kraken Oil covering the #3H Well and the #4H Well, ostensibly effective as of January 11, 2021 (the "New CA"). *See* Exhibit 10 attached hereto. Both the Amended CA and the New CA (collectively, the "2023 CAs") were executed by Kraken Oil and BLM. Exs. 9 and 10.

55.     Phoenix is not a party to the 2023 CAs and it was not involved in the minerals at issue in this litigation in Richland County (the "Lands") prior to obtaining its lease in 2024. *Id.*; Ex. 6, at ¶ 10.

56.     Unlike the 2021 CA, Section 5 of the 2023 CAs contains unique, non-standard language. *Id.* at ¶ 23; Ex. 1, at USA_000092-93.

57.     Section 5 of the 2023 CAs acknowledges that the communitized area contains unleased federal minerals but purports to "allocate" to the operator "the percentage of production attributable" to the unleased federal minerals "until effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s). . . ." Ex. 9, at § 5; Ex. 10, at § 5.

58.     In the very next paragraph of Section 5 of the 2023 CAs, it requires the ultimate lessee of the federal minerals to pay its proportionate cost of the wells, "including drilling, completing and equipping the well" to exercise its rights under a lease. *Id.* This second paragraph is identical to language in a standard CA, which requires the lessee of unleased federal minerals to pay its proportionate share of costs before the escrow funds from the unleased mineral account are released. Ex. 1, at USA_000092_93; Ex. 6, at ¶ 25.

59.     Phoenix is unaware of any other federal CA which allocates production and/or revenue from unleased federal minerals to an operator, as that is

language that would only be included in a Compensatory Royalty Agreement ("CRA"). Ex. 6, at ¶ 27.

60.    According to the BLM's own policy, a CA is not authorized for purposes of allocating revenue among operators or working interest owners as this can be accomplished without sacrificing a portion of Federal royalites. Ex. 1 at § .1(.11)(B)(1) (USA_000071).

61.    Allocating unleased federal mineral revenue to an operator is not a justification for a CA. *Id.* at § .1(.11)(A) (USA_000070).

62.    Revenue from federal minerals can be allocated to an operator only through a federal lease or, if minerals are unleased, through a CRA. *See* Ex. 3 at § 2.5 (A)(2) (USA_000143). According to the BLM's Drainage Protection Manual, BLM can either offer unleased federal minerals for lease or enter into a CRA. *Id.* at USA_000142-43.

63.    A CRA allows an operator to keep revenue from the unleased minerals so long as it pays the United States a royalty based upon the gross proceeds attributable to the oil and gas produced according to BLM's Model Form for Compensatory Royalty Agreement for Unleased Lands. Ex. 3 at USA_000173. The language in Section 5 of the 2023 CAs is not language from a model CA or from any other CA that Phoenix has reviewed. *Id.*; Ex. 1 at USA_000092-93; Ex. 6, at ¶ 27. It is language from a CRA. Ex. 3 at USA_000173; Ex. 6, at ¶ 27.

27

64.     Once a CRA is entered into, BLM cannot subsequently lease the minerals. Ex. 1 at § .1(.11)(H)(3) (USA_000074); 43 CFR § 3162.2-2(b), (c).

65.     Any potential lessee would expect proceeds from unleased minerals to be held in an escrow account as required by BLM's policy and its standard CA. Ex. 6, at ¶ 25; Ex. 1 at § .1(.11)(H)(1)-(2) (USA_000074); Ex. 1 at USA_000092-93. A potential lessee would not bid on a lease where such an escrow account holding the suspended funds did not exist. Ex. 6, at ¶ 25. Further, no bidder, including Phoenix, would bid on a lease for minerals covered by a CRA (or similar agreement) because it makes no sense financially and it is against BLM's policy and applicable regulations to lease minerals that are subject to a CRA. Ex. 1 at § .1(.11)(H)(3) (USA_000074); 43 CFR § 3162.2-2(b), (c); Ex. 6, at ¶ 27.

66.     On May 21, 2024, the BLM issued a Notice of Competitive Oil and Gas Internet Lease Sale (the "First Notice"). Ex. 4. The unleased Federal Minerals were listed in the First Notice as parcel MT-2024-07-0360 (the "Parcel"). *Id.* at p. 32 (Kraken_000093). The Parcel description includes the following:

67.     The Parcel description on the First Notice includes the following:

> Agreements:
> **MTMT105667610:** The land within this parcel is committed to a Communitization Agreement (CA) MTM 111087, Bakken/Three Forks Formation, effective 6/01/2018, which includes the entire area of this parcel. The operator of this CA is Kraken Oil & Gas, LLC. The successful bidder should contact the CA operator to determine their rights under this CA. The CA operator may require the successful

> bidder to pay a proportionate cost of the well, including drilling, completing, equipment, and operating the well.

*Id.*

68.    The First Notice only lists "a Communitization Agreement" – the 2021 CA. *Id.* Neither the Amended CA nor the New CA are listed on the First Notice, and it does not state that the 2021 CA was ever amended. *Id.* The First Notice states that the "successful bidder" should contact the operator, but not that any potential bidder should do so. *Id.*

69.    Kraken Oil is listed as the "operator" in the First Notice. *Id.* Kraken Oil is not the operator of the #3H Well or the #4H Well, and it never has been. Ex. 6, at ¶ 11. Kraken Operating has always been the operator of those wells. *Id.*

70.    There is nothing in the First Notice to alert a potential bidder that the operator has kept the unleased federal mineral revenue instead of depositing it into a standard escrow account. Ex. 4 at p. 32 (Kraken_000093). This is a critical fact because bidders know that under a standard CA (like the 2021 CA), an operator is required to place unleased federal mineral revenue into an escrow account to be released to the ultimate lessee. Ex. 1, at USA_000092-93 and at § .1(.11)(H)(2) (USA_000074); Ex. 2 at § 5 (USA_000667); Ex. 6, at ¶¶ 24-25.

71.    Phoenix based its bid upon the understanding that a standard unleased mineral account existed. Ex. 6, at ¶ 24. There was nothing in the First Notice to alert Phoenix or any other bidder to the contrary. Ex. 4 at p. 32 (Kraken_000093).

72.     BLM issued four subsequent parcel list thereafter titled "Appendix A July 2024 Oil & Gas Parcel List." *See* Parcel Lists attached hereto as Exhibit 5. For each Notice and/or Parcel List, under "Agreement" for the Parcel (MT 2024-07-0360, which later become MT-2024-08-0360), the only CA which is listed is the 2021 CA. *See* Ex. 4, at p. 32 (Kraken-000093); Ex. 5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The language in each Parcel List is identical to that in the First Notice. *Id.* The Parcel Lists do not reference the 2023 CAs, do not state that Kraken Operating is the operator of any CAs or wells, and do not have any language alerting a potential bidder that the revenue from the unleased federal minerals has been kept by the operator instead of being placed in a standard escrow account. Ex. 5 at Kraken_000141, Kraken_000160, Kraken_000180, and Kraken_000042. The language in the Parcel Lists also suggest that only a "successful bidder" should contact the operator about the 2021 CA. *Id.*

73.     Phoenix reviewed the First Notice and subsequent Parcel Lists prior to the lease sale. Ex. 6, at ¶ 6. Since there was nothing to alert Phoenix otherwise, Phoenix assumed that the revenue from the unleased federal minerals had been placed in an interest-bearing escrow account. *Id.* at ¶¶ 9-11 and ¶ 24. Phoenix bid $765,580 for the Lease with this understanding. Ex. 7, at USA_001420.

74. BLM did not give Phoenix notice of the 2023 CAs prior to Phoenix signing the Lease. Ex. 6, at ¶ 18. BLM did not give Phoenix notice of the 2023 CAs after Phoenix signed the Lease. *Id.* CAs are not recorded against the legal mineral descriptions. *Id.* at ¶ 17.

75. The Lease does not contain any language incorporating any of the CAs or even the 2021 CA. Ex. 7.

76. Phoenix first became aware of the 2023 CAs when Kraken emailed a copy of them to Phoenix on December 12, 2024, after Phoenix requested information on the unleased federal mineral revenue that should have been held in suspense. Ex. 6, at ¶ 20; Ex. 8; Ex. 1, at USA_000092-93; Ex. 2, § 5.

77. On December 11, 2024, Kraken informed Phoenix that there was no escrow/suspense account and "revenue will be paid" from the date of the lease forward "[p]er the amended Dagney #1H and the Dagney #3H & #4H Communitization Agreements." Ex. 8. Kraken followed up with an email attaching the 2023 CAs on December 12 after Phoenix reiterated its position. *Id.*

78. The December 11th and 12th emails constituted the first time that Phoenix was given information about the 2023 CAs and a copy of the 2023 CAs. Ex. 6, at ¶¶ 20-22.

79. Because the 2023 CAs were not referenced in any of the lease sale documents and BLM did not inform Phoenix about them, Phoenix was confused

and did not know what BLM's position was on the 2023 CAs, including whether BLM had a formal position in interpretation of the contradictory language in Section 5. Ex. 6, at ¶ 28.

80.   After receiving copies of the 2023 CAs from Kraken, Phoenix spent the next several months attempting to get answers from BLM about those documents and trying to get BLM to take a final position on interpretation or applicability of the CAs. Kraken's SUF, Ex. L, at Resp. to Int. Nos. 2 and 3; Ex. 11.

81.   Aaron Bieber, counsel for Phoenix, had a phone call with Leanne Waterman with BLM on January 14, 2025. Kraken's SUF, Ex. L, at Resp. to Int. Nos. 2 and 3. During that conversation, Mr. Bieber requested additional information on the 2023 CAs, including whether BLM had a file for them and whether it had a CRA in place for the unleased Federal Minerals. *Id.* Mr. Bieber had another conversation with Samantha Iron Shirt, an Acting Supervisor Petroleum Engineer with BLM, on January 30, 2025, asking for similar information. *Id.* At the end of the phone call, Ms. Iron Shirt indicated that she would conduct an investigation into the issues along with counsel for BLM and follow up with Mr. Bieber. *Id.*

82.   Mr. Bieber diligently followed up with Ms. Iron Shirt, including sending her an email with additional questions on February 4, 2025. Ex. 11. Mr.

Bieber reminded her that he was waiting for the results of her investigation on March 3th and 12th. *Id.*

83.    On March 13, 2025, Ms. Iron Shirt responded to some of the questions that Mr. Bieber had asked. Ex. 11. Ms. Iron Shirt wrote, "Section 5 of the unleased mineral account contains this language, 'The designated operator may utilize the 7/8ths proceeds to recoup the proportional share of the drilling, completion, and production costs attributable to the unleased lands that are being placed in the escrow account.'" *Id.*

84.    Ms. Iron Shirt did not understand that Kraken had kept all proceeds under the 2023 CAs and had not just recouped its costs as allowed. *Id.* She also did not appear to understand whether Kraken had ever placed any proceeds in an unleased mineral account. *Id.* Ms. Iron Shirt then quoted the language from the BLM notices for the lease sale, which only referenced the 2021 CAs, as if she assumed that there was an unleased escrow account. *Id.* Ms. Iron Shirt stated, "The BLM typically sees this as a civil matter between the lessee and the operator not involving the BLM." *Id.* It does not appear that Ms. Iron Shirt was aware that the 2023 CAs existed. *Id.*

85.    On March 14, 2025, Mr. Bieber attempted to clarify remaining issues with Ms. Iron Shirt. Ex. 11. Specifically, he asked her whether Kraken had ever placed any proceeds from production into an unleased lands account from the wells

and what was paid.  *Id.* He also asked Ms. Iron Shirt what exactly BLM expected Kraken and Phoenix to come to an agreement about, and what authority BLM had for the language in the 2023 CAs. *Id.* Despite Mr. Bieber's attempts to get answers and a position from BLM, Ms. Iron Shirt did not answer his March 14, 2025 email. *Id.*

86.    Phoenix still does not know whether Kraken ever placed any unleased mineral proceeds in an escrow account or whether BLM understood what Kraken was doing with the proceeds. Ex. 6, at ¶ 29. Phoenix also does not know BLM's position on validity or interpretation of the 2023 CAs, and it will have to conduct discovery on that issue. *Id.*; Ex. 11.

87.    Phoenix waited for answers from Ms. Iron Shirt, but it eventually realized that BLM was not going to respond to its inquiries, provide any further information or documents, or provide any official position on the 2023 CAs. Kraken SUF, Ex. L at Int. No. 3; Ex 6, at ¶ 30.

88.    Phoenix has not appealed the CAs in its Complaint because it is not a party to the 2023 CAs. Compl.; Exs. 9 and 10.

89.    Phoenix has specifically asked this Court to find that the 2023 CAs are invalid because Phoenix is not a party to them. Compl., ¶ 104.

90.    Phoenix is not appealing the lease sale or the issuance of the Lease. Compl. at Counts I-VII.

91.     Phoenix is asking the Court to determine whether the 2023 CAs are valid, invalid, or partially valid given the lack of notice and the applicable law. *Id.*

92.     Some of Phoenix's claims for declaratory relief cite to provisions of the MLA, but Phoenix also has claims that include, for example, a request that the Court interpret ambiguous language in the 2023 CAs. Compl., at Count VII.

93.     Only two of Phoenix's declaratory judgment claims cite to provisions of the MLA. *Id.* at Count I and Count V.

Dated this 19th day of January, 2026.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone (406) 403-7066
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Brian D. Lee
LEE LAW OFFICE PC
P.O. Box 790, 158 Main Street
Shelby, MT 59474
Telephone: (406) 434-5244
Email: brian@leelawofficepc.com

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2026, the foregoing was served by the Clerk of the U.S. District Court of Montana, Billings Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

/s/ Adrian A. Miller
Adrian A. Miller