IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KRAKEN OIL AND GAS, LLC; KRAKEN OPERATING, LLC; and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | CV 25-65-BLG-TJC<br><br>**ORDER** |

Plaintiff Phoenix Energy One, LLC, formerly known as Phoenix Capital Group Holdings, LLC, ("Phoenix"), brings this action seeking declaratory judgment against the United States Bureau of Land Management ("BLM"), as well as Kraken Oil and Gas, LLC and Kraken Operating, LLC (collectively, "Kraken"). (Doc. 1.) Three motions are currently pending before the Court: BLM's Motion to Dismiss (Doc. 45); Kraken's Motion for Summary Judgment, or, in the Alternative to Dismiss (Doc. 50); and Phoenix's Motion for Leave to File a Sur-Reply or, Alternatively, to Disregard or Strike New Arguments Raised in Defendant BLM's Reply Brief (Doc. 63). The motions are fully briefed and ripe for review.

/ / /

Having considered the parties' submissions, the Court hereby orders BLM's motion is **GRANTED, without prejudice and with leave to amend**, Kraken's motion for summary judgment is **DENIED**, and Phoenix's motion for leave to file a sur-reply is **DENIED as moot**.

## I. FACTUAL BACKGROUND[1]

This case concerns a subsurface mineral interest located in Richland County, Montana, at Township 26 North, Range 59 East, MPM, Section 21: W1/2NW1/4 and NW1/4SW1/4 ("the Lands"). The surface estate is privately owned. The United States owns a 50% undivided interest in the subsurface mineral estate ("the Federal Minerals"), and the other 50% undivided interest is privately owned. Kraken has leased the majority of the privately-owned mineral interest in the Lands.

The Montana Board of Oil and Gas Conservation ("MBOGC"), a state regulatory agency, created a temporary spacing unit encompassing the Lands, and issued Kraken a permit authorizing it to drill a well to produce minerals from the spacing unit. Kraken spud the Dagney 21-28 #1H well ("#1H well") in December 2017. The #1H well was completed and began producing oil and gas from the spacing unit in June 2018.

[1] The background facts set forth here are taken from the parties' submissions and are undisputed except where indicated.

In December 2018, the MBOGC entered a permanent spacing unit and pooling order which pooled the non-federal mineral interests in the Lands, as well as those in Section 28 of Township 26 North, Range 59 East, into a 1,280-acre unit with shares of the produced minerals to be allocated on the basis of surface acreage.

Kraken obtained a lease of the Federal Minerals in either late 2017 or early 2018.[2] Following the MBOGC's permanent spacing and pooling order, Kraken applied to BLM for a communitization agreement ("CA") whereby BLM would agree to pool the Federal Minerals leased by Kraken with the other minerals in the MBOGC-ordered spacing unit. Kraken planned to drill more wells and further develop oil and gas from the spacing unit.

On May 1, 2020, however, District Judge Morris issued an opinion in *WildEarth Guardians v. United State Bureau of Land Management*, that vacated a number of federal oil and gas leases in Montana for failure to comply with the National Environmental Policy Act ("NEPA"). 457 F. Supp. 3d 880 (D. Mont. 2020). Kraken's lease of the Federal Minerals was among those vacated.

[2] It is unclear from the parties' filings when exactly Kraken obtained its lease of the Federal Minerals. In its Complaint, Phoenix alleges that Kraken obtained its lease in 2018 (Doc. 1, ¶ 10), and both Kraken and BLM admit this allegation (Doc. 41, ¶ 10; Doc. 19, ¶ 10). But an October 14, 2021, letter from BLM to Kraken states that Kraken's lease was sold in December 2017. (Doc. 52-8 at 2.) Nevertheless, the precise date of Kraken's lease of the Federal Minerals is not material to the current motions.

On April 8, 2021, BLM approved Kraken's application for a CA, issuing Federal CA MTM 111087 ("2021 CA"), with an effective date of June 1, 2018. At the time, the Federal Minerals were unleased. Under the 2021 CA, all proceeds attributed to unleased Federal Minerals within the CA were to be placed in an interest-bearing account until the Federal Minerals were leased. (Doc. 66-2 at 6.)

Kraken later sent a letter to BLM on September 21, 2021, requesting the agency issue a compensatory royalty agreement ("CRA") regarding the now-unleased Federal Minerals. On October 14, 2021, BLM sent Kraken a letter declining to do so, declaring that the issuance of a CRA was "not the proper legal course of action." (Doc. 52-8 at 2.) Kraken appealed BLM's decision to the Interior Board of Land Appeals ("IBLA"), an appellate review body within the Department of Interior. On September 14, 2022, the IBLA issued a decision "hold[ing] that BLM denied the CRA on the incorrect legal conclusion that it lacked authority to do so." (Doc. 52-9 at 11.) Although the IBLA's decision indicated that BLM could enter a CRA with Kraken, it did not require BLM to do so. BLM did not subsequently enter a CRA with Kraken.

Instead, on June 13, 2023, BLM and Kraken entered into a CA purporting to amend the 2021 CA covering the #1H well, with an effective date of June 1, 2018 ("Amended CA"). The contract number of the Amended CA was the same as the 2021 CA: MTM 111087. (Doc. 66-9 at 2.) On the same day, BLM and Kraken

also entered into a new CA, MTM 112222, ("New CA") covering two other wells Kraken had drilled, the Dagney 33-21 #3H well ("#3H well") and the Dagney 33-21 #4H well ("#4H well"), with an effective date of January 11, 2021. The Amended CA and New CA (collectively "2023 CAs") purport to allocate to the operator the percentage of production attributable to the unleased Federal Minerals until the lands were leased. (Doc. 66, ¶ 57.)

On December 28, 2023, BLM announced the beginning of a scoping period seeking public comment on a potential future sale to once again lease the Federal Minerals, among other parcels. BLM eventually scheduled the lease sale for August 6, 2024. Parcel lists issued by BLM prior to the sale indicated that the parcel covering the Federal Minerals was committed to a CA, and directed that: "[t]he successful bidder should contact the CA operator to determine their rights under this CA. The CA operator may require the successful bidder to pay a proportionate cost of the well, including drilling, completing, equipping, and operating the well as a condition of participating in the CA." (Doc. 52-11 at 118.) But the parcel description for the first notice only references CA MTM 111087, with an effective date of June 1, 2018. (Doc. 66-4 at 33.) BLM subsequently issued four additional parcel lists prior to the sale. Again, only MTM 111087 is referenced. (Doc. 66-5 at 3, 23, 44, 66.)

/ / /

Phoenix submitted the winning bid for the Federal Minerals, and BLM awarded it a lease dated September 19, 2024, with an effective date of October 1, 2024.

Shortly thereafter, Phoenix emailed Kraken informing it of its lease. Phoenix inquired about funds it contends Kraken should have held in escrow related to previous production of the communitized Federal Minerals. In December 2024, Kraken emailed Phoenix copies of the 2023 CAs. Kraken told Phoenix it would only provide accounting information regarding the Federal Minerals from October 1, 2024, onward.

Phoenix contacted BLM beginning in January 2025, requesting additional information regarding the 2023 CAs and seeking BLM's position on their validity. Phoenix eventually determined that BLM did not intend to take a position regarding the application of the 2023 CAs. Phoenix filed this lawsuit on May 15, 2025, advancing seven counts for declaratory judgment under 28 U.S.C. § 2201. In essence, Phoenix alleges that the 2023 CAs contain impermissible provisions, and it seeks rulings from this Court regarding the CAs' validity as well as the parties' attendant rights and obligations.

On December 12, 2025, BLM moved to dismiss Phoenix's Complaint pursuant to Fed. R. Civ. P. 12(b)(1). (Doc. 45.) BLM argues Phoenix has not adequately alleged a waiver of BLM's sovereign immunity, and that this Court,

therefore, lacks subject matter jurisdiction.

On December 15, 2025, Kraken moved for summary judgment on all seven counts of Phoenix's Complaint, arguing that Phoenix's claims are barred by the statute of limitations contained at 30 U.S.C. § 226-2, or alternatively, by laches. (Doc. 50.) Kraken also moves in the alternative for dismissal based on the doctrine of primary jurisdiction, arguing the IBLA is the more appropriate forum for this dispute.

BLM's reply brief in support of its motion to dismiss quotes extensively from Kraken's brief in support of summary judgment, and explicitly adopts Kraken's arguments that Phoenix's claims are time-barred by § 226-2. (Doc. 60 at 4–7.) BLM, therefore, argues that any amendment of the Complaint to cure the jurisdictional defect would be futile. Phoenix moves to strike what it characterizes as BLM's procedurally inappropriate expansion of its argument. (Docs. 63, 64.) In the alternative, Phoenix requests leave to file a sur-reply.

Typically, courts address arguments raised under Rule 12(b)(1) before addressing other arguments for dismissal. *Francois v. United States*, 2017 WL 467976, at *2 (D. Ariz. Feb. 3, 2017). But, for reasons that will become clear in the discussion below, the Court will first analyze Kraken's motion for summary judgment, then Kraken's motion for dismissal, and BLM's motion for dismissal.

/ / /

## II. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id*.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)).

The Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. KRAKEN'S MOTION FOR SUMMARY JUDGMENT

Although Kraken and Phoenix vigorously dispute Phoenix's entitlement to the declaratory judgments it seeks, Kraken's instant motion does not request summary judgment based on the substantive merits of Phoenix's claims. Instead, Kraken argues summary judgment is appropriate because all seven of Phoenix's claims are untimely and barred by the 90-day statute of limitations in the Mineral Leasing Act ("MLA"), 30 U.S.C. § 226-2.

### A. Time-Bar Under 30 U.S.C. § 226-2

Congress first enacted the MLA in 1920 and extensively amended it in September 1960. Among the changes made in 1960 was the addition of a section later codified as § 226-2 – Limitations for filing oil and gas contests. This section provides as follows:

> No action contesting a decision of the Secretary [of the Interior] involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter. No such action contesting such a

> decision of the Secretary rendered prior to September 2, 1960 shall be maintained unless the same be commenced or taken within ninety days after September 2, 1960.

30 U.S.C. § 226-2.

Phoenix asserts § 226-2 is inapplicable because this case does not involve an appealable final decision of BLM.[3] (Doc. 65 at 18.) While Kraken asserts that the essence of Phoenix's claim is a challenge to BLM's incorporation of the 2023 CAs in the lease, Phoenix disagrees, and argues that there was no final BLM decision "to lease the Federal Minerals subject to the 2023 CAs or issue the Lease subject to the same." (*Id.* at 20.)[4]

Kraken, on the other hand, argues that § 226-2 applies broadly to claims brought under the MLA. Kraken characterizes all of Phoenix's claims as based on the MLA and its implementing regulations. Thus, Kraken contends that all of Phoenix's claims are time-barred because none were brought within § 226-2's

---

[3] The Secretary of the Interior has delegated implementation of the MLA to BLM, so actions taken pursuant to the MLA by BLM are ascribed to the Secretary. *See* 43 C.F.R. § 3170.1.

[4] Phoenix appears to also assert that there was no final decision here because there was no final decision issued by the IBLA. Phoenix cites 43 C.F.R. § 4.21 for the proposition that "[w]here IBLA review is available, it is the IBLA's decision, not preliminary BLM action, that constitutes final agency action." (Doc. 65 at 18.) Section 4.21(a) of this regulation provides, however, that "[a]n appeal must be filed with the Director or applicable Appeals Board to exhaust administrative remedies unless otherwise provided by applicable law or the decision is immediately effective." 43 C.F.R. § 4.21(a). No appeal to IBLA was filed here, so BLM's action would have been the agency's final decision.

prescribed 90-day window.

As Kraken acknowledges, however, courts have determined that § 2-226 does not govern all legal challenges to BLM decisions involving oil and gas leases. Courts entertain challenges filed past § 226-2's 90-day limit so long as the suit is premised on violation of a law other than the MLA. *See, e.g.*, *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1142 (D. Mont. 2004) (challenging BLM decision involving an oil and gas lease under NEPA); *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 250 F. Supp 3d 1068, 1085 (D. Utah 2017) (same). Indeed, the *WildEarth Guardians* case, which set in motion the series of events that led to this action, was one such case. Therefore, it is clear § 226-2 is not applied strictly and literally to all challenges of BLM decisions which may involve oil and gas leases.

Nevertheless, Kraken argues that cases interpretating § 2-226 support a broad application of the limitations period to decisions under the MLA. One of the principal cases Kraken relies on is *Park County Resource Council, Inc. v. U.S. Department of Agriculture*, 817 F.2d 609, 616 (10th Cir. 1987). But *Park County Resource Council* was actually the first case to hold that challenges to secretarial decisions involving oil and gas leases need not comply with § 226-2's statute of limitations when suit is brought under NEPA. Thus, the decision recognizes that the limitations period does not apply to all cases which may involve or impact an

oil and gas lease.

In its decision, however, the Tenth Circuit also commented on the application of § 226-2. The court stated, first, that the section "applies only to actions contesting either the lease issuance or substantive decisions relating to the lease itself." 817 F.2d at 616. But in the next sentence, the court stated, somewhat contradictorily, that "[i]t applies in cases challenging lack of compliance with all the intricate requirements of Subchapter IV of the [MLA] which deals with oil and gas leasing." *Id*. The court did not, however, accompany the latter, far-reaching pronouncement with any substantive analysis of the statute.

A more recent district court decision in the Tenth Circuit declined to apply the broad statements from *Park County Resource Council* in considering § 226-2. *Wyoming v. U.S. Dep't of the Interior*, 2024 WL 5264647, at *9–10 (D. Wyo. Dec. 31, 2024). In *Wyoming*, the state challenged BLM's failure to hold lease sales on federal lands for oil and gas development, as it was authorized to do under the MLA. BLM argued that Wyoming's claims were barred by § 226-2, since the case was filed more than 90 days after BLM's alleged failure to hold the sales.

The court disagreed, and said that, even if the statute were broadly interpreted to encompass any claim "affecting" an oil and gas lease, it would not apply to the circumstances of that case. The Court pointed out that Wyoming was challenging its inability to bid on oil and gas leases, but there were no leases in

existence. Therefore, the challenged BLM decisions '"involve[d]' or 'affect[ed]' bidding opportunities as opposed to oil and gas leases." *Id*. at *9.

The court also scrutinized the above-quoted statements from *Park County Resource Council*. The court characterized them as "rather broad dicta," and explicitly declined to extend § 226-2 to cover all MLA challenges. *Id*. The Court said: "Congress was capable of saying the statute [§ 226-2] applies to claims challenging a lack of MLA compliance if it so desired. Instead, though, Congress limited the statute's application to decisions 'involving any oil and gas lease.'" *Id.*

This Court agrees that § 226-2 does not reach every claim under the oil and gas leasing provisions of the MLA. Instead, § 226-2 means what it says. It applies to an "action contesting a *decision* of the Secretary *involving any oil and gas lease*." For that reason, this Court is also unconvinced by Kraken's citations to cases where interpretation of § 226-2 is explicitly predicated on the Tenth Circuit's dicta in *Park County Resource Council*. (*See* Doc. 51 at 15–16.)

Kraken also argues, however, that the legislative history of § 226-2 supports a broad application of its provisions. But in interpreting a statute, a court must look first to the plain language of the statute, and need not look to the legislative history unless the statute is ambiguous or the "the legislative history clearly indicates that Congress meant something other than what it said." *Zuress v. Donley*, 606 F.3d 1249, 1252–53 (9th Cir. 2010).

But even if the legislative history is considered here, it does not support Kraken's broad interpretation of the statute. In support of its contention that § 226-2 applies expansively to all suits alleging BLM's failure to comply with the MLA, Kraken cites to testimony given before the Senate in March 1960, when the MLA amendments were under consideration. (Doc. 51 at 14.) Although Kraken suggests that the legislative history it highlights is representative of what Congress was "concerned about," "understood," and "determined" when it was amending the MLA, the three quotations Kraken presents in support of these contentions are drawn exclusively from just two sentences of testimony provided by Arthur Thad Smith. Mr. Smith was not a member of Congress, but an attorney for the Continental Oil Company and a representative of the Independent Petroleum Association of America. *Compare id. with Hearings on S. 2983 Before the Subcomm. on Pub. Lands of the Comm. on Interior and Insular Affs.,* 86th Cong. 296, 305 (1960). Moreover, Mr. Smith's comments about the desirability of a statute of limitations did not pertain to any draft legislative text, but to a question Senator Gordon Allott posed about an amendment he would "propose to offer at a later time." *Hearings on S. 2983*, 86th Cong. at 304. These brief remarks on the subject provide little insight into the ways in which Congress intended for courts to construe the scope of § 226-2. *See United States v. Fairfield Gloves*, 558 F.2d 1023, 1027 (C.C.P.A. 1977) ("Statements made in briefs or in testimony presented

at committee hearings cannot be considered as a guide to what Congress intended, since Congress has not delegated to organizations or individuals appearing before its committees the authority to construe a statute.”).

In fact, the earliest version of the section that eventually became § 226-2 would seem to indicate that the statute of limitations was at least initially intended to apply only to certain specific scenarios, rather than encompass the entirety of potential secretarial action under the MLA. In June 1960, the proposed draft read:

> No action under the Administrative Procedure Act to review a decision of the Secretary involving the application for, issuance, cancellation, or forfeiture of or title to any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days from and after the final decision of the Secretary relating to such matter. No such action to review such a decision of the Secretary heretofore rendered shall be maintained unless the same be commenced or taken within ninety days from and after the effective date of this Act.

S. Rep. No. 86-1549, at 39 (1960). The report accompanying this version of the MLA amendments merely states that Congress intended for the statute of limitations to “remove a potential cloud on acreage subject to leasing.” *Id.* at 5.

By August 1960, the operative language had been reworked to that which is now codified as § 226-2. Staff of H. Comm. on Interior and Insular Affs., 86th Cong., *Language Tentatively Approved by Conference Committee on H.R. 10455* 28 (Comm. Print 1960). But Congress’s reasons for substantially simplifying the wording of this section between June and August of 1960 are not clear from the legislative history. The August 1960 congressional report only indicates that “[t]he

conferees reworked this matter until it read as shown in the text above." *Id.* at 28 n.39.

Thus, contrary to Kraken's representations, the legislative history of § 226-2 is of relatively little help in determining how broadly courts should apply the section's 90-day statute of limitations.

Turning, then, to whether § 226-2 applies to Phoenix's claims here, it must first be determined whether a final decision of the Secretary involving an oil and gas lease is implicated. The Supreme Court has outlined a basic two-part test for determining whether an agency action can be considered final: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up, internal citations omitted).

In support of its motion, Kraken offers four potential final decisions which may be subject to § 226-2:

1. BLM's April 8, 2021, decision to execute the original CA, effective June 1, 2018;
2. BLM's June 13, 2023, decision to amend the original CA, effective June 1, 2018, and to execute the New CA, effective January 11, 2021;

3. BLM's August 5, 2024, decision to offer its 50% interest in the parcel subject to the CAs at the lease sale; and
4. BLM's September 19, 2024, decision to issue the lease subject to the CAs to Phoenix, effective October 1, 2024. (Doc. 51 at 17.)

The first two potential decisions, on April 8, 2021, and June 13, 2023, did not involve an oil and gas lease. At the time the 2021 CA and the 2023 CAs were executed, the lease of the Federal Minerals on the Lands had been vacated by Judge Morris. Thus, there was no federal oil and gas lease in effect at the time, so plainly the BLM's decision to enter into these CAs did not involve an oil and gas lease.

As for the latter two potential decisions, on August 5, 2024, and September 19, 2024, there are issues of fact as to whether BLM made a final decision to "issue the lease subject to the CAs." Viewing all inferences drawn from the underlying facts in the light most favorable to Phoenix, it appears the notices that were issued for the lease sale only referenced one CA. There was no mention in the notice of applicability of an Amended CA or New CA, and it has not been established in connection with the current motions that BLM has made a decision on whether the 2023 CAs are applicable to this lease. Kraken has certainly taken the position that the 2023 CAs apply, but there is nothing in the record to establish that BLM shares that view, and if so, when it made the decision to issue the lease

subject to those CAs.

Therefore, Kraken has not established the absence of any issue of material fact that BLM made a final decision to issue the lease to Phoenix subject to the 2023 CAs. With no identifiable final decision involving an oil and gas lease, summary judgment based on the 90-day statute of limitations is not appropriate.

Moreover, when each count of the amended complaint is evaluated, only one can be said to contest a decision of the Secretary involving an oil and gas lease. Each count is considered in turn below.

**1. Count I**

In Count I, Phoenix asks the Court to declare that BLM exceeded its authority by including certain language in the 2023 CAs. Phoenix also requests the Court declare Section 5 of these CAs "unlawful, invalid, and of no force and effect." (Doc. 1, ¶¶ 59–61.) As discussed above, when BLM entered into the 2023 CAs with Kraken, the Federal Minerals were unleased. Accordingly, it is axiomatic that BLM's decision to enter into these CAs did not involve any oil and gas lease. Section 226-2 is thus inapplicable, and Count I is not time-barred.

**2. Count II**

Count II is a closer call. In Count II, Phoenix requests a declaration that Section 5 of the 2023 CAs violates federal law "because the Federal Minerals cannot be subject to what is effectively a CRA, allocating production to Kraken in

the instant case, and also be leased." (*Id.*, ¶ 71.) Phoenix also seeks an alternate declaration that if the contested Section 5 language remains in place, "Phoenix is entitled to cancellation of the Lease and a refund of all expenditures for bid and award of the Lease." (*Id.*, ¶ 72.) Phoenix's first request in Count II thus effectively challenges BLM's decision to lease the Federal Minerals, and Phoenix's second request explicitly seeks cancellation of the lease Phoenix was awarded. Therefore, unlike Count I, Count II directly challenges BLM's decisions involving Phoenix's lease. But Count II is also based on the assumption that BLM made a decision to issue the lease subject to the 2023 CAs. As discussed above, there are questions of fact as to when and whether BLM has made such a decision. Since there are issues of fact as to whether the ultimate decision has been made, summary judgment on this Count would not be appropriate at this time.

**3. Count III**

Similar to Count I, Count III seeks a declaration that Section 5 of the 2023 CAs is unlawful and invalid. (*Id.*, ¶ 80.) For the same reasons § 226-2 does not render Count I untimely, Count III is similarly not time-barred.

**4. Count IV**

In Count IV, Phoenix seeks "a declaration that BLM and Kraken could not allocate any production revenue to Kraken for the unleased Federal Minerals." (*Id.*, ¶ 89.) The 2023 CAs provide for this allegedly unlawful allocation. As stated

above, BLM's decision to enter the 2023 CAs cannot have involved an oil and gas lease because the Federal Minerals were unleased at the time. Accordingly, Count IV is not time-barred.

### 5. Count V

Count V is a bit more complicated, as Phoenix seeks relief on several fronts. Phoenix asserts it:

> is entitled to a declaration that Section 5 of the [2023] CAs must be interpreted in accordance with the Lease and federal law to: (1) require Phoenix to pay its proportionate share of costs from the Wells' inception, being the spud dates forward; (2) require Phoenix to be allocated its proportionate share of revenue associated with the Federal Minerals from the Wells' inception, being the spud dates forward; and (3) require that the federal government be paid its 1/6 (and not 1/8) royalty from the Federal Minerals from the Wells' respective first dates of production.

(*Id.*, ¶ 102.) Phoenix also requests again that Section 5 of the 2023 CAs be declared unlawful and invalid. (*Id.*, ¶ 104.)

While Phoenix specifically references its lease of the Federal Minerals, Count V essentially brings another challenge to BLM's decision to include the Section 5 language in the 2023 CAs. This Count does not directly challenge any BLM decision involving an oil and gas lease, and is, therefore, not time-barred.

### 6. Count VI

Phoenix brings Count VI as an alternate request for relief if the Court ultimately upholds the validity of the 2023 CAs. (*Id.*, ¶ 106.) In that event,

Phoenix requests a declaration that "the 2023 CAs are not effective as to Phoenix's interest unless or until it executes the 2023 CAs." (*Id.*, ¶ 117.) In effect, this is yet another challenge to BLM's decision to enter the 2023 CAs and to ostensibly give them retroactive effective dates. Again, challenges to the 2023 CAs are not time-barred by § 226-2 because BLM decided to enter these CAs when there was no oil and gas lease in effect. Count VI is not time-barred.

**7. Count VII**

Phoenix's final count for declaratory judgment is, like Count VI, brought in the alternative should the Court find that Section 5 of the 2023 CAs is valid and lawful. In Count VII, Phoenix again seeks a multi-faceted judgment declaring that Section 5 be interpreted against Kraken and, moreover, that Phoenix is entitled to:

> (1) pay its proportionate share of the costs, including drilling, completing, and equipping the Wells, (2) after paying its proportionate share of costs, obtain its proportionate share of revenue from the Wells from inception, (3) upon payment of such costs, 'own the working interest' covering the Federal Minerals and be entitled to exercise all rights and obligations associated with its interest.

(*Id.*, ¶ 127.)

As with the majority of the other Counts, nothing in Count VII challenges a decision of BLM involving an oil and gas lease. Instead, Count VII seeks a declaration interpreting language from the 2023 CAs, which were executed when no lease existed. Accordingly, Count VII is not time-barred.

/ / /

In sum, Kraken has not established the absence of any issue of material fact as to whether the lease was issued subject to the 2023 CAs. Additionally, with the exception of Count II, none of the Counts of Phoenix's Complaint challenge a BLM decision involving an oil and gas lease, and Kraken is, therefore, denied summary judgment that these claims are time-barred.

**B. Laches**

Kraken also asserts that summary judgment is appropriate based on the equitable doctrine of laches, arguing it is prejudiced by Phoenix's unreasonable delay in bringing this action.

"[L]aches penalizes inexcusable dilatory behavior[.]" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002). "Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001) (internal citations omitted). The general rule for laches is that "any delay is to be measured from the time that the plaintiff knew or should have known about the potential claim at issue." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000). "There must, of course, have been knowledge on the part of the plaintiff of the existence of the rights, for there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend." *Halstead v. Grinnan,* 152 U.S. 412, 417

(1894).

"To obtain a judgment on th[e] affirmative defense [of laches], a defendant must prove 'both an unreasonable delay by the plaintiff and prejudice to itself.'" *Kling*, 225 F.3d at 1036 (quoting *Couveau v. Am. Airlines*, 218 F.3d 1078, 1083 (9th Cir. 2000)). *See also Jarrow Formulas*, 304 F.3d at 835 ("A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit."). "A defendant may [] demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Danjaq*, 263 F.3d at 955. "Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine." *Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir. 1977).

Kraken contends that Phoenix was notified as early as December 2023 that the lease it was ultimately awarded in September 2024 would be subject to a CA and that it would need to contact Kraken to determine its rights. (Doc. 51 at 22.) Thus, Kraken argues that Phoenix waited an unreasonable amount of time to bring this lawsuit challenging the applicability of the 2023 CAs. The Court disagrees.

Even if the Court were inclined to credit Kraken's characterization of Phoenix's suit as untimely, disputed questions of fact preclude summary judgment based on laches. Despite Kraken's representations that Phoenix was given ample

notice of the 2023 CAs to which its lease is purportedly subject, Phoenix disputes (a) that BLM's notices adequately informed potential bidders of the existence of the 2023 CAs and (b) that it was under an obligation to inquire as to the content of any CA prior to becoming the winning bidder. Phoenix states that it did not actually see the text of the 2023 CAs until Kraken emailed them in December 2024. (Doc. 65 at 13.)

The Court is also unpersuaded by Kraken's arguments that the sale notices BLM issued beginning in December 2023 could have begun running the clock for purposes of laches. Even assuming that Phoenix had the text of the 2023 CAs in-hand in December 2023, it is unclear how Phoenix would have had standing to challenge the agreements' validity—in a federal district court or before the IBLA—until it was awarded the lease in September 2024. Thus, Phoenix could only have asserted its claims, at the earliest, approximately eight months before it filed this lawsuit. Typically, where laches is found, a plaintiff's unreasonable delay is measured in years, not months. *E.g., Danjaq*, 263 F.3d at 950 (somewhere between 21 and 36 years); *Jarrow Formulas*, 304 F.3d at 839 (seven years). As explained above, § 226-2 is largely inapplicable to Phoenix's claims, so the Court cannot credit Kraken's arguments that that statute's 90-day limitations period is the proper metric by which to measure a supposed delay in bringing this suit. (Doc. 51 at 24.)

Furthermore, Kraken's argument for the application of laches falls short of establishing the doctrine's second element; Kraken does not demonstrate it was prejudiced by Phoenix's alleged delay in bringing suit. Kraken claims it was prejudiced because it "paid all the costs for developing the federal minerals and paid the federal royalties with the reasonable expectation that the CAs were valid and Kraken would be compensated as they provide." (*Id.*) The #1H Well was spud in 2017 and began producing in 2018. While Kraken does not directly state in its filings when the #3H and #4H Wells were spud, they no doubt began producing prior to June 2023—otherwise there would have been no production to communitize in the New CA. Therefore, Kraken has not shown that it took actions or suffered consequences as a result of any delay in bringing suit. Kraken had already developed the wells covered by the 2023 CAs prior to BLM's issuance of the first notice of the lease sale in December 2023, and well before Phoenix could have brought this action. While Kraken may be negatively impacted financially should Phoenix ultimately prevail on its claims, Kraken has not carried its burden of showing that delay by Phoenix in filing this action has caused it prejudice.

In sum, Phoenix's suit is not barred by the doctrine of laches. Having also determined that summary judgment is not warranted based on the statute of limitations, the Court now turns to Kraken and BLM's motions to dismiss.

/ / /

## IV. MOTIONS TO DISMSS

Kraken argues dismissal is appropriate under the primary jurisdiction doctrine, and BLM argues dismissal is warranted under Rule 12(b)(1). The Court will address each motion in turn.

### A. Kraken's Motion to Dismiss

Kraken argues that Phoenix's Complaint should be dismissed under the doctrine of primary jurisdiction. Kraken urges that Phoenix's claims "should first be addressed (if at all) by [the] IBLA—the forum established to handle challenges to BLM decisions, including those related to entering CAs that burden federal minerals and leases." (Doc. 51 at 26.)

"Primary jurisdiction 'is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts.'" *United States v. King County*, 122 F.4th 740, 754 (9th Cir. 2024) (quoting *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002)). The doctrine "is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) (cleaned up, internal citations

omitted). "Not every case that implicates the expertise of federal agencies warrants invocation of primary jurisdiction." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015). "Rather, primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002) (quoting *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987)).

"While 'no fixed formula exists for applying the doctrine of primary jurisdiction,' [courts in the Ninth Circuit] consider: '(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration.'" *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 910 (9th Cir. 2019) (quoting *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086–87 (9th Cir. 2006)). Notwithstanding these considerations, "efficiency is the deciding factor in whether to invoke primary jurisdiction." *Id.* (cleaned up, citations omitted). Accordingly, "primary jurisdiction is not required *when a referral to the agency would significantly postpone a ruling* that a court is otherwise competent to make." *Id.* (emphasis in original).

Because there is no formal mechanism for referring or transferring a case from a federal district court to an agency, *see Syntek*, 307 F.3d at 782 (explaining that "referral" is a term of art in the primary jurisdiction context), the "doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark*, 523 F.3d at 1114.

While the Court agrees with Kraken that the resolution of the issues in this case requires an understanding of the MLA's framework and implementing regulations, the Court declines to "refer" this case to the IBLA on that basis alone. Invocation of the primary jurisdiction doctrine is not appropriate here for a number of reasons.

First, Kraken does not suggest that dismissing this case would allow for the IBLA to efficiently resolve the issues involved. Instead, Kraken suggests that such a dismissal, though nominally without prejudice, would in effect be a dismissal with prejudice because the IBLA would not consider Phoenix's claims. (Doc. 51 at 32–33.) Although Kraken bases this suggestion on its assumption that Phoenix's claims would be wholly barred by § 226-2, Kraken does not provide how this issue may be presented and resolved by the IBLA. The Ninth Circuit has previously declined to invoke primary jurisdiction partly on the grounds that "it is unclear how [the plaintiff] could seek an administrative ruling, and [the defendant] does

not suggest a path forward." *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1291 (9th Cir. 2021). Kraken does not urge the Court to invoke the primary jurisdiction doctrine because it seeks a more efficient resolution of Phoenix's claims, but instead because it seeks to foreclose consideration of those claims entirely. This is contrary to the purposes of the doctrine.

Second, Kraken has not made a showing that the validity of the 2023 CAs is of far-reaching importance for BLM's orderly implementation of the MLA. Kraken argues that the issue of how to allocate production of federal minerals from vacated leases is an increasingly large problem being confronted by BLM (Doc. 51 at 32), but then separately states that it is "extremely rare for a producing lease to be vacated . . . ." (Doc. 70 at 15). Although Kraken asserts that Phoenix's claims have wide-ranging implications which necessitate resolution by the IBLA, nothing in its filings indicates that the disputed language in the 2023 CAs is anything other than a one-of-a-kind arrangement based on the unique circumstances of this case. In short, it does not appear this language is an integral part of BLM's wider regulatory scheme under the MLA.

Accordingly, the Court does not find that invocation of the primary jurisdiction doctrine is warranted. Kraken's motion in the alternative for dismissal is denied.

/ / /

**B. BLM's Motion to Dismiss**

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs a motion to dismiss for lack of subject matter jurisdiction. As the party asserting jurisdiction, the plaintiff bears the burden of proving its existence. *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008.)

A defendant may pursue a Rule 12(b)(1) motion to dismiss either as a facial challenge to the jurisdictional allegations of a pleading, or as a substantive challenge to the facts underlying those allegations. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 (9th Cir. 2003). A facial challenge asserts the allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The challenge does not involve resolution of factual disputes; it only concerns the allegations in the complaint. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

Here, BLM brings a facial challenge to jurisdiction. BLM argues that dismissal is appropriate under Rule 12(b)(1) because Phoenix failed to adequately plead a waiver of the government's sovereign immunity, rendering this Court without subject matter jurisdiction.

The United States, as a sovereign, is absolutely immune from suit unless it has expressly waived its immunity and consented to suit. *United States v. Shaw*, 309 U.S. 495, 500–01 (1940). This immunity extends to agencies of the federal

government. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The waiver cannot be implied; it must be unequivocally expressed. *United States v. King*, 395 U.S. 1, 4 (1969). The existence of such consent is a prerequisite for jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Therefore, any case against a federal agency requires an analysis of whether, and to what extent, the United States has waived its sovereign immunity and permitted the suit.

Phoenix first appears to assert that BLM has waived its sovereign immunity by failing to assert sovereign immunity as an affirmative defense in its Answer. (Doc. 55 at 7.) BLM disputes that its sovereign immunity can be impliedly waived in this way. BLM is correct. As noted above, sovereign immunity goes to a court's jurisdiction and can be raised at any time by the government. *Dep't of the Treasury-IRS v. Fed. Lab. Rels. Auth.*, 521 F.3d 1148, 1152 (9th Cir. 2008).

As to the merits of the motion, a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction. . . ." Fed. R. Civ. P. 8(a)(1). In its Complaint, Phoenix lists 28 U.S.C. §§ 1331, 2201 as the purported basis for this Court's jurisdiction over its claims. (Doc. 1 at 3.) But neither of these statutes provide a waiver of the government's sovereign immunity in this action.

Phoenix argues that 5 U.S.C. § 702 of the Administrative Procedure Act ("APA"), contains such a waiver. (Doc. 55 at 8.) While § 702 does indeed waive the government's sovereign immunity for certain claims, Phoenix does not

reference this statute in its Complaint, nor does the Complaint refer more generally to the APA. (*See* Doc. 1.) Accordingly, Phoenix has failed to properly state the basis for the Court's jurisdiction and its complaint is subject to dismissal.

Nevertheless, Courts have discretion to grant leave to amend a complaint to cure jurisdictional defects. *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). *See also NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016) (stating that "a facial attack is easily remedied by leave to amend jurisdictional allegations pursuant to 28 U.S.C. § 1653"); *Segundo Suenos, LLC v. Jones*, 494 F. App'x 732, 735 (9th Cir. 2012) (citing § 1653 as basis for district court's discretion to either dismiss complaint for lack of subject matter jurisdiction or else grant leave to amend); *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 n.3 (9th Cir. 1988) (citing § 1653 and stating that "[w]hen the district court has jurisdiction over the action at the outset but the complaint inadequately alleges jurisdiction, the court may grant leave to amend the defective allegations"); *Am. Land Title Ass'n v. Great Am. Ins. Co.*, 2006 WL 1329782, at *5 (N.D. Cal. May 16, 2006) (citing § 1653 and stating that when there is a pleading defect, "[a] plaintiff may be given leave to amend a complaint to show that jurisdiction does exist"); *Nationwide Mut. Ins. Co. v. Liberatore*, 2004 U.S. Dist. LEXIS 27949, at *16 (E.D. Cal. Feb. 4, 2004), *aff'd*, 408 F.3d 1158 (9th Cir. 2005)

(stating that § 1653 "is liberally construed to avoid dismissals of complaints on technical grounds").

Moreover, the Ninth Circuit has made clear "[i]t is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). It appears Phoenix may be able to amend its complaint to properly identify a waiver of sovereign immunity and allege the basis for the Court's jurisdiction.

BLM also argues, however, that leave to amend would be futile. But it does so on the basis of arguments drawn from Kraken's briefing regarding the statute of limitations in § 226-2. (Doc. 60 at 4–8.) As explained above, § 226-2 does not bar Phoenix's seven claims for relief. Amendment by Phoenix would, therefore, not be futile.

Additionally, because the Court does not credit BLM's arguments about the futility of amendment, a sur-reply from Phoenix addressing these arguments would be superfluous. Accordingly, Phoenix is denied leave to file a sur-reply.

Therefore, Phoenix will be given thirty (30) days within which to file an amended complaint that cures the deficiencies outlined above. If no amended complaint is filed, the claims against BLM will be subject to dismissal.

/ / /

## V. CONCLUSION

Based on the foregoing, it is **ORDERED** that:

1. Kraken's Motion for Summary Judgment, or, in the Alternative to Dismiss (Doc. 50) is **DENIED**.

2. BLM's Motion to Dismiss (Doc. 45) is **GRANTED**, **without prejudice and with leave to amend.**

3. Phoenix's Motion for Leave to File a Sur-Reply or, Alternatively, to Disregard or Strike New Arguments Raised in Defendant BLM's Reply Brief (Doc. 63) is **DENIED as moot**.

**IT IS ORDERED**.

DATED this 17th day of August, 2026.

TIMOTHY J. CAVAN
United States Magistrate Judge