Adrian A. Miller
Michelle M. Millhollin
Millhollin Miller Law PLLC
2812 1st Avenue North, Suite 225
Billings, MT 59101
Telephone: 406-605-3910
Email: adrian.miller@millhollinmiller.com
michelle.millhollin@millhollinmiller.com

Ross M. Good
The Good Law Group
800 E. Northwest Hwy, Ste. 814
Palatine, IL 60074
Telephone: 847-600-9576
Email: Ross@thegoodlawgroup.com
*Admitted Pro Hac Vice*

Brian D. Lee
LEE LAW OFFICE PC
P.O. Box 790, 158 Main Street
Shelby, MT 59474
Telephone: (406) 434-5244
Email: brian@leelawofficepc.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PHOENIX ENERGY ONE, LLC f/k/a PHOENIX CAPITAL GROUP HOLDINGS, LLC, | Cause No. CV-25-65-BLG-TJC |
| Plaintiff, | **AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AGAINST DEFENDANT BUREAU OF LAND MANAGEMENT** |
| vs. | |
| KRAKEN OIL AND GAS, LLC, KRAKEN OPERATING, LLC, and UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendants. | |

Plaintiff Phoenix Energy One, LLC, formerly known as Phoenix Capital Group Holdings, LLC, by and through its attorneys of record, and pursuant to the Court's Order granting leave to amend (Doc. # 87), for its Amended Complaint, alleges and states as follows:

**PARTIES**

1. Phoenix Energy One, LLC, formerly known as Phoenix Capital Groups Holdings, LLC ("Phoenix") is a Delaware limited liability company with its principal place of business located in Irvine, California.

2. Kraken Oil and Gas, LLC ("Kraken Oil") is a Delaware limited liability company with its principal place of business located in Houston, Texas.

3. Kraken Operating, LLC ("Kraken Operating") is a Texas limited liability company with its principal place of business located in Houston, Texas.

4. The United States Bureau of Land Management ("BLM") is an agency within the United States Department of the Interior responsible for administering U.S. federal lands.

**JURISDICTION AND VENUE**

5. Venue is proper because the mineral interests at issue in this litigation are in Richland County, Montana, which is located in the Billings Division for the District of Montana. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 as this case involves claims arising out of federal law and is brought pursuant to 28 U.S.C. §

2201.

6. Jurisdiction is proper pursuant to 5 U.S.C. § 702, which provides for a right of judicial review for any person suffering a legal wrong because of agency action or adversely affected or aggrieved by agency action and waives federal sovereign immunity.

## FACTS COMMON TO ALL COUNTS

7. This case involves an undivided one half (1/2) of the oil, gas and associated hydrocarbons in certain lands in Richland County, Montana, more particularly described as follows:

Township 26 North, Range 59 East, MPM
Section 21: W1/2NW1/4 and NW1/4SW1/4

(the "Lands").

8. The surface estate is privately owned, and the United States owns an undivided one half (1/2) of the oil, gas and associated hydrocarbons in the Lands (the "Federal Minerals").

9. Kraken Oil and/or Kraken Operating (collectively, "Kraken") leased the other undivided one half (1/2) of the oil, gas and associated hydrocarbons from their private owner(s).

10. Kraken Oil leased the Federal Minerals in 2018.

11. There are three oil and gas wells producing from the Lands: The Dagney 21-28 #1H well, the Dagney 33-21 #3H well, and the Dagney 33-21 #4H

well (collectively, the "Wells").

12. The Dagney 21-28 #1H well was spud in December 2017 and began producing in June of 2018.

13. On December 13, 2018, Sections 21 and 28 of Township 26 North, Range 59 East were pooled by the Montana Board of Oil and Gas ("MBOG") "on the basis of surface acreage for production of oil and associated natural gas from the Bakken/Three Forks Formation." ("21-28 Pooling Order").

14. In June 2020, in litigation challenging the prior federal lease sale, Judge Morris ordered that Kraken's federal lease for the Federal Minerals be vacated. *WildEarth Guardians v. United States Bureau of Land Management*, 458 F.Supp.3d 880, 897 (D. Mont. 2020) ("WildEarth Guardians Litigation").

15. The Dagney 33-21 #3H well was spud on October 19, 2020, and the Dagney 33-21 #4H was spud on October 17, 2020. Both wells began producing on January 1, 2021.

16. Both the Dagney 33-21 #3H well and the Dagney 33-21 #4H well were spud after Kraken Oil's lease was vacated for the Federal Minerals.

17. Approximately nine months after its previous federal lease was vacated, BLM approved a Communitization Agreement (a "CA") that Kraken Oil submitted for the BLM's approval before its previous federal lease was vacated, adding the unleased Federal Minerals to a 1280-acre spacing unit (the "2021 CA").

18. The 2021 CA was approved by BLM, and Section 5 of the 2021 CA required Kraken Oil to place all the proceeds attributable to the unleased Federal Minerals into an escrow or trust account until the Federal Minerals were leased or ownership was established.

19. On April 8, 2021, Kraken Oil submitted its Application to MBOG for Permanent Spacing Unit and Application for Compulsory Pooling for the Wells, to create a permanent spacing unit for the Wells and to pool oil and gas in all of Sections 21, 28, and 33 in Township 26 North, Range 59 East.

20. In its petition, Kraken Oil represented to MBOG that it was the working interest owner covering the Federal Minerals.

21. Kraken Oil and Kraken Operating did not have a lease covering the Federal Minerals when it submitted its petition to MBOG on April 8, 2021; Kraken's previous federal lease was vacated by the Court in the WildEarth Guardians Litigation.

22. That same day, MBOG pooled Sections 21, 28, and 33 of Township 26 North, Range 59 East for the Wells "on the basis of surface acreage for production of oil and associated natural gas from the Bakken/Three Forks Formation" (the "21-28-33 Pooling Order").

23. On September 21, 2021, Kraken requested that BLM enter into a Compensatory Royalty Agreement (a "CRA") for the unleased Federal Minerals.

BLM refused.

24. Kraken Oil appealed BLM's decision refusing to enter a CRA to the Interior Board of Land Appeals ("IBLA") of the United States Department of the Interior.

25. The IBLA issued a decision on September 14, 2022, finding that BLM had authority to enter a CRA in that instance and remanding to BLM for further consideration of Kraken's request for a CRA (the "2022 IBLA Decision"). The IBLA offered "no opinion on whether BLM must, or should, grant the CRA."

26. BLM and Kraken did not subsequently enter into a CRA. There is no document entitled Compensatory Royalty Agreement between BLM and Kraken covering the Federal Minerals.

27. Instead, Kraken Operating entered into an Amended Communitization Agreement with BLM in June 2023 for the Dagney 21-28#1H well (the "21-28 CA"). A true and correct copy of the 21-28 CA is attached hereto as Exhibit A.

28. In Section 5 of the 21-28 CA, the language contemplates that there might be a future lessee of the Federal Minerals – "Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), including drilling, completing and equipping the well, the acquiring party(s) [lessee] shall own the

working interest described in the tract, as described on Exhibit B, and shall have the rights and obligations of said working interest as to the effective date of the Federal Lease."

29. Kraken Oil also entered into a new CA in June 2023 for the Dagney 33-21 #4H and Dagney 33-21 #3H wells (the "33-21 CA"). A true and correct copy of the 33-21 CA is attached hereto as Exhibit B. The 33-21 CA includes the same language in Section 5 as the 21-28 CA, requiring a future lessee of the Federal Minerals to pay its proportionate share of costs of the wells, including drilling, completing and equipping the wells, as a condition precedent to exercise its rights and obligations under a federal lease covering the Federal Minerals.

30. Section 5 of both the 21-28 CA and the 33-21 CA (collectively, the "2023 CAs") also purport to "allocate" to the operator (Kraken Oil or Kraken Operating) "the percentage of production attributable to the unleased Federal land within the communitized area" until "the effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s)," or until production ceases, or the CA is terminated.

31. The language in Section 5 of both 2023 CAs purporting to "allocate" production to Kraken appears to be language from a CRA even though there is no separate document establishing a CRA.

32. Kraken's attorney drafted and inserted Section 5 language in both 2023

CAs in an attempt to mirror a CRA and create the same effect as a CRA. BLM made a few minor revisions to the language drafted by Kraken's attorney, but the language largely came from Kraken.

33. The 2023 CAs purport to be effective retroactively; even though they were both executed in June 2023, the 21-28 CA purports to be effective as of June 1, 2018, and the 33-21 CA purports to be effective as of January 11, 2021.

34. It is unclear what happened to the revenue from the unleased Federal Minerals between June 2020 when Kraken's federal leases were vacated and June 2023 when Kraken and BLM entered into the 2023 CAs.

35. Upon information and belief, the only agreement between BLM and Kraken covering the three years between June 2020 and June 2023 was the 2021 CA, applicable only to the Dagney 21-28 #1H well. The 2021 CA required Kraken to place all the proceeds attributable to the unleased Federal Minerals into an escrow or trust account until the Federal Minerals were leased or ownership was established.

36. Upon information and belief, Kraken did not deposit the proceeds attributable to the unleased Federal Minerals into an escrow or trust account between June 2020 and June 2023 as required by the 2021 CA.

37. Upon information and belief, the Dagney 21-28 #1H well paid out sometime between June 2019 and December 2019.

38. Upon information and belief, the Dagney 33-21 #3H well and the

Dagney 33-21 #4H well paid out sometime between January 2022 and June 2022.

39. Phoenix was awarded a lease for the Federal Minerals effective as of October 1, 2024, after bidding successfully at a competitive bidding auction (the "Lease"). *See* Lease for Oil and Gas, MTMT106370202 (dated September 19, 2024, effective October 1, 2024), attached hereto as Exhibit C.

40. After Phoenix was awarded the Lease, pursuant to the 2023 CAs, it reached out to Kraken for an accounting to pay its proportionate share of the Wells, including drilling, completing, and equipping the Wells so that it may exercise its rights to net revenue for the Federal Minerals since inception.

41. Kraken refused to provide an accounting for the unleased Federal Minerals prior to October 1, 2024.

42. Despite clear language in the 2023 CAs that Phoenix is responsible to pay its proportionate share of the Wells, including drilling, completing, and equipping the Wells, Kraken has taken the stance that it is entitled to all revenues for the unleased Federal Minerals until the effective date of the Lease.

43. According to the language in Section 5 of the 2023 CAs, it is a condition precedent for Phoenix to pay its proportionate share of the costs of the Wells, including from drilling the wells until present, in order for Phoenix to exercise its rights under the Lease, including the right to receive its proportionate share of revenues.

44. Under the 2023 CAs and federal law, once Phoenix pays its proportionate share of costs, it is, correspondingly, entitled to its proportionate share of revenues.

45. Upon information and belief, Kraken has kept all revenue attributable to the unleased Federal Minerals from the date the Wells were drilled until October 1, 2024, the effective date of Phoenix's Lease.

**COUNT I – DECLARATORY JUDGMENT**
**(Violation of 30 U.S.C. § 226 & 43 CFR § 3105.22)**

46. Phoenix reasserts the allegations in paragraphs 1 through 45 as if fully set forth herein.

47. The 21-28 CA and the 33-21 CA each have language in Section 5 that purports to determine the contract and property rights among lessees within a pooled interest area.

48. In the 2023 CAs, Kraken has attempted to mirror language from a CRA by allocating to itself the proceeds from production in the unleased Federal Minerals.

49. The definition of a "communitization agreement" includes: "[w]hen separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program, any lease, or a portion thereof, may be pooled with other lands, whether or not owned by the United States, under a communitization <u>or</u> drilling agreement providing for an apportionment of production or royalties among the separate tracts of land comprising the drilling or spacing unit

when determined by the Secretary of the Interior to be in the public interest, and operations or production pursuant to such an agreement shall be deemed to be operations or production as to each such lease committed thereto." 30 U.S.C. § 226(m) (emphasis added).

50. A further definition of a communitization agreement is: "the agreement to combine small tracts for the purpose of committing enough acreage to form the spacing and proration unit necessary to comply with the applicable state conservation requirements." L. Cox, "Unitization and Communitization," 2 Law of Federal Oil and Gas Leases § 18.01[2], at 18-5 (LexisNexis Matthew Bender).

51. The purpose of a CA is set forth in 43 CFR § 3105.22. According to that regulation, "when a lease or a portion thereof cannot be independently developed and operated in conformity with an established well-spacing or well-development program, the authorized officer may approve a communitization agreement for such lands with other lands…"

52. The Federal Minerals could always be developed through a lease and operated in conformity with a well-spacing program, as is evident from the fact that Kraken held a lease covering the Federal Minerals until June 2020 and Phoenix now holds the Lease covering the Federal Minerals.

53. According to the BLM Handbook on Communitization, communitization cannot be construed as "[j]ustification for allowing two or more

lessees, working interest owners, or operators to share drilling costs and revenues." Rather, "[t]his can only be done by contractual agreement between interested parties without sacrificing portion of the federal royalties or splitting royalties among various leases." BLM Handbook 3160-9 – Communitization, § .1.11(B).

54. Phoenix is not a party to the 21-28 CA or the 33-21 CA.

55. Phoenix is not a party to any agreement with Kraken regarding the Federal Minerals.

56. Paragraph 5 of the 2023 CAs exceeds and is outside of the purpose of and effect of a CA, namely the agreement to combine small tracts for the purpose of committing enough acreage to form the spacing and proration unit necessary to comply with the applicable state conservation requirements.

57. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

58. There is an actual controversy among Phoenix, Kraken, and the BLM as to whether Section 5 of the 2023 CAs is applicable to Phoenix and/or whether it is an unlawful provision.

59. Phoenix is entitled to a declaration that by entering into CAs containing Section 5 of the 21-28 CA and the 33-21 CA, BLM exceeded its authority under 30 U.S.C. § 226(m) and 43 CFR § 3105.22 and violated said statute and regulation.

60. Phoenix is entitled to a declaration that Section 5 of the 21-28 CA and the 33-21 CA violates 30 U.S.C. § 226(m) and 43 CFR § 3105.22 because a CA cannot be used to determine contractual and property rights among lessees within a pooled unit, as determining such rights are outside the purpose and effect of a communitization agreement.

61. Phoenix is entitled to a declaration that the provisions of Section 5 of the 21-28 CA and the 33-21 CA, attempting to allocate revenue from the unleased Federal Minerals to Kraken, is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

**COUNT II – DECLARATORY JUDGMENT**
**(Section 5 of the 2023 CAs Violates Already Settled Law)**

62. Phoenix reasserts the allegations in paragraphs 1 through 61 as if fully set forth herein.

63. Section 5 of the 2023 CAs has language that mirrors language from a Compensatory Royalty Agreement, including the language purporting to allocate to Kraken the revenue attributable to the unleased Federal Minerals.

64. The IBLA has already determined that if federal minerals are subject to a CRA, they cannot subsequently be leased. *Enron Oil and Gas Co.*, 152 IBLA 153 (2000).

65. Inversely, federal minerals that are leased cannot also be subject to a CRA.

66. In addition, "a compensatory agreement for small tracts of unleased lands may also be negotiated pursuant to 43 CFR § 3100.2-1 <u>in lieu of leasing such tracts</u>." BLM Handbook 3160-9 - Communitization .1.11(H)(3) (emphasis added).

67. If a well is draining federal minerals, the BLM can: enter into a CRA; or offer the minerals for lease. 43 CFR § 3162.2-2(b), (c). The term "or" appears between 43 CFR § 3162.2-2(b) and (c) subsections, and they are mutually exclusive.

68. BLM cannot both enter into a CRA (or a de facto CRA) and subsequently offer the minerals for lease as it did in the instant case.

69. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

70. There is an actual controversy among Phoenix, Kraken, and the BLM as to whether Section 5 of the 2023 CAs is applicable to Phoenix and/or whether it is an unlawful provision.

71. Phoenix is entitled to a declaration that Section 5 of the 21-28 CA and the 33-21 CA is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C.

§§ 702 and 706 because the Federal Minerals cannot be subject to what is effectively a CRA, allocating production to Kraken in the instant case, and also be leased.

72. In the alternate, if Section 5 remains in place with the language that mirrors a CRA, Phoenix is entitled to cancellation of the Lease and a refund of all expenditures for bid and award of the Lease.

**COUNT III – DECLARATORY JUDGMENT**
**(Allocation from Unleased Federal Minerals Absent a CRA not Authorized)**

73. Phoenix reasserts the allegations in paragraphs 1 through 72 as if fully set forth herein.

74. Under applicable federal law, the only way that BLM can allocate production revenue for unleased federal minerals to a non-lessee party is through a Compensatory Royalty Agreement.

75. The 2022 IBLA Decision determined that BLM may enter into a CRA with Kraken, but it did not determine that BLM was required to enter such an agreement.

76. BLM and Kraken did not enter into a CRA after the 2022 IBLA Decision.

77. Instead, Kraken and BLM added de facto CRA language into the 21-28 CA and the 33-21 CA. However, the 2023 CAs are not Compensatory Royalty Agreements and did not follow the formal requirements of a CRA.

78. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may

declare the rights and other legal relations of any parties in an actual case or controversy.

79. There is an actual controversy among Phoenix, Kraken, and the BLM as to whether BLM had any authority to allocation production payments from the unleased Federal Minerals to Kraken in a CA.

80. Phoenix is entitled to a declaration that under federal regulations, BLM could not allocate production payments from the Federal Minerals to a non-lessee through a communitization agreement, and that language Section 5 of the 2023 CAs that attempts to allocation production payments from the Federal Minerals to a non-lessee is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

**COUNT IV – DECLARATORY JUDGMENT**
**(Allocation of Production Must be Based upon Leasehold Interests)**

81. Phoenix reasserts the allegations in paragraphs 1 through 80 as if fully set forth herein.

82. The 21-28 Pooling Order and the 21-28-33 Pooling Order for the Wells order that the lands covered are pooled and production from such Wells are allocated "on the basis of surface acreage."

83. CAs simply adopt the production allocation method of state pooling

orders.

84. Paragraph 5 of the 2023 CAs states, "The communitized area shall be operated as an entirety, with the understanding and agreement between the parties hereto that all communitized substances produced therefore shall be allocated among leaseholds comprising said area in the production that the acreage interest of each leasehold bears to the entire acreage committed to this agreement." (emphasis added).

85. Kraken does not have a lease covering the Federal Minerals, nor any interest in the Federal Minerals.

86. Kraken cannot be allocated revenue for the Federal Minerals under federal communitization agreement regulations, state pooling laws, and/or the actual language of the 2023 CAs.

87. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

88. There is an actual controversy among Phoenix, Kraken, and BLM as to whether BLM and Kraken could allocate any production revenue from the Federal Minerals to Kraken under the Pooling Orders, federal law, and the language in the CAs.

89. Phoenix is entitled to a declaration that BLM and Kraken could not allocate any production revenue to Kraken for the unleased Federal Minerals

because such action is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

**COUNT V – DECLARATORY JUDGMENT**
**(Violation of 30 U.S.C. § 226(m) and (j))**

90. Phoenix reasserts paragraphs 1 through 89 as if fully set forth herein.

91. 30 U.S.C. § 226(m) requires that a communitization agreement be "in the public interest."

92. Under Section 5 of the 2023 CAs, the federal government is paid a 12.5% (1/8) royalty from production associated with the Federal Minerals.

93. Under Kraken's interpretation of Section 5 of the 2023 CAs, the federal government gets paid the 12.5% royalty from inception of the Wells until October 1, 2024 (the effective date of the Lease).

94. Under the Lease, the federal government gets paid a 1/6 (16.67%) royalty.

95. Under applicable federal statutes, regulations, and Phoenix's interpretation of Section 5 of the 2023 CAs, the federal government gets paid a 1/6 royalty from inception of the Wells forward.

96. The 2022 IBLA Decision determined that BLM may enter into a CRA with Kraken. BLM did not enter into a CRA with Kraken, but Section 5 of the 2023

CAs contains de facto CRA language making those portions of the 2023 CAs an impermissible CRA.

97. According to 30 U.S.C. § 226(j), a CRA requires: (1) a determination by the Secretary of Interior that federal lands are being drained by wells on adjacent lands, (2) BLM to negotiate agreements with the lessees of adjacent lands to compensate the federal government for drainage of federal minerals, and (3) if the federally owned lands that are being drained are subject to a lease, such agreements "shall be made with the consent of the lessees, if any, affected thereby."

98. The requirements of 30 U.S.C. § 226(j) were not followed by BLM or Kraken in formulating and adopting the CRA language in Section 5 of the 2023 CAs.

99. Phoenix has not consented to the 2023 CAs and is not a party to them as required by law.

100. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

101. There is an actual controversy among Phoenix, Kraken, and the BLM as to whether Section 5 of the 2023 CAs is in the "public interest" as required by law.

102. Phoenix is entitled to a declaration that Section 5 of the CAs must be interpreted in accordance with the Lease and federal law to: (1) require Phoenix to

pay its proportionate share of costs from the Wells' inception, being the spud dates forward; (2) require Phoenix to be allocated its proportionate share of revenue associated with the Federal Minerals from the Wells' inception, being the spud dates forward; and (3) require that the federal government be paid its 1/6 (and not 1/8) royalty from the Federal Minerals from the Wells' respective first dates of production.

103. Phoenix is entitled to a declaration that Section 5 of the 2023 CAs is effectively a CRA, and that BLM and Kraken did not follow the requirements of 30 U.S.C. § 226(j) for obtaining a CRA and that such action is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

104. Phoenix is entitled to a declaration that it was a necessary party to Section 5 of the 2023 CAs and that Section 5 is, accordingly, unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

**COUNT VI – DECLARATORY JUDGMENT**
**(In the Alternative - Violation of 43 C.F.R. § 3105.23)**

105. Phoenix reasserts the allegations in paragraphs 1 through 104 as if fully set forth herein.

106. This claim is brought in the alternative if Section 5 of the 2023 CAs is determined to be valid and lawful.

107. The 21-28 CA and the 33-21 CA were not entered into until June 2023. However, the 21-28 CA has language purporting to make it effective as of June 1, 2018, and the 33-21 CA has language purporting to make it effective as of January 11, 2021.

108. The 2023 CAs affect the rights of Phoenix, who has an interest in the production and royalties from the Wells and Federal Minerals.

109. A necessary party to a federal oil and gas communitization agreement includes all parties who have an interest in the production or royalties from the communitized formation. 43 C.F.R. § 3105.23.

110. A communitization agreement must be signed by or on behalf of all necessary parties and must be filed prior to the expiration of the federal lease(s) involved to confer the benefits of the agreement upon such lease(s). 43 C.F.R. § 3105.23.

111. All indispensable parties to an agreement are parties whose rights are affected by the agreement. *See, e.g., Whelan v. Placid Oil Co*., 198 F.2d 39 (5th Cir. 1952) (all mineral owners who joined in the unitization agreement had an interest in all the unitized lands and were necessary and indispensable parties in related legal actions).

112. The IBLA has expressly held that if there is a new lease, a CA may not be effective prior to the date of the lease issuance. *Lee Oil Properties, Inc.*, 85 IBLA 291, at FN. 4 (March 13, 1985).

113. A CA may be made retroactive and effective to first production only if all parties agree, including the new lessee. *Id.*

114. Phoenix is the new lessee of the Federal Minerals. Phoenix is not a party to the 2023 CAs and has not agreed to the retroactive language in those CAs.

115. According to 28 U.S.C. § 2201 and 5 U.S.C. § 702, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

116. There is an actual controversy among Phoenix, Kraken, and BLM as to whether Phoenix's interest in the Federal Minerals and the Wells are controlled by the 2023 CAs.

117. Phoenix is entitled to a declaration that under federal regulations and general law that the 2023 CAs are not effective as to Phoenix's interest unless or until it executes the 2023 CAs because any other interpretation of the CAs is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

**COUNT VII – DECLARATORY JUDGMENT**
**(In the Alternative - Interpretation of Section 5 of the 2023 CAs)**

118. Phoenix reasserts the allegations in paragraphs 1 through 117 as if fully set forth herein.

119. This claim is brought in the alternative if the Court finds that the 2023 CAs and, specifically, that Section 5 of the 2023 CAs is lawful and valid.

120. Section 5 of the 21-28 CA and the 33-21 CA includes the following language:

> "Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), including drilling, completing and equipping the well, the acquiring party(s) shall own the working interest" and "shall have the rights and obligations of said working interest as to the effective date of the Federal lease."

121. In order for Phoenix to exercise its "rights and obligations" under the Lease, Section 5 of the 2023 CAs requires Phoenix to pay its proportionate cost of "drilling", "completing" and "equipping" the Wells, including all costs from the Wells' inception, being the spud dates until present.

122. Since Phoenix is required to pay its proportionate share of costs of the Wells from inception until present as a condition precedent to receiving revenue under the Lease, it is also entitled to its proportionate share of revenue for the Federal Minerals under the Lease from inception.

123. In the alternative, the language in Section 5 of the 2023 CAs is ambiguous.

124. Upon information and belief, Kraken and/or Kraken's attorneys drafted Section 5 of both the 21-28 CA and the 33-21 CA with a few minor revisions from BLM, and the ambiguity must be interpreted against Kraken.

125. According to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any parties in an actual case or controversy.

126. There is an actual controversy between Kraken, Phoenix, and the BLM as to interpretation of Section 5 of the 2023 CAs.

127. Phoenix is entitled to a declaration that Section 5 of the 2023 CAs should be interpreted against Kraken and that Section 5 entitles Phoenix to: (1) pay its proportionate share of the costs, including drilling, completing, and equipping the Wells, (2) after paying its proportionate share of costs, obtain its proportionate share of revenue from the Wells from inception, (3) upon payment of such costs, "own the working interest" covering the Federal Minerals and be entitled to exercise all rights and obligations associated with its interest.

WHEREFORE, Plaintiff Phoenix Energy One, LLC f/k/a Phoenix Capital Group Holdings, LLC prays for the following relief:

A. For entry of judgment against Defendants;

B. For a declaratory judgment finding that Section 5 of the 2023 CAs is unlawful, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or

without observance of procedure required by law, and must be set aside pursuant to 5 U.S.C. §§ 702 and 706.

C. For a declaratory judgment finding that Defendants Kraken Oil and Gas, LLC and Kraken Operating, LLC are required to provide accounting information to Plaintiff so that Plaintiff may pay its proportionate share of costs, including drilling, completing, and equipping the Wells.

D. For a declaratory judgment finding that Plaintiff is entitled to its proportionate share of revenue from inception of the Wells upon payment of its proportionate share of the costs;

E. In the alternative, for a declaratory judgment finding that Phoenix is a necessary party to the 2023 CAs, and the 2023 CAs are not effective as to Phoenix's interest unless executed by Phoenix;

F. In the alternative, for a declaratory judgment finding that Plaintiff is entitled to cancellation of the Lease and a refund of all expenditures for bid and award of the Lease;

G. For costs and attorneys' fees as allowed by law; and

H. For any other and further relief as the Court deems appropriate.

Dated this 24th day of August, 2026.

/s/ Adrian Miller
Adrian A. Miller
ATTORNEY FOR PLAINTIFF4

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, the foregoing was served by the Clerk of the U.S. District Court of Montana, Billings Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

/s/ Adrian A. Miller
Adrian A. Miller

Amended Federal Communitization Agreement
Contract No. MTM 111087

THIS AGREEMENT, entered into as of the date shown in Section 10 hereof by and between the parties subscribing, ratifying, or consenting hereto, such parties being hereinafter referred to as "parties hereto."

WITNESSETH:

WHEREAS, The Act of February 25, 1920 (41 Stat. 437), as amended and supplemented, authorizes communitization or drilling agreements communitizing or pooling a Federal oil and gas lease, or any portion thereof, with other lands, whether or not owned by the United States, when separate tracts under such Federal lease cannot be independently developed and operated in conformity with an established well-spacing program for the field or area and such communitization or pooling is determined to be in the public interest; and

WHEREAS, the parties hereto own working, royalty or other leasehold interests, or operating rights under the oil and gas leases and lands subject to this agreement which cannot be independently developed and operated in conformity with the well-spacing program established for the field or area in which said lands are located; and

WHEREAS, the parties have drilled a Bakken/Three Forks Formation oil well designated the Dagney 21-28 #1H Well in Sections 21 and 28, Township 26 North, Range 59 East; and

WHEREAS, the parties hereto desire to communitize and pool their respective mineral interests in lands subject to this agreement for the purpose of developing and producing communitized substances from the Subject Well only, in accordance with the terms and conditions of this agreement:

NOW, THEREFORE, in consideration of the premises and the mutual advantages to the parties hereto, it is mutually covenanted and agreed by and between the parties hereto as follows:

1. The lands covered by this agreement (hereinafter referred to as "communitized area") are described as follows:

   Township 26 North, Range 59 East, M.PM.
   Sections 21 & 28: ALL
   Richland County, Montana

   containing 1,280.00 acres. This agreement is in conformance with the Montana Board of Oil and Gas Conservation's Order No. 20-2020. This agreement shall include only the natural gas and associated liquid hydrocarbons produced from the Bakken/Three Forks formation through the well bore of the Subject Well, hereinafter, referred to as "communitized substances."

2. Attached hereto, and made a part of this agreement for all purposes, is Exhibit B, designating the operator of the communitized area and showing the acreage, percentage and ownership of oil and gas interests in all lands within the communitized area, and the authorization, if any, for communitizing or pooling any patented or fee lands within the communitized area.

3. All matters of operation shall be governed by the operator under and pursuant to the terms and provisions of this agreement. A successor operator may be designated by the owners of the


RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023
Exhibit A

working interest in the communitized area, and four (4) executed copies of a designation of successor operator shall be filed with the Authorized Officer.

4. Operator shall furnish the Secretary of the Interior, or his authorized representative, with a log and history of any well drilled on the communitized area, monthly reports of operations, statements of oil and gas sales and royalties and such other reports as are deemed necessary to compute monthly the royalty due the United States, as specified in the applicable oil and gas regulations.

5. The communitized area shall be developed and operated as an entirety, with the understanding and agreement between the parties hereto that all communitized substances produced therefrom shall be allocated among leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears to the entire acreage interest committed to this agreement.

   The communitized area approved in this Agreement contains unleased Federal lands. The value of 12 1/2 percent for the Federal lands, of the production that would be allocated to such Federal lands, described above, if such lands were leased, committed and entitled to participation, shall be payable as royalties to the Federal government. Operator is responsible for such royalty payments on the volume of production. The value of such production subject to the payment of said royalties shall be determined pursuant to the method set forth in 30 CFR Part 1206 for the unleased Federal lands. Payment of royalties on the production reallocated from the unleased Federal lands to the committed tracts within the communitized area shall fulfill the Federal royalty obligation for such production. Payment of royalties, as provided herein, shall accrue from the date the committed tracts in the communitized area that includes unleased Federal land receive a production allocation, and shall be due and payable monthly by the last day of the calendar month next following the calendar month of actual production. Payment due under this provision shall end on the effective date of any lease covering the Federal tract or when production of communitized substances ceases within the communitized area and the Communitization Agreement is terminated, whichever occurs first.

   From the date of first production, there shall be allocated to Operator the percentage of production attributable to the unleased Federal land within the communitized area, which is the proportion the number of acres of such unleased Federal land included in said communitized area bears to the total acres of communitized lands in said communitized area, until the effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s), or when production of the communitized substances ceases within the communitized area and the Communitization Agreement is terminated, whichever occurs first.

   Any party acquiring a Federal lease of the unleased Federal land included in the communitized area established hereunder, will be subject to this Agreement as of the effective date of the Federal lease to said party(s). Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), including drilling, completing and equipping the well, the acquiring party(s) shall own the working interest described in the tract, as described on Exhibit "B", and shall have the rights and obligations of said working interest as to the effective date of the Federal lease.

6. The royalties payable on communitized substances allocated to the individual leases comprising the communitized area and the rentals provided for in said leases shall be determined and paid on the basis prescribed in each of the individual leases. Payments of rentals under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein



RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

Exhibit A

be otherwise provided. Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued. It is agreed that for any Federal lease bearing a sliding- or step-scale rate of royalty, such rate shall be determined separately as to production from each communitization agreement to which such lease may be committed, and separately as to any noncommunitized lease production, provided, however, as to leases where the rate of royalty for gas is based on total lease production per day, such rate shall be determined by the sum of all communitized production allocated to such a lease plus any noncommunitized lease production.

7. There shall be no obligation on the lessees to offset any well or wells completed in the same pool as covered by this agreement on separate component tracts into which the communitized area is now or may hereafter be divided, nor shall any lessee be required to measure separately communitized substances by reason of the diverse ownership thereof, but the lessees hereto shall not be released from their obligation to protect said communitized area from drainage of communitized substances by a well or wells which may be drilled offsetting said area.

8. The commencement, completion, continued operation, or production of the Subject Well for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation, or production on each and all of the lands within and comprising said communitized area, and operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto.

9. Production of communitized substances and disposal thereof shall be in conformity with allocation, allotments, and quotas made or fixed by any duly authorized person or regulatory body under applicable Federal or State statutes. This agreement shall be subject to all applicable Federal and State laws or executive orders, rules and regulations, and no party hereto shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this agreement if such compliance is prevented by, or if such failure results from, compliance with any such laws, orders rules or regulations.

10. The date of this agreement is June 1, 2018, and it shall become effective as of this date or from the onset of production of communitized substances, whichever is earlier upon execution by the necessary parties, notwithstanding the date of execution, and upon approval by the Secretary of the Interior or by his duly authorized representative, and shall remain in force and effect for a period of 2 years and for as long as communitized substances are, or can be, produced from the communitized area in paying quantities from the Subject Well. Provided, that prior to production in paying quantities from the communitized area and upon fulfillment of all requirements of the Secretary of the Interior, or his duly authorized representative, with respect to any dry hole or abandoned well, this agreement may be terminated at any time by mutual agreement of the parties hereto. This agreement shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the Subject Well are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 2-year term of this agreement will not in itself serve to extend the term of any Federal lease which would otherwise expire during said period.

11. The covenants herein shall be construed to be covenants running with the land with respect to the communitized interests of the parties hereto and their successors in interests until this agreement terminates and any grant, transfer, or conveyance of any such land or interest subject hereto, whether voluntary or not, shall be and hereby is conditioned upon the assumption of all obligations hereunder by the grantee, transferee, or other successor in interest, and as to Federal land shall be subject to approval by the Secretary of the Interior, or his duly authorized representative.



RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

Exhibit A

12. It is agreed between the parties hereto that the Secretary of the Interior, or his duly authorized representative, shall have the right of supervision over all fee and State mineral operations within the communitized area to the extent necessary to monitor production and measurement, and assure that no avoidable loss of hydrocarbons occurs in which the United States has an interest pursuant to applicable oil and gas regulations of the Department of the Interior relating to such production and measurement.

13. This agreement shall be binding upon the parties hereto and shall extend to and be binding upon their respective heirs, executors, administrators, successors, and assigns.

14. This agreement may be executed in any number of counterparts, no one of which needs to be executed by all parties, or may be ratified or consented to by separate instrument, in writing, specifically referring hereto, and shall be binding upon all parties who have executed such a counterpart, ratification or consent hereto with the same force and effect as if all parties had signed the same document.

15. Nondiscrimination: In connection with the performance of work under this agreement, the operator agrees to comply with all of the provisions of Section 202(1) to (7) inclusive, of Executive Order 11246 (30 F.R. 12319), as amended, which are hereby incorporated by reference in this agreement.


RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

Communitization Agreement Operator Self-Certification Statement

I, the undersigned, hereby certify, on behalf of Kraken Oil & Gas, LLC, the Operator of the proposed Communitization Agreement, that all working interest owners *(i.e.,* lessees of record and operating rights owners) shown on Exhibit "B" attached to the Communitization Agreement are, to the best of my knowledge, the working interest owners of the Federal or Indian leases subject to the Communitization Agreement, and that the written consents of all of the named owners have been obtained and will be made available to the BLM immediately upon request.

Signature: [signature] Date: 6-13-2023

Printed Name: Alan White

Position Title: Vice President - Land

**ACKNOWLEDGEMENT**

STATE OF TEXAS §

§

COUNTY OF HARRIS §

On this 13th day of June, 2023, before the undersigned, a Notary Public in and for said County, personally appeared **Alan White, Vice President of Land of Kraken Oil and Gas, LLC,** to me personally known to be the identical person whose name is affixed to the above instrument, and acknowledged the execution thereof to be his voluntary act and deed as such office and the voluntary act and deed of the said Limited Liability Corporation.

Witness my hand and seal in said county the day and year last above written

My Commission expires: 3/26/2026

SUNNI K. TURNER
Notary Public, State of Texas
Comm. Expires 03-28-2026
Notary ID 128119481

[signature]
Notary Public

Residing at ____________________

Exhibit A

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

**FEDERAL COMMUNITIZATION AGREEMENT**
**CONTRACT NO. MTM112222**

THIS AGREEMENT, entered into as of the date shown in Section 10 hereof by and between the parties subscribing, ratifying, or consenting hereto, such parties being hereinafter referred to as "parties hereto".

W I T N E S S E T H:

WHEREAS, the Act of February 25, 1920 (41 Stat. 437), as amended and supplemented, authorizes communitization or drilling agreements communitizing or pooling a Federal oil and gas lease, or any portion thereof, with other lands, whether or not owned by the United States, when separate tracts under such Federal lease cannot be independently developed and operated in conformity with an established well-spacing program for the field or area and such communitization or pooling is determined to be in the public interest; and

WHEREAS, the parties hereto own working, royalty or other leasehold interests, or operating rights under the oil and gas leases and lands subject to this agreement which cannot be independently developed and operated in conformity with the well-spacing program established for the field or area in which said lands are located; and

WHEREAS, the parties have drilled a Bakken/Three Forks Formation oil well designated the Dagney 33-21 #3H Well and the Dagney 33-21 #4H Well in Sections 21, 28, and 33 Township 26 North, Range 59 East; and

WHEREAS, the parties hereto desire to communitize and pool their respective mineral interests in lands subject to this agreement for the purpose of developing and producing communitized substances in accordance with the terms and conditions of this agreement:

NOW, THEREFORE, in consideration of the premises and the mutual advantages to the parties hereto, it is mutually covenanted and agreed by and between the parties hereto as follows:

1. The lands covered by this agreement (hereinafter referred to as "communitized area") are described as follows:

   **Township 26 North, Range 59 East, M.P.M.**
   **Sections 21, 28, & 33: ALL**

   **Richland County, Montana**

   Containing 1,920.00 Acres. This agreement shall include only the crude oil and associated natural gas produced from the Bakken/Three Forks Formation through the well bore of the Subject Wells(s), hereinafter, referred to as "communitized substances."

2. Attached hereto, and made a part of this agreement for all purposes, are Exhibit "A" and Exhibit "B" designating the

Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/22/2023

operator of the communitized area and showing the acreage, percentage and ownership of oil and gas interests in all lands within the communitized area, and the authorization, if any, for communitizing or pooling any patented or fee lands within the communitized area.

3. All matters of operation shall be governed by the operator under and pursuant to the terms and provisions of this agreement. A successor operator may be designated by the owners of the working interest in the communitized area, and four (4) executed copies of a designation of successor operator shall be filed with the Authorized Officer.

4. Operator shall furnish the Secretary of the Interior, or his authorized representative, with a log and history of any well drilled on the communitized area, monthly reports of operations, statements of oil and gas sales and royalties and such other reports as are deemed necessary to compute monthly the royalty due the United States, as specified in the applicable oil and gas regulations.

5. The communitized area shall be developed and operated as an entirety, with the understanding and agreement between the parties hereto that all communitized substances produced therefrom shall be allocated among the leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears to the entire acreage interest committed to this agreement.

The communitized area approved in this Agreement contains unleased Federal lands. The value of 12 1/2 percent for the Federal lands, of the production that would be allocated to such Federal lands, described above, if such lands were leased, committed and entitled to participation, shall be payable as royalties to the Federal government. Operator is responsible for such royalty payments on the volume of production. The value of such production subject to the payment of said royalties shall be determined pursuant to the method set forth in 30 CFR Part 1206 for the unleased Federal lands. Payment of royalties on the production reallocated from the unleased Federal lands to the committed tracts within the communitized area shall fulfill the Federal royalty obligation for such production. Payment of royalties, as provided herein, shall accrue from the date the committed tracts in the communitized area that includes unleased Federal land receive a production allocation, and shall be due and payable monthly by the last day of the calendar month next following the calendar month of actual production. Payment due under this provision shall end on the effective date of any lease covering the Federal tract or when production of communitized substances ceases

Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

within the communitized area and the Communitization Agreement is terminated, whichever occurs first.

From the date of first production, there shall be allocated to Operator the percentage of production attributable to the unleased Federal land within the communitized area, which is the proportion the number of acres of such unleased Federal land included in said communitized area bears to the total acres of communitized lands in said communitized area, until the effective date of a lease covering the Federal tract and payment of its proportionate cost of the well(s), or when production of the communitized substances ceases within the communitized area and the Communitization Agreement is terminated, whichever occurs first.

Any party acquiring a Federal lease of the unleased Federal land included in the communitized area established hereunder, will be subject to this Agreement as of the effective date of the Federal lease to said party(s). Upon issuance of the Federal lease and payment of its proportionate cost of the well(s), including drilling, completing and equipping the well, the acquiring party(s) shall own the working interest described in the tract, as described on Exhibit "B", and shall have the rights and obligations of said working interest as to the effective date of the Federal lease.

6. The royalties payable on communitized substances allocated to the individual leases comprising the communitized area and the rentals provided for in said leases shall be determined and paid on the basis prescribed in each of the individual leases. Payments of rentals under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein be otherwise provided. Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued. It is agreed that for any Federal lease bearing a sliding- or step-scale rate of royalty, such rate shall be determined separately as to production from each communitization agreement to which such lease may be committed, and separately as to any noncommunitized lease production, provided, however, as to leases where the rate of royalty for gas is based on total lease production per day, such rate shall be determined by the sum of all communitized production allocated to such a lease plus any noncommunitized lease production.

7. There shall be no obligation on the lessees to offset any well or wells completed in the same formation as covered



RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

by this agreement on separate component tracts into which the communitized area is now or may hereafter be divided, nor shall any lessee be required to measure separately communitized substances by reason of the diverse ownership thereof, but the lessees hereto shall not be released from their obligation to protect said communitized area from drainage of communitized substances by a well or wells which may be drilled offsetting said area.

8. The commencement, completion, continued operation, or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation, or production on each and all of the lands within and comprising said communitized area, and operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto.

9. Production of communitized substances and disposal thereof shall be in conformity with allocation, allotments, and quotas made or fixed by any duly authorized person or regulatory body under applicable Federal or State statutes. This agreement shall be subject to all applicable Federal and State laws or executive orders, rules and regulations, and no party hereto shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this agreement if such compliance is prevented by, or if such failure results from, compliance with any such laws, orders, rules or regulations.

10. The date of this agreement is January 11th, 2021 and it shall become effective as of this date or from the onset of production of communitized substances, whichever is earlier upon execution by the necessary parties, notwithstanding the date of execution, and upon approval by the Secretary of the Interior or by his duly authorized representative, and shall remain in force and effect for a period of two (2) years and for so long as communitized substances are produced, or can be produced, from the communitized area in paying quantities; provided, that prior to production in paying quantities from the communitized area and upon fulfillment of all requirements of the Secretary of the Interior, or his duly authorized representative, with respect to any dry hole or abandoned well, this agreement may be terminated at any time by mutual agreement of the parties hereto. This agreement shall not terminate upon cessation of production if, within sixty (60) days thereafter, reworking or drilling operations on the communitized area are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The two-year term of this agreement will not in itself serve to extend the term of any



RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

Federal lease which would otherwise expire during said period.

11. The covenants herein shall be construed to be covenants running with the land with respect to the communitized interests of the parties hereto and their successors in interests until this agreement terminates, and any grant, transfer, or conveyance of any such land or interest subject hereto, whether voluntary or not, shall be and hereby is conditioned upon the assumption of all obligations thereunder by the grantee, transferee, or other successor in interest, and as to Federal land shall be subject to approval by the Secretary of the Interior, or his duly authorized representative.

12. It is agreed between the parties hereto that the Secretary of the Interior, or his duly authorized representative, shall have the right of supervision over all fee and State mineral operations within the communitized area to the extent necessary to monitor production and measurement and assure that no avoidable loss of hydrocarbons occurs in which the United States has an interest pursuant to applicable oil and gas regulations of the Department of the Interior relating to such production and measurement.

13. This agreement shall be binding upon the parties hereto and shall extend to and be binding upon their respective heirs, executors, administrators, successors, and assigns.

14. This agreement may be executed in any number of counterparts, no one of which needs to be executed by all parties, or may be ratified or consented to by separate instrument, in writing, specifically referring hereto, and shall be binding upon all parties who have executed such a counterpart, ratification or consent hereto with the same force and effect as if all parties had signed the same document.

15. Nondiscrimination: In connection with the performance of work under this agreement, the operator agrees to comply with all of the provisions of Section 202(1) to (7) inclusive, of Executive Order 11246 (30 F.R. 12319), as amended, which are hereby incorporated by reference in this agreement.

Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

# Communitization Agreement Operator Self-Certification Statement

I, the undersigned, hereby certify, on behalf of Kraken Oil & Gas, LLC, the Operator of the proposed Communitization Agreement, that all working interest owners *(i.e.,* lessees of record and operating rights owners) shown on Exhibit "B" attached to the Communitization Agreement are, to the best of my knowledge, the working interest owners of the Federal or Indian leases subject to the Communitization Agreement, and that the written consents of all of the named owners have been obtained and will be made available to the BLM immediately upon request.

Signature: [signature] Date: 6-13-2023

Printed Name: Alan White

Position Title: Vice President - Land

## ACKNOWLEDGEMENT

STATE OF TEXAS §

§

COUNTY OF HARRIS §

On this 13th day of June, 2023, before the undersigned, a Notary Public in and for said County, personally appeared **Alan White, Vice President of Land of Kraken Oil and Gas, LLC,** to me personally known to be the identical person whose name is affixed to the above instrument, and acknowledged the execution thereof to be his voluntary act and deed as such office and the voluntary act and deed of the said Limited Liability Corporation.

Witness my hand and seal in said county the day and year last above written

My Commission expires: 3/28/2026 [signature]

Notary Public

SUNNI K. TURNER
Notary Public, State of Texas
Comm. Expires 03-28-2026
Notary ID 128119481

Residing at ____________

Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

**EXHIBIT A**

**Attached to and made a part of the Communitization Agreement dated effective January 11th, 2021, embracing All of Section 21 & All of Section 28, & All of Section 33 Township 26 North, Range 59 East, Richland County, Montana.**

PLAT OF COMMUNITIZED AREA




Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

# EXHIBIT B

To Communitization Agreement dated January 11th, 2021, embracing All of Section 21 & All of Section 28, & All of Section 33, Township 26 North, Range 59 East
Richland County, Montana

Operator of Communitized Area: KRAKEN OIL & GAS LLC

## DESCRIPTION OF LEASES COMMITTED

### Tract No. 1

| | |
|---|---|
| Lease Serial No.: | ULA MTM-112185 |
| Description of Land Committed: | Township 26 North, Range 59 East<br>Section 21: W/2NW/4, NW/4SW/4 |
| Number of Acres: | 120.00 acres / 120.00 acres |
| Lessee of Record: | The United State of America |
| Name and Percent WI Owners: | The United States of America – 50% |

### Tract No. 2

| | |
|---|---|
| Lease Serial No.: | MTM-97819 |
| Description of Land Committed: | Township 26 North, Range 59 East<br>Section 21: S/2SW/4, SW/4NE/4 |
| Number of Acres: | 120.00 acres / 120 acres |
| Lessee of Record: | Marshall & Winston, Inc. |
| Name and Percent WI Owners: | Equinor Energy, LP. – 100% |

### Tract No. 3

| | |
|---|---|
| Lease Serial No.: | MTM-071768-A |
| Description of Land Committed: | Township 26 North, Range 59 East<br>Section 28: SE/4NE/4<br>Section 33: NW/4SE/4 |
| Number of Acres: | 80.00 acres / 80.00 acres |
| Lessee of Record: | Continental Resources, Inc. |
| Name and Percent WI Owners: | Continental Resources, Inc. – 100% |

### Tract No. 4

| | |
|---|---|
| Non-Federal | |
| Description of Land Committed: | Township 26 North, Range 59 East<br>Section 21: E/2NW/4, NE/4SW/4, N/2NE, SE/4NE/4, SE/4<br>Section 28: W/2, W/2NE/4, NE/4NE/4, SE/4<br>Section 33: W/2, NE/4, NE/4SE/4, S/2SE/4 |
| Number of Acres: | 1,600.00 acres / 1,600.00 acres |



RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

## RECAPITULATION

| Tract Number | | Number of Acres Committed | Percentage of Interest In Communitized Area |
|---|---|---|---|
| 1 - | ULA MTM-112185 | 120.00 | 6.2500% |
| 2 - | MTM-97819 | 120.00 | 6.2500% |
| 3 - | MTM-071768-A | 80.00 | 4.1667% |
| 4 - | FEE | 1600.00 | 83.3334% |
| **TOTAL** | | **1,920.00** | **100.0000%** |

Exhibit B

RECEIVED BLM MILES CITY MT FIELD OFFICE 06/15/2023

Form 3100-11
(March 2023)

**FOR LESSEE**

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**LEASE FOR OIL AND GAS**

Serial Number
**MTMT106370202**

The undersigned (page 2) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to the Mineral Lands Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C. 351-359), or ______________________________ (other).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name PHOENIX CAPITAL GROUP HOLDINGS LLC
Street 18575 JAMBOREE RD STE 830
City, State, Zip Code IRVINE, CA 92612

2. This lease is for: *(Check Only One)* ☐ PUBLIC DOMAIN LANDS ☑ ACQUIRED LANDS (percent U.S. interest 50%)

Surface managing agency if other than the Bureau of Land Management (BLM): ______________ Unit/Project: ______________

Land included in lease:

T. 26 N R. 59 E Meridian PRINCIPAL MER State MT County Richland
Sec. 21 W1/2NW1/4, NW1/4SW1/4.

Total acres in lease 120.000
Rental retained $360.00

This lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 2 together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

**For a competitive lease, this lease is issued to the high bidder pursuant to the highest bidder's duly executed bid form submitted under 43 CFR 3120 and is subject to the provisions of that bid and those specified on this form.**

Type and primary term of lease:

☑ Competitive lease (ten years)

☐ Other ______________________________

THE UNITED STATES OF AMERICA

by [signature] (BLM)

Chief, Fluids Adjudication Section 09/19/2024
(Title) (Date)

EFFECTIVE DATE OF LEASE **10/01/2024**

Continued on Page 2



Exhibit C

3. (a) Undersigned certifies that lessee shall comply with the Department of the Interior's nonprocurement debarment and suspension regulations as required by 2 CFR 1400 subpart B and shall communicate to comply with these regulations to persons with whom it does business related to this lease by including this term in its contracts and transactions.

(b) For leases that may be issued as a result of the Mineral Leasing Act (MLA) of 1920, the undersigned certifies that: (1) the lessee is a citizen of the United States; an association (including partnerships and trusts) of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the lease are in compliance with 43 CFR parts 3000 and 3100 and the leasing authorities cited herein; (3) they are in compliance with the acreage limitation requirements wherein the bidder's/lessee's chargeable interests, direct and indirect, in each public domain and acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options or 300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options); (4) the lessee is not considered a minor under the laws of the State in which the lands covered by this offer are located; (5) the lessee is in compliance with qualifications concerning Federal coal lease holdings provided in sec. 2(a)2 (A) of the MLA (Title 30 U.S.C. Section 201(a)(2)(A)); (6) the lessee is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the MLA (Title 30 U.S.C. Section 226(g)); and (7) the lessee is not in violation of sec. 41 of the MLA (Title 30 U.S.C. Section 195).

(c) For leases that may be issued as a result of this sale under the Department of the Interior Appropriations Act of 1981, the undersigned must: (1) be a citizen or national of the United States; a citizen of another country lawfully admitted for permanent residence; a private, public or municipal corporation organized under the laws of the United States or of any State or Territory thereof; an association (including partnerships and trusts) of such citizens, nationals, resident citizens of another country or private, public or municipal corporations; and (2) certify that all parties in interest are in compliance with 43 CFR part 3130 and the leasing authority cited herein.

(d) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which the lessee has been given notice, and any amendment or separate lease that may include any land described in this lease open to leasing at the time this lease was filed but omitted for any reason from this lease.

Duly executed this 1st day of October, 20 24 Lindsey Wilson, Manager
(Signature and Title of Lessee or Attorney-in-fact)

(Name of President of Company) (Name of Vice President of Company) ☐ See Attachment for additional principals

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212 make it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

## LEASE TERMS

Sec. 1. Rentals - Rentals must be paid to proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are:

(a) Competitive lease, $3.00 for the first 2 years; $5.00 for years 3 through 8; thereafter $15.00;
(b) Other, see attachment; or
as specified in regulations at the time this lease is issued.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, and the plan contains a provision for allocation of production, royalties must be paid on the production allocated to this lease. However, annual rentals must continue to be due at the rate specified in (a) or (b) rentals for those lands not within a participating area.

Failure to pay annual rental, if due, on or before the anniversary date of this lease (or next official working day if office is closed) must automatically terminate this lease by operation of law. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties - Royalties must be paid to proper office of lessor. Royalties must be computed in accordance with regulations on production removed or sold. Royalty rates are:

(a) Competitive lease, 16.67%;
(b) Other, see attachment; or
as specified in regulations at the time this lease is issued.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties must be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production must be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee must not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor must lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of lessee.

Minimum royalty in lieu of rental of not less than the rental which otherwise would be required for that lease year must

Continued on Page 3



Exhibit C

be payable at the end of each lease year beginning on or after a discovery in paying quantities. This minimum royalty may be waived, suspended, or reduced, and the above royalty rates may be reduced, for all or portions of this lease if the Secretary determines that such action is necessary to encourage the greatest ultimate recovery of the leased resources, or is otherwise justified.

An interest charge will be assessed on late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee must be liable for royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under FOGRMA or the leasing authority.

Sec. 3. Bonds - A bond must be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage - Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee must drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection - Lessee must file with proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee must furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee must keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee must keep open at all reasonable times for inspection by any representative of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee must maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that supports costs claimed as manufacturing, preparation, and/or transportation costs. All such records must be maintained in lessee's accounting offices for future audit by lessor. Lessee must maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section will be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6. Conduct of operations - Lessee must conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee must take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses must be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.

Prior to disturbing the surface of the leased lands, lessee must contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee must immediately contact lessor. Lessee must cease any operations that would result in the destruction of such species or objects.

Sec. 7. Mining operations - To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

Sec. 8. Extraction of helium - Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee must include in any contract of sale of gas the provisions of this section.

Sec. 9. Damages to property - Lessee must pay lessor for damage to lessor's improvements, and must save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 10. Protection of diverse interests and equal opportunity - Lessee must pay, when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee must comply with section 28 of the Mineral Leasing Act of 1920.

Continued on Page 4



Exhibit C

Lessee must comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors must maintain segregated facilities.

Sec. 11. Transfer of lease interests and relinquishment of lease - As required by regulations, lessee must file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which will be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 12. Delivery of premises - At such time as all or portions of this lease are returned to lessor, lessee must place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 13. Proceedings in case of default - If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease will be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement which contains a well capable of production of unitized substances in paying quantities. This provision will not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. Any such remedy or waiver will not prevent later cancellation for the same default occurring at any other time. Lessee will be subject to applicable previsions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 14. Heirs and successors-in-interest - Each obligation of this lease will extend to and be binding upon, and every benefit hereof will inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

A. General:

1. The BLM will complete page 1 of the form.

2. For competitive leases, a bidder must submit a completed bid form (3000-002). For all other leases, the lessee must sign item 3. If additional principals need to be listed, please include those on a separate sheet. See 2 CFR 180.995 for the definition of principals.

**NOTICES**

This form is exempt from the Paperwork Reduction Act of 1995 (P.L. 104-13) under 5 CFR 1320.3(h)(1).

The Privacy Act of 1974 and the regulations in 43 CFR 2.48(d) provide that you be furnished with the following information in connection with information required by this oil and gas lease.

AUTHORITY: 30 U.S.C. 181 et seq.; 30 U.S.C. 351-359; 42 U.S.C. 6508.

PRINCIPAL PURPOSE: The information is to be used to process oil and gas leases.

ROUTINE USES: (1) The adjudication of the lessee's rights to the land or resources. (2) Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources. (3) Transfer to appropriate Federal agencies when consent or concurrence is required prior to granting a right in public lands or resources. (4)(5) Information from the record and/or the record will be transferred to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION: Disclosure of the information is voluntary. If all the information is not provided, the lease may be rejected. See regulations at 43 CFR 3100.

**MTMT106370202**

# OIL AND GAS LEASE STIPULATIONS

**Stipulation:** ESTHETICS--To maintain esthetic values, all surface-disturbing activities, semi-permanent and permanent facilities may require special design including location, painting and camouflage to blend with the natural surroundings and meet the intent of the visual quality objectives of the Federal Surface Managing Agency (SMA).

EROSION CONTROL--Surface-disturbing activities may be prohibited during muddy and/or wet soil periods.

CONTROLLED OR LIMITED SURFACE USE STIPULATION --This stipulation may be modified, consistent with land use documents, when specifically approved in writing by the Bureau of Land Management (BLM) with concurrence of the SMA. Distances and/or time periods may be made less restrictive depending on the actual on-ground conditions. The prospective lessee should contact the SMA for more specific locations and information regarding the restrictive nature of this stipulation.

The lessee/operator is given notice that the lands within this lease may include special areas and that such areas may contain special values, may be needed for special purposes, or may require special attention to prevent damage to surface and/or other resources. Possible special areas are identified below. Any surface use or occupancy within such special areas will be strictly controlled, or if absolutely necessary, excluded. Use or occupancy will be restricted only when the BLM and/or the SMA demonstrates the restriction necessary for the protection of such special areas and existing or planned uses. Appropriate modifications to imposed restrictions will be made for the maintenance and operations of producing oil and gas wells.

After the SMA has been advised of specific proposed surface use or occupancy on the leased lands, and on request of the lessee/operator, the Agency will furnish further data on any special areas which may include:

100 feet from the edge of the rights-of-way from highways, designated county roads and appropriate federally-owned or controlled roads and recreation trails.

500 feet, or when necessary, within the 25-year flood plain from reservoirs, lakes, and ponds and intermittent, ephemeral or small perennial streams: 1,000 feet, or when necessary, within the 100-year flood plain from larger perennial streams, rivers, and domestic water supplies.

500 feet from grouse strutting grounds. Special care to avoid nesting areas associated with strutting grounds will be necessary during the period from March 1, to June 30. One-fourth mile from identified essential habitat of state and federal sensitive species. Crucial wildlife winter ranges during the period from December 1 to May 15, and in elk calving areas during the period from May 1 to June 30.

300 feet from occupied buildings, developed recreational areas, undeveloped recreational areas receiving concentrated public use and sites eligible for or designated as National Register sites.

Seasonal road closures, roads for special uses, specified roads during heavy traffic periods and on areas having restrictive off-road vehicle designations.

On slopes over 30 percent or 20 percent on extremely erodible or slumping soils.

APPLICATIONS FOR PERMIT TO DRILL (APDs)--The appropriate BLM field offices are responsible for the receipt, processing, and approval of APDs. The APDs are to be submitted by oil and gas operators pursuant to the requirements found in Onshore Oil and Gas Order No. 1 -- Approval of Operations on Onshore Federal and Indian Oil and Gas Leases (Circular No. 2538). Additional requirements for the conduct of oil and gas operations can be found in the Code of Federal Regulations Title 43, Part 3160. Copies of Onshore Oil and Gas Order No. 1, and pertinent regulations, can be obtained from the BLM field offices in which the operations are proposed. Early coordination with these offices on proposals is encouraged.

CULTURAL AND PALEONTOLOGICAL RESOURCES--The SMA is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the SMA, shall:

1. Contact the appropriate SMA to determine if a site-specific cultural resource inventory is required. If an inventory is required, then:

2. Engage the services of a cultural resource specialist acceptable to the SMA to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the SMA for review and approval no later than that time when an otherwise complete application for approval of drilling or subsequent surface-disturbing operation is submitted.

3. Implement mitigation measures required by the SMA. Mitigation may include the relocation of proposed lease-related activities or other protective

measures such as testing salvage and recordation. Where impacts to cultural resources cannot be mitigated to the satisfaction of the SMA, surface occupancy on that area must be prohibited.

The operator shall immediately bring to the attention of the SMA any cultural or paleontological resources discovered as a result of approved operations under this lease, and not disturb such discoveries until directed to proceed by the SMA.

ENDANGERED OR THREATENED SPECIES--The SMA is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species, listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.

The lessee/operator may, unless notified by the authorized officer of the SMA that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resources specialist approved by the SMA. An acceptable report must be provided to the SMA identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats.

**On the lands described below:**

All Lands

**MTMT106370202**

## SOILS, SENSITIVE SOILS

**Stipulation:** Surface occupancy and use is subject to the following operating constraints: prior to surface occupancy and use, prior to surface disturbance on sensitive soils, a reclamation plan must be approved by the administrative officer. Sensitive soils are determined using a combination of slope and soil erodibility. The plan must demonstrate the following:

o no other practicable alternatives exist for relocating the activity,
o the activity will be located to reduce impacts to soil and water resources,
o site productivity will be maintained or restored,
o surface runoff and sedimentation will be adequately controlled,
o on- and off-site areas will be protected from accelerated erosion,
o that no areas susceptible to mass wasting would be disturbed, and
o surface-disturbing activities will be prohibited during extended wet periods.

Objective: To maintain the chemical, physical, and biotic properties of soils which includes maintaining soil productivity, soil stability, and soil biotic properties. This will prevent excessive erosion, potential mass wasting, and improve the likelihood of successful reclamation.

Exception: The AO may grant an exception to this stipulation if the operator can demonstrate that the proposed action will not contribute to degradation of the soil resource (e.g. excessive soil erosion, mass wasting, and/or lost productivity) or downslope resource conditions (e.g. reduced water quality due to sedimentation).

Modification: The AO may modify the area affected by this stipulation if it is determined that portions of the leasehold do not contain sensitive soils.

Waiver: The AO may waive this stipulation if it is determined that the entire leasehold does not contain sensitive soils.

**On the lands described below:**

All Lands

**MTMT106370202**

# SIGNIFICANT CULTURAL RESOURCES, NRHP - ELIGIBLE PROPERTIES AND DISTRICTS, AND TCPS, NHLS AND HISTORIC BATTLEFIELDS

**Stipulation:** Surface occupancy and use and surface disturbance is restricted within the Setting Consideration Zone where the integrity of the setting is a contributing element of NRHP significance of a property, for the following historic properties: Wolf Mountains Battlefield NHL and Battle Butte Battlefield ACEC; Reynolds Battlefield site and Reynolds Battlefield ACEC; Cedar Creek Battlefield site and Cedar Creek Battlefield ACEC; and the Long Medicine Wheel ACEC, and all significant Cultural Resources, NRHP-eligible Properties and Districts, and TCPs, NHLs and Historic Battlefields and the Lewis and Clark National Historic Trail. Prior to surface disturbance, occupancy or use within the Setting Consideration Zone of the identified historic properties a mitigation plan (Plan) must be submitted to the BLM by the applicant as a component of the APD (BLM Form 3160-3) or Sundry Notice (BLM Form 3160 -5) – Surface Use Plan of Operations. The operator may not initiate surface-disturbing activities unless the BLM AO has approved the Plan or approved it with conditions. (b) The Plan must demonstrate to the AO's satisfaction that the infrastructure will either not be visible or will result in a weak contrast rating and would not have an adverse effect on the setting of the historic properties, ensuring the setting of historic properties.

Objective: To protect inadvertent impacts to significant cultural properties, districts, and their settings; NRHP-eligible properties and districts; TCPs or those designated for traditional use and the settings in which they occur; and those properties determined to be of particular importance to American Indian groups, and NHLs and historic sites eligible for the NRHP and the setting or viewshed in which they occur.

Exception: The BLM AO may grant an exception if it is determined that the action is of a scale, sited in a location, or otherwise designed so that the action will not result in a more than a weak contrast rating. The Plan may be subject to consultation with Montana SHPO, applicable tribes, and other interested parties.

Modification: The BLM AO may modify the area subject to the stipulation based on local evaluation. The stipulation may be modified based on negative or positive monitoring results from similar proposed actions on similar sites. The modification may be subject to consultation with Montana SHPO, applicable tribes, and other interested parties.

Waiver: The BLM AO determines that the entire lease area does not contribute to the setting of a historic property, the waiver may be subject to consultation with Montana SHPO, applicable tribes, and other interested parties.

**MTMT106370202**

**On the lands described below:**

All Lands

**MTMT106370202**

# LEASE NOTICE

## Cultural Resource Protection

This lease may be found to contain historic properties and/or resources protected under National Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statutes and executive orders. The BLM will not approve any ground-disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized, or mitigated.

**MTMT106370202**

# LEASE NOTICE

## Notice to Lessee Concerning Mineral Leasing Act Section 2(a)(2)(A)

Provisions of the Mineral Leasing Act (MLA) of 1920, as amended by the Federal Coal Leasing Amendments Act of 1976, affect an entity's qualifications to obtain an oil and gas lease. Section 2(a)(2)(A) of the MLA, 30 U.S.C. 201(a)(2)(A), requires that any entity that holds and has held a Federal Coal Lease for 10 years beginning on or after August 4, 1976, and that is not producing coal in commercial quantities from each such lease cannot qualify for the issuance of any other lease granted under the MLA. 43 CFR 3472 explains coal lessee compliance with Section 2(a)(2)(A).

In accordance with the terms of this oil and gas lease with respect to compliance by the initial lessee with qualifications concerning Federal coal lease holdings, all assignees and transferees are hereby notified that this oil and gas lease is subject to cancellation if: (1) the initial lessee as assignor or as transferor has falsely certified compliance with Section 2(a)(2)(A) because of a denial or disapproval by a State Office of a pending coal action, i.e., arms-length assignment, relinquishment, or logical mining unit; (2) the initial lessee as assignor or as transferor is no longer in compliance with Section 2(a)(2)(A); or (3) the assignee or transferee does not qualify as a bona fide purchaser and, thus, has no rights to bona fide purchaser protection in the event of cancellation of this lease due to noncompliance with Section 2(a)(2)(A).

The lease case file, as well as in other Bureau of Land Management (BLM) records available through the State Office issuing this lease, contains information regarding assignor or transferor compliance with Section 2(a)(2)(A).

**MTMT106370202**

# LEASE NOTICE

## Threatened and Endangered Species Act

The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. The BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that would contribute to a need to list such a species or their habitat. The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. The BLM will not approve any ground-disturbing activity until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. § 1531 et seq. including completion of any required procedure for conference or consultation.

**MTMT106370202**

# LEASE NOTICE

## Cultural Resources

The Surface Management Agency is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures.

This notice would be consistent with the present Montana State Office guidance for cultural resource protection related to oil and gas operations (NTL-MSO-85-1).

**MTMT106370202**

# LEASE NOTICE

## Paleontological Resource Inventory Requirement

This lease has been identified as being located within geologic units rated as being moderate to very high potential for containing significant paleontological resources. The locations meet the criteria for class 3, 4 and/or 5 as set forth in the Potential Fossil Yield Classification System, WO IM 2008-009, Attachment 2-2. The BLM is responsible for assuring that the leased lands are examined to determine if paleontological resources are present and to specify mitigation measures. Guidance for application of this requirement can be found in WO IM 2008-009 dated October 15, 2007, and WO IM 2009-011 dated October 10, 2008.

Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or project proponent shall contact the BLM to determine if a paleontological resource inventory is required. If an inventory is required, the lessee or project proponent will complete the inventory subject to the following:

- the project proponent must engage the services of a qualified paleontologist, acceptable to the BLM, to conduct the inventory.

- the project proponent will, at a minimum, inventory a 10-acre area or larger to incorporate possible project relocation which may result from environmental or other resource considerations.

- paleontological inventory may identify resources that may require mitigation to the satisfaction of the BLM as directed by WO IM 2009-011.

**MTMT106370202**

# LEASE NOTICE

## Cultural Visual Setting

The lease is located adjacent to known historic properties that are or may be eligible for listing on the National Register of Historic Places (NRHP). The lease may in part or whole contribute to the importance of the historic properties and values, and listing on the NRHP. The operator may be required to implement specific measures to reduce impacts of oil and gas operations on historic properties and values. These measures may include, but are not limited to, project design, location, painting and camouflage. Such measures shall be developed during the on-site inspection and environmental review of the application for permit to drill (APD), and shall be consistent with lease rights.

The goal of this Lease Notice is to provide information to the lessee and operator that would help design and locate oil and gas facilities to preserve the integrity and value of historical properties that are or may be listed on the National Register of Historic Places.

This notice is consistent with the present Montana guidance for cultural resource protection related to oil and gas operations (NTL-MSO-85-1).

MTMT106370202

# LEASE NOTICE

## Air Resource Analysis

The lessee/operator is given notice that prior to project-specific approval, additional air resource analyses may be required in order to comply with the NEPA, FLPMA, and/or other applicable laws and regulations. Analyses may include equipment and operations information, emission inventory development, dispersion modeling or photochemical grid modeling for air quality and/or air quality related value impact analysis, and/or emission control determinations. These analyses may result in the imposition of additional project-specific control measures to protect air resources.

**MTMT106370202**

# LEASE NOTICE

## Special Status Species

The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or requirements of the ESA as amended, 16 U.S.C. § et seq., including completion of any required procedure for conference or consultation.

**MTMT106370202**

# LEASE NOTICE

## Migratory Bird Treaty Act

The Operator is responsible for compliance with provisions of the Act by implementing one of the following measures;

a) avoidance by timing; ground disturbing activities will not occur from April 15 to July 15,

b) habitat manipulation; render proposed project footprints unsuitable for nesting prior to the arrival of migratory birds (blading or pre-clearing of vegetation must occur prior to April 15 within the year and area scheduled for activities between April 15 and July 15 of that year to deter nesting, or

c) survey-buffer-monitor; surveys will be conducted by a BLM approved biologist within the area of the proposed action and a 300 foot buffer from the proposed project footprint between April 15 to July 15 if activities are proposed within this timeframe.

If nesting birds are found, activities would not be allowed within 0.1 miles of nests until after the birds have fledged. If active nests are not found, construction activities must occur within 7 days of the survey. If this does not occur, new surveys must be conducted. Survey reports will be submitted to the appropriate BLM Office.

**MTMT106370202**

# LEASE NOTICE

## Cultural Resources Setting Consideration Zones

This lease is known to contain historic properties or resources protected under NHPA that contain a Setting Consideration Zone where the integrity of the setting is known to be an important contributing element of NRHP significance of the property, and applies to the following historic properties: Wolf Mountains Battlefield NHL and Battle Butte Battlefield ACEC; Reynolds Battlefield site and Reynolds Battlefield ACEC; Cedar Creek Battlefield site and Cedar Creek Battlefield ACEC; and the Long Medicine Wheel ACEC, and all significant Cultural Resources, NRHP-eligible Properties and Districts, and TCPs, NHLs and Historic Battlefields and the Lewis and Clark National Historic Trail.

**MTMT106370202**

# LEASE NOTICE

## Setback From Human Occupied Residences Requirement

The Lease area may contain human occupied dwellings. Under Regulation 43 CFR 3101.1-2 and terms of the lease (BLM form 3100-11), the authorized officer may require reasonable measures to minimize adverse impacts to other resource values, land uses, and users not addressed in lease stipulations at the time operations are proposed. Such reasonable measures may include, but are not limited to, modification of siting or design of facilities, which may require relocating proposed operations up to 200 meters, but not off the leasehold.

The setback requirement of 500 feet from human occupied dwellings has been established based upon the best information available. The following condition of approval may be applied as a result of the Application for Permit to Drill (APD) process during the on-site inspection and the environmental review unless an acceptable plan for mitigation of impacts is reached between the resident, lessee and BLM:

- Facilities will not be allowed within 500 feet of human occupied residences.

The intent of this Lease Notice is to provide information to the lessee that would help design and locate oil and gas facilities to preserve the aesthetic qualities around human occupied dwellings.

**MTMT106370202**

# LEASE NOTICE

## Cultural Inventory Requirement

An inventory of those portions of the leased lands subject to proposed disturbance may be required prior to any surface disturbance to determine whether cultural resources are present and to identify needed mitigation measures. Prior to undertaking any surface- disturbing activities on the lands covered by this lease, the lessee or operator shall:

1. Contact the Surface Management Agency (SMA) to determine whether a cultural resource inventory is required. If an inventory is required, then:

2. The SMA will complete the required inventory; or the lessee or operator, at their option may engage the services of a cultural resource consultant acceptable to the SMA to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the standard ten-acre minimum to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the SMA for review and approval no later than that time when an otherwise complete application for approval of drilling or subsequent surface-disturbing operation is submitted.

3. Implement mitigation measures required by the SMA. Mitigation may include the relocation of proposed lease-related activities or other protective measures such as data recovery and extensive recordation. Where impacts to cultural resources cannot be mitigated to the satisfaction of the SMA, surface occupancy on that area must be prohibited. The lessee or operator shall immediately bring to the attention of the SMA any cultural resources discovered as a result of approved operations under this lease, and shall not disturb such discoveries until directed to proceed by the SMA.

**MTMT106370202**

# LEASE NOTICE

## Raptors

The lease area may contain raptor nest sites active within the last 7 years. At the development stage when surface-disturbing activities are proposed, an active nest inventory of the project area may be required. If active nests are found within 1/4 mile of the proposed action, surface occupancy and use may be prohibited. If active nests are found within 1/2 mile of the proposed action, surface occupancy and use may be restricted from March 1 through July 31. The BLM may require modification to exploration or development proposals to protect active raptor nests, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated.

**MTMT106370202**

# LEASE NOTICE

## Big Game Winter Range and Migration Corridors

The lease area may contain habitat for big game winter range and/or migration corridors delineated by Montana Fish, Wildlife and Parks. The lessee/operator is given notice that prior to project-specific approval, the authorized officer may require modifications to exploration and development proposals to conserve or restore habitat necessary to sustain local and regional big-game populations (Secretarial Order 3362, February 9, 2018 and 43 CFR 3101.1-2). The objective of the requirements would be to conserve, restore, minimize, avoid and/or limit activities that could impact habitat for big game winter range and/or migration corridors Site-specific requirements would be identified during environmental review processes and would be developed into the project proposal or as terms and conditions of the subsequent approval.

**MTMT106370202**

## STREAMS, WATERBODIES, RIPARIAN, WETLAND, AND FLOODPLAINS

**Stipulation:** Surface occupancy and use is prohibited within perennial or intermittent streams, lakes, ponds, reservoirs, 100-year floodplains, wetlands, and riparian areas.

Objective: To protect the unique biological and hydrological features and functions associated with perennial and intermittent streams, lakes, ponds, reservoirs, floodplains, wetlands, and riparian areas.

Exception: No exceptions would be allowed in streams, natural lakes, or wetlands. An exception may be granted by the AO for riparian areas, floodplains, and artificial ponds or reservoirs if the operator can demonstrate that:

- o there are no practicable alternatives to locating facilities in these areas,
- o the proposed actions would maintain or enhance resource functions, and
- o all reclamation goals and objectives would be met.

Modification: The AO may modify the boundaries of the stipulated area if it is determined that portions of the leasehold do not include these types of areas.

Waiver: The AO may waive this stipulation if it is determined that the entire leasehold does not include these types of areas.

**On the lands described below:**

All Lands